# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| KANSAS NATURAL RESOURCE COALITION; CAMERON EDWARDS; LONE BUTTE FARM, LLC; SCHILLING LAND, LLC; and JDC FARMS, INC., | Civil Action Case No._____ |
|                 Petitioners and Plaintiffs, | |
|   v. | |
| UNITED STATES FISH AND WILDLIFE SERVICE; UNITED STATES DEPARTMENT OF THE INTERIOR; DEBRA HAALAND, in her official capacity as Secretary of the Department of the Interior; and MARTHA WILLIAMS, in her official capacity as Director of the United States Fish and Wildlife Service, | |
|               Respondents and Defendants. | |

## PETITION FOR REVIEW AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.      Petitioners and Plaintiffs Kansas Natural Resource Coalition (KNRC); Cameron Edwards; Lone Butte Farm, LLC; Schilling Land, LLC; and JDC Farms, Inc. (collectively, the "Counties and Private Landowners"), ask for review and action for declaratory and injunctive relief against Respondents and Defendants the United States Fish and Wildlife Service; the United States Department of the Interior; Debra Haaland, in her official capacity as Secretary of the Department of the Interior; and Martha Williams, in her official capacity as Director of the United States Fish and Wildlife Service (collectively, the "Service"). The Counties and Private Landowners challenge the Service's November 25, 2022, final Endangered Species Act (ESA) section 4(d) rule extending protective regulations to the threatened Northern Distinct Population Segment (DPS) of the lesser prairie-chicken. *See* 87 Fed. Reg. 72,674, 72,748–55 (Nov. 25, 2022) (the "4(d) Rule"). This petition for review and action for declaratory and injunctive relief is brought pursuant to 16 U.S.C. § 1540(c) and (g) (judicial review of actions arising under the ESA); 5 U.S.C. § 611 (judicial review of final agency action under the Regulatory Flexibility Act (RFA)); and 5 U.S.C. §§ 702, 706 (judicial review of final agency action under the Administrative Procedure Act (APA)).

2.      The Counties and Private Landowners are a group of local government jurisdictions and family businesses. For generations, the Edwards and Schilling families have operated ranching and farming businesses on the expansive plains of Western Kansas. The Kansas Natural Resource Coalition is a coalition of county governments located throughout western and south-central

Kansas who manage natural resources on behalf of, and provide essential services to, citizens like the members of the Edwards and Schilling families.

3.     The Counties and Private Landowners must contend with geographic isolation and a harsh climate to provide essential services to their citizens and conduct their business operations. These challenges are amplified by the Endangered Species Act.

4.     ESA regulations inflict significant burdens on ordinary land use. They impose often insurmountable regulatory hurdles to day-to-day land use and resource management; force landowners to forgo economically beneficial activities; reduce the market value of affected lands; and expose landowners to potentially ruinous civil and even criminal penalties. It is therefore crucially important that, when considering the imposition of such burdens, federal decision-makers follow the requirements set forth by Congress.

5.     In November 2022 the collective goals of the Edwardses, Schillings, and KNRC's member-counties were placed in jeopardy, when the Service finalized a rule to extend protective regulations to the Northern DPS of the lesser prairie-chicken, pursuant to section 4(d) of the ESA. *See* 87 Fed. Reg at 72,748–52.

6.     The 4(d) Rule broadly prohibits "take" of the Northern DPS of the lesser prairie-chicken, subject to three narrow exceptions. *See id.* at 72,748–52. In doing so, it prohibits a staggering array of ordinary land use activities throughout the species' range, severely injuring the livelihoods of landowners such as the members of the Schilling and Edwards families and presenting significant regulatory challenges to members of KNRC.

7.     In extending protective regulations to the Northern DPS of the lesser prairie-chicken, the Service willfully ignored the limitations Congress placed upon its power. It explicitly refused to consider the costs and benefits of such broad regulation; violated basic principles of

reasoned administrative decision-making; and shrugged off the Regulatory Flexibility Act's requirement that it consider the impacts of its actions on small entities—such as the Counties and Private Landowners.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); 16 U.S.C. § 1540(c) and (g) (judicial review of actions arising under the ESA); 5 U.S.C. § 611 (judicial review of final agency action under the RFA, as amended); 5 U.S.C. §§ 702, 706 (judicial review of final agency action under the APA).

9.     This Court has authority to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, and to vacate unlawful agency action under 5 U.S.C. § 706.

10.     On April 12, 2023, more than 60 days before the filing of this complaint, the Counties and Private Landowners provided the Secretary of the Interior and the Director of the United States Fish and Wildlife Service with written notice of the violations that are the subject of this lawsuit, in accordance with 16 U.S.C. § 1540(g)(2)(C). This notice is attached as Exhibit 1 and is incorporated herein by reference. The Service responded to the Counties and Private Landowners' notice by letter. In its response, the Service maintained that its decision to extend protective regulations to the Northern DPS of the lesser prairie-chicken pursuant to ESA section 4(d) is correct and complied with the ESA. The Service's response is attached as Exhibit 2.

11.     The Counties and Private Landowners assert that the 4(d) Rule constitutes unlawful, arbitrary, and capricious agency action. An actual, justiciable controversy now exists between the Counties and Private Landowners, and the Service.

12.     The federal government has waived sovereign immunity in this action pursuant to 16 U.S.C. § 1540(g) and 5 U.S.C. § 702.

4

13.     The Counties and Private Landowners have exhausted all available administrative remedies.

14.     The Counties and Private Landowners are injured by the 4(d) Rule. Invalidation of the 4(d) Rule will redress those injuries.

15.     Venue is proper under 28 U.S.C. § 1391(e)(1)(C) because the Respondents and Defendants are officers, employees, and agencies of the United States and the Petitioners and Plaintiffs reside within the District of Kansas. *See also* 5 U.S.C. § 703 (venue for actions under the Administrative Procedure Act is generally proper in "a court of competent jurisdiction").

**DESCRIPTION OF PARTIES AND STANDING ALLEGATIONS**

**Petitioners and Plaintiffs**

16.     The ***Kansas Natural Resource Coalition*** is a coalition of 30 Kansas Boards of County Commissioners located throughout western and south-central Kansas.[1]

17.     KNRC promotes local government participation in federal and state policy on conservation and natural resource issues. KNRC believes that local governments are in the best position to study, manage, and conserve natural resources, while also respecting private property rights, economic impacts, and other fundamental concerns. It promotes counties taking a greater role in managing natural resources and exercising an appropriate influence on federal environmental decision-making.

---

[1] KNRC's member counties are: Barton, Clark, Coffey, Comanche, Edwards, Finney, Ford, Gove, Graham, Haskell, Hodgeman, Kearny, Kiowa, Lane, Logan, Meade, Morton, Ness, Pawnee, Rooks, Rush, Russell, Seward, Sheridan, Sherman, Stafford, Stevens, Thomas, Trego, and Wallace counties.

18.     Member counties fund KNRC, and those counties' commissioners govern it. KNRC employs an Executive Director to oversee the day-to-day operations and communicate decisions and positions taken by the organization.

19.     The majority of KNRC's member counties are located within the areas identified in the Service's published range maps for the Northern DPS of the lesser prairie-chicken. *See* 87 Fed. Reg. at 72,682. As a result, KNRC devotes substantial resources to advocacy on regulatory issues pertaining to the lesser prairie-chicken. KNRC publishes information and performs research on the lesser-prairie-chicken; has submitted comments to government agencies addressing concerns about how lesser prairie-chicken regulation under the ESA will affect its members; and engaged in litigation when members were threatened by illegal government action impacting lesser prairie-chicken regulation. *See Kansas Nat. Res. Coal. v. U.S. Dep't of Interior*, 971 F.3d 1222 (10th Cir. 2020) (challenging Service's failure to submit its Policy for Evaluating Conservation Efforts When Making Listing Decisions to Congress as required by the Congressional Review Act, a failure with significant implications for the federal listing of the lesser prairie-chicken).

20.     The Service's illegal 4(d) Rule for the Northern DPS of the lesser prairie-chicken frustrates KNRC's objectives and forces KNRC to expend additional resources advocating for and educating its affected members counties.

21.     KNRC seeks through this lawsuit to protect its member counties' interests germane to its purpose. KNRC's member counties have standing to challenge the 4(d) Rule in their own right but their participation is not required for this lawsuit. KNRC's member counties are injured by the 4(d) Rule in at least three ways.

22.     First, many of KNRC's member counties engage in resource management activities and provide essential public services in native grassland areas containing lesser prairie-chicken

habitat. These activities include the regular use of heavy machinery to blade gravel roads; the use of machinery to maintain bridges and culverts; the spraying of herbicides to control noxious weeds in grassland areas; and the erection and maintenance of radio towers for emergency management. According to the Service, these activities may lead to incidental take of the species and are therefore directly regulated under the 4(d) Rule. *See* 87 Fed. Reg. at 72,749. As such, the 4(d) Rule will directly injure the ability of KNRC's member counties to provide basic and essential services to their citizens. As a result of the 4(d) Rule, KNRC's member counties must expend additional resources to ensure their activities in native grassland areas do not result in take of the lesser prairie-chicken. And they will likely need to forgo many beneficial natural resource management and public service activities altogether.

23.     Second, the 4(d) Rule frustrates existing cooperative efforts between its members to conserve the lesser prairie-chicken—imposing a federal mandate at the expense of local control.

24.     Third, the 4(d) Rule will have a devastating impact on the industries that drive the local economies of KNRC's member counties—such as ranching and energy development—negatively impacting county tax receipts.

25.     These injuries are traceable to the 4(d) Rule. Setting aside the 4(d) Rule will redress these injuries.

26.     Each of KNRC's member counties has a population of less than 50,000 people and is therefore a small entity for purposes of the RFA. *See* 5 U.S.C. § 601(5).

27.     KNRC submitted comments in opposition to the proposed ESA section 4(d) rule for the Northern DPS of the lesser prairie-chicken.[2]

28.     **Lone Butte Farm, LLC**, is a Kansas limited liability company that grows corn, wheat, sorghum, and cover crops; ranches cattle; and operates two oil wells. Lone Butte Farm operates on approximately 7,000 acres of privately owned land, leased from private landowners in Logan County, Kansas. This land is owned by **Cameron Edwards**, other members of the Edwards family, and several additional private landowners. Lone Butte Farm is owned and operated by Mr. Edwards and other members of the Edwards family.

29.     The Edwards family are proud stewards of their land. Due to the importance of maintaining healthy rangeland to conduct their cattle grazing operations, the Edwards family maintains approximately 3,000 contiguous acres of native grassland. The Edwards family's herd thrives under the same conditions that the lesser prairie-chicken does. As a result, their property contains a large amount of high-quality native grassland habitat.

30.     That careful stewardship is now penalized. Because the Edwards family's property is identifiable within the Service's published range maps for the lesser prairie-chicken, *see* 87 Fed. Reg. at 72,682, and because the family has maintained large areas of native grassland habitat, the 4(d) Rule imposes significant direct regulatory burdens upon their business operations. The 4(d) Rule injures the Edwards family in at least five ways.

---

[2] *See* Comment from Kansas Natural Resource Coalition, Federal Comment ID No. FWS-R2-ES-2021-0015-0347, *available at* https://www.regulations.gov/comment/FWS-R2-ES-2021-0015-0347. *See also* Comment from Pacific Legal Foundation, Kansas Natural Resource Coalition, Kenneth Klemm, and Beaver Creek Buffalo Company, Federal Comment ID No. FWS-R2-ES-2021-0015-0327, *available at* https://www.regulations.gov/comment/FWS-R2-ES-2021-0015-0327.

31.     First, the 4(d) Rule requires ranchers wishing to avoid liability for take to conduct grazing activities in accordance with a site-specific grazing plan. *See* 87 Fed. Reg. at 72,750. This condition effectively requires the Edwards family to hire a Service-approved consultant to develop a grazing plan before they can run cattle on their property—leading to significant compliance costs and costly alterations to their operations.

32.     Second, the Edwards family operates motorized vehicles on their property; maintain trails; repair and erect vertical structures such as windmills and fences; and perform various activities to develop and maintain the existing oil and gas infrastructure on their property. Each of these activities is heavily regulated if not entirely prohibited by the 4(d) Rule. *See id.* at 72,749. The Edwards family is therefore required to expend additional resources to ensure these activities do not result in take of the lesser prairie-chicken. And due to the cost and regulatory burdens associated with the 4(d) Rule, the Edwards family will need to forgo many of these economically beneficial activities altogether.

33.     Third, the 4(d) Rule will severely restrict the Edwards family's future land use planning decisions by prohibiting the conversion of the native grasslands on their property to other land uses—such as row crop agriculture. *See id.* As such, the 4(d) Rule will stifle the Edwards family's ability to productively use their land and eliminate many options for growing their business in the future.

34.     Fourth, the 4(d) Rule subjects the Edwards family to the risk of citizen suits and agency enforcement actions under the ESA, further adding to their operational costs.

35.     Fifth, the 4(d) Rule has reduced the market value of the Edwards family's property, due to public perceptions of the burdens imposed by endangered species regulations.

36.     These economic injuries are traceable to the 4(d) Rule. Setting aside the 4(d) Rule will redress these injuries.

37.     Lone Butte Farm, LLC, is a beef cattle ranching and corn farming operation with less than $2.5 million in annual receipts and is an oil and gas extraction operation with fewer than 1,250 employees. It therefore qualifies as a small business for purposes of the RFA. *See* 13 C.F.R. § 121.201.

38.     ***JDC Farms, Inc.***, is a Kansas for-profit corporation that grows crops and raises cattle on approximately 10,000 acres of privately owned land in Wallace County, Kansas. This land is owned by ***Schilling Land, LLC***, a Kansas limited liability company. JDC Farms, Inc., and Schilling Land, LLC, are owned and operated by Ronald and Marsha Schilling.

39.     The Schillings are proud stewards of their land and have conserved approximately 6,000 acres of native grassland on their property. Prior to the finalization of the 4(d) Rule for the lesser prairie-chicken, the Schillings saw no conflict between their cattle grazing operations and the maintenance of high-quality native grassland habitats. Indeed, during the past five years, the Schillings have converted significant amounts of previously cultivated farmland to native grassland.

40.     The Schillings are now being punished. Because the Schilling family's property is identifiable within the Service's published range maps for the lesser prairie-chicken, *see* 87 Fed. Reg. at 72,682, and because the Schillings have maintained and reclaimed large areas of native grassland habitat, the 4(d) Rule imposes significant direct regulation upon their business operations. The 4(d) Rule injures the Schillings in at least five ways.

41.     First, the 4(d) Rule requires ranchers wishing to avoid potential liability for take to conduct grazing activities in accordance with a site-specific grazing plan. *See* 87 Fed. Reg. at

72,750. Seeking such a permit will lead to significant compliance costs and costly alterations to the Schillings' operations.

42.    Second, the Schillings perform numerous economically beneficial activities within grassland habitats on their property that are now directly regulated under the 4(d) Rule. These activities include operating motorized vehicles; maintaining trails, roads, and water pipelines; and repairing and erecting vertical structures such as windmills and fences. Each of these activities is heavily regulated if not entirely prohibited by the 4(d) Rule. *See id.* at 72,749. As such, the 4(d) Rule requires the Schillings to expend additional resources to ensure their activities in grassland areas do not result in take of the lesser prairie-chicken. And due to the cost and regulatory burdens associated with the 4(d) Rule, they will need to forgo many of these economically beneficial activities altogether.

43.    Third, the 4(d) Rule will severely restrict the Schillings' future land use planning decisions, by effectively prohibiting the conversion of native grasslands to other land uses—such as farmland for growing wheat and corn. *See id.* As such, the 4(d) Rule will stifle their ability to productively use their land and eliminate many options for growing their business in the future.

44.    Fourth, the 4(d) Rule has reduced the market value of the Schillings' property, due to public perceptions of the burdens imposed by endangered species regulations.

45.    Fifth, the 4(d) Rule subjects the Schillings to the risk of citizen suits and agency enforcement actions under the ESA, further adding to their operational costs.

46.    These injuries are traceable to the 4(d) Rule. Setting aside the 4(d) Rule will redress these injuries.

47.    Schilling Land, LLC, is a lessor of real estate property with less than $34.0 million in annual receipts. It therefore qualifies as a small business for purposes of the RFA. *See* 13 C.F.R. § 121.201.

### Respondents and Defendants

48.    The ***United States Fish and Wildlife Service*** is an agency of the Department of the Interior. The Service has been delegated responsibility by the Secretary of the Interior for the day-to-day administration of the ESA with respect to most terrestrial and freshwater plant and animal species. This includes issuing protective regulations for threatened species pursuant to 16 U.S.C. § 1533(d). The Service's 4(d) Rule extending protective regulations to the threatened Northern DPS of the lesser prairie-chicken is the subject this action.

49.    The ***United States Department of the Interior*** is an agency of the United States that administers and implements the ESA with respect to most terrestrial and freshwater plant and animal species. This includes issuing protective regulations for threatened species pursuant to 16 U.S.C. § 1533(d). The Service's 4(d) Rule extending protective regulations to the threatened Northern DPS of the lesser prairie-chicken is the subject of this action.

50.    ***Debra Haaland*** is the Secretary of the United States Department of the Interior. In that capacity Secretary Haaland is responsible for the administration of the ESA with respect to most terrestrial and freshwater plant and animal species. She is sued in her official capacity.

51.    ***Martha Williams*** is the Director of the United States Fish and Wildlife Service. In that capacity, Director Williams oversees the United States Fish and Wildlife Service's administration of the ESA. She is sued in her official capacity.

## LEGAL BACKGROUND

## The Endangered Species Act

### Listing of Threatened or Endangered Species

52.     To receive protection under the Endangered Species Act, a "species" must be determined to be "endangered" or "threatened," based on certain factors. *See* 16 U.S.C. § 1533(a). A "species" includes "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." *Id*. § 1532(16).

53.     A species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range." *Id*. § 1532(6). A species is "threatened" if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id*. § 1532(20).

54.     Section 4(a)(1) of the ESA provides five factors which the Service must consider in determining whether a species is threatened or endangered. *See* 16 U.S.C. § 1533(a)(1). Section 4(b)(1)(A) adds that "[t]he Secretary shall make such determinations required by [section 4(a)(1)] solely on the basis of the best scientific and commercial data available to him." *Id.* § 1533(b)(1)(A).

### The ESA's prohibition of "take" for endangered species

55.     The distinction between endangered and threatened status has significant implications for the federal regulation of private property that is authorized by the ESA.

56.     As an additional safeguard for endangered species, befitting their greater risk of extinction, section 9 of the ESA forbids the "take" of such species. *See* 16 U.S.C. §§ 1532(19); 1538(a).

57.     The term "take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id*. § 1532(19). The term "harm" includes "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3.

58.     Under certain circumstances a landowner may seek a permit to allow for incidental take of a species. *See* 16 U.S.C. § 1539(a)(1)(B). *See also* 50 C.F.R. § 17.32. However, the process for obtaining such a permit is time consuming, costly, and burdensome. *See* 16 U.S.C. § 1539(a)(2). To receive such a permit a landowner must create a conservation plan and is generally required to agree to significant project modifications and costly mitigation. *See id. Cf.* Robert Gordon, *"Whatever the Cost" of the Endangered Species Act, It's Huge*, Competitive Enterprise Institute OnPoint No. 247, Competitive Enter. Inst., at 9 (Aug. 20, 2018).[3]

59.     The ESA imposes harsh civil and criminal penalties for violation of its take prohibition. 16 U.S.C. § 1540(a)–(b). *See also* 88 Fed. Reg. 5796 (Jan. 30, 2023).

60.     The ESA provides for citizen enforcement of its prohibitions. 16 U.S.C. § 1540(g).

***Protective regulation under ESA Section 4(d)***

61.     Recognizing the take prohibition's stringency, Congress expressly limited its application to those species on the brink of extinction—endangered species. *See* 16 U.S.C. § 1538(a).

62.     In section 4(d) of the ESA, Congress permitted that the take prohibition could be extended to particular threatened species, but only if "necessary and advisable to provide for the conservation" of that species. 16 U.S.C. § 1533(d). *See also* S. Rep. No. 93-307, at 8 (1973)

---

[3] *Available at* https://cei.org/studies/whatever-the-cost-of-the-endangered-species-act-its-huge/.

("[O]nce he has listed a species of fish or wildlife as a threatened species," the Secretary may prohibit take "as to the particular threatened species.").

63.    But take of threatened species would be presumptively unregulated because Congress wished for states to take the lead on regulating these species. *See* Congressional Research Service, A Legislative History of the Endangered Species Act of 1973, as Amended in 1976, 1977, 1978, 1979, and 1980 (hereafter, "ESA Legislative History"), at 357 (1982) (statement of Sen. Tunney) ("States . . . are encouraged to use their discretion to promote the recovery of threatened species . . . .").

64.    Even when occurring concurrently with the initial listing, the extension of protective regulations to a threatened species is a necessarily distinct regulatory action that is subject to a separate statutory standard. *Compare* 16 U.S.C. § 1533(a)(1), (b)(1)(A) (determining that listing determinations must be made on the basis of the five listing factors and "the best scientific and commercial data available") *with id.* § 1533(d) (determining that protective regulation may be extended to particular threatened species where the Service "deems [such regulation] necessary and advisable to provide for the conservation of such species"). *See also* S. Rep. No. 93-307, at 8 (1973) ("[O]nce he has listed a species of fish or wildlife as a threatened species," the Secretary may prohibit take "as to the particular threatened species.").

***The Service's historical "blanket" approach to ESA Section 4(d)***

65.    Notwithstanding the clear distinction set forth by Congress in ESA section 4(d), in 1975 the Service issued a regulation commonly known as the "blanket" 4(d) rule. *See* 40 Fed. Reg. 44,412, 44,414, 44,425 (Sept. 26, 1975), *codified at* 50 C.F.R. § 17.31 (2018). That rule prohibited the take of all threatened species, including any subsequently listed threatened species, unless the

Service issued a separate "special" rule to relax the prohibition for a particular species. *See* 50 C.F.R. § 17.31 (2018).

66.    This regulation was illegal, *see* Jonathan Wood, *Take it to the Limit: The Illegal Regulation Prohibiting the Take of Any Threatened Species Under the Endangered Species Act*, 33 Pace Envtl. L. Rev. 23 (2015), and in 2019 the Service prospectively repealed it, restoring the statutory default, *see* 84 Fed. Reg. 44,753 (Aug. 27, 2019).

67.    The illegal "blanket" approach was briefly revived between July 5, 2022, and September 21, 2022, following a district court's vacatur of the 2019 repeal rule. *See* Order Granting Motion to Remand and Vacating Challenged Regulations, *Ctr. for Biological Diversity v. Haaland*, No. 4:19-cv-05206 (N.D. Cal. July 5, 2022), ECF No. 168. However, a subsequent appellate decision ensured the continued operation of the 2019 non-"blanket" approach. *See In re Washington Cattlemen's Ass'n*, No. 22-70194, 2022 WL 4393033, at *1 (9th Cir. Sept. 21, 2022) (staying district court's order and reinstating 2019 repeal rule). *See also* Amended Order Granting Motion to Remand, *Ctr. for Biological Diversity v. Haaland*, No. 4:19-cv-05206 (N.D. Cal. July 5, 2022), ECF No. 198 (amending previous order and leaving 2019 repeal rule in place pending further agency rulemaking).

## Regulatory Flexibility Act

68.    The Regulatory Flexibility Act was passed by Congress to minimize unnecessary impacts of federal regulations on "small entities."

69.    A "small entity" is any small business, small organization, or small governmental organization. 5 U.S.C. § 601(3), (6).

70.    The term "small business" is used as it is defined in the Small Business Act. *Id.* § 601(3). Pursuant to the Small Business Act, the Administrator of the Small Business

Administration (SBA) has specified detailed standards by which an entity will qualify as a "small business." 15 U.S.C. § 632(a)(2)(A).

71.    Under these standards, beef cattle ranching and corn farming operations with less than $2.5 million in annual receipts; oil and gas extraction operations with fewer than 1,250 employees; and lessors of real estate property with less than $34.0 million in annual receipts, are small businesses for purposes of the RFA. *See* 13 C.F.R. § 121.201.

72.    The RFA defines "small governmental jurisdiction" to mean any government of a city, county, town, township, village, school district, or special district, with a population of fewer than 50,000 people. 5 U.S.C. § 601(5).

73.    The RFA requires that whenever an agency publishes a general notice of proposed rulemaking, it must also "prepare and make available for public comment" an "initial regulatory flexibility analysis," describing the impact of the proposed rule on small entities. 5 U.S.C. § 603(a).

74.    This initial regulatory flexibility analysis must include, among other things, an estimate of the number of small entities likely to be affected by the rule, a description of less burdensome alternatives to the proposed rule, and a description of projected compliance requirements. 5 U.S.C. § 603.

75.    The RFA also requires the agency to complete a final regulatory flexibility analysis when adopting a final rule. This analysis must include, among other things, "a description of the steps the agency has taken to minimize the significant economic impact on small entities." 5 U.S.C. § 604.

76.    These requirements apply unless the head of the agency correctly "certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." *Id.* § 605(b).

77.     The RFA provides that "a small entity that is adversely affected or aggrieved by final agency action is entitled to judicial review of agency compliance with the requirements of sections 601, 604, 605(b), 608(b), and 610 in accordance with the [APA]." 5 U.S.C. § 611(a).

## Administrative Procedure Act

78.     The Administrative Procedure Act ("APA") provides that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704.

79.     Pursuant to the APA, a court must set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in excess of statutory authority; or otherwise fails to meet statutory, procedural, or constitutional requirements. 5 U.S.C. § 706(2)(A)–(D).

## FACTUAL ALLEGATIONS

## The Service's 2022 Listing of Two DPS of Lesser Prairie-Chicken Under the ESA

80.     The lesser prairie-chicken (*Tympanuchus pallidicinctus*) is a species of grouse endemic to the Southern Great Plains Region of Southeastern Colorado, Southwestern Kansas, Western Oklahoma, and the Panhandle and South Plains of Texas. 87 Fed. Reg. at 72,675–76.

81.     The lesser prairie-chicken relies upon open grassland and shrubland habitats across this region. *Id.* at 72,677. The Service has identified habitat loss, degradation, and fragmentation resulting from woody vegetation encroachment and conversion of grassland to cropland, as the primary threat to the species. *See id.* at 72,683–94.

82.    The Service estimates that 97% of the species' range is under private ownership. *See* 86 Fed. Reg. 29,432, 29,444, 29,454 (June 1, 2021). As a result, voluntary programs and cooperative efforts with landowners have been critical to the species' conservation. *See id*.[4]

83.    On November 25, 2022, the United States Fish and Wildlife Service finalized a rule to add two distinct population segments of the lesser prairie-chicken to the federal list of threatened and endangered wildlife, pursuant to the ESA. *See* 87 Fed. Reg. at 72,674, 72,744–45. In doing so, the Service disavowed successful cooperative efforts, in favor of broadly regulating private activity.

84.    The Service listed a Southern DPS—found in New Mexico and Texas—as endangered, and a Northern DPS—found in Colorado, Kansas, Oklahoma, and Texas—as threatened. *Id*.

**The 4(d) Rule for the Northern DPS of the Lesser Prairie-Chicken**

85.    In addition to listing the Northern DPS as threatened, the Service issued species-specific protections pursuant to ESA section 4(d). *Id.* at 72,748–52, *codified at* 50 C.F.R. § 17.41.

86.    The 4(d) Rule for the Northern DPS of the lesser prairie-chicken was promulgated pursuant to the 2019 non-"blanket" approach to ESA section 4(d). *See* 87 Fed. Reg. at 72,682–83. That is, the 4(d) Rule operates to independently impose special protections for the species, over and above the statutory default of no protection. *See* 84 Fed. Reg. at 44,753.

---

[4] Due to these voluntary conservation efforts, the species' population doubled between 2013 and 2018. *See* Western Association of Fish and Wildlife Agencies, *The 2018 Lesser Prairie-Chicken Range-wide Conservation Plan Annual Progress Report* (2019), https://wafwa.org/wp-content/uploads/2020/07/LPCRWP_AnnualReport_2018.pdf. Essential to the continuation of this progress is the maintenance of landowners' incentives to conserve and improve lesser prairie-chicken habitat.

87.    The 4(d) Rule broadly prohibits "take" of the species. The lone exceptions are for the continuation of certain routine agricultural practices on existing cultivated lands (meaning lands cultivated within the preceding five years); grazing pursuant to a site-specific grazing plan; and the implementation of prescribed fire for the purpose of grassland management. *See* 87 Fed. Reg. at 72,748–52.

88.    The breadth of land use activities regulated by the 4(d) Rule is staggering. Activities that may constitute take—and are therefore effectively prohibited—under the 4(d) Rule include (but are not limited to) grazing activities not conducted in accordance with a site-specific grazing plan developed by an entity approved by the Service; conversion of native grassland to cropland or any other land use; seeding of non-native plant species in occupied habitat; herbicide applications resulting in sustained alteration of the lesser prairie-chicken's preferred vegetative features; the installation of power lines and fences (and other vertical structures, such as windmills); the ownership of existing power lines and fences (and other vertical structures) occasioning collisions with the lesser prairie-chicken; native shrub removal; insecticide applications killing native invertebrates upon which the species feeds; and motorized vehicle or machinery use causing the lesser prairie-chicken to avoid an area. 87 Fed. Reg. at 72,749

89.    The 4(d) Rule therefore directly regulates, and effectively prohibits, a large range of ordinary land use activities that might harm the species by altering its habitat or disturbing its life processes. *See id*.

90.    As a result, the 4(d) Rule will impose significant burdens on private landowners and local government entities across Colorado, Kansas, Oklahoma, and Texas. And it will have a devastating impact on the industries that drive local economies within this region, such as energy development, farming, and ranching.

91.    Yet the Service made no attempt to justify the 4(d) Rule under the ESA's "necessary and advisable" standard, beyond rendering a vague conclusion that the rule "as a whole" satisfies the standard. 87 Fed. Reg. at 72,749.

92.    And notwithstanding the staggering implications of the 4(d) Rule, the Service failed to justify the extent to which the 4(d) Rule would apply section 9's prohibitions to common land use activities, beyond a vague conclusion that a "range" of activities have the "potential to affect" the species. *Id.* To support this claim, the Service did little more than list virtually every form of productive land use activity that might conceivably occur within the lesser prairie-chicken's range, and broadly conclude that regulation of these activities is justified to prevent "potential" harm to the species. *Id.*

93.    Worse still, the Service expressly disavowed any obligation to consider the economic and other costs associated with imposing such sweeping regulations under ESA section 4(d). *See* 87 Fed. Reg. at 72,717. Instead, the Service vaguely (and without any attempt at quantification) focused solely on the conservation *benefits* of extending such protections to the lesser prairie-chicken. *Id.* at 72,749–50. The 4(d) Rule addresses only one side of the ledger (conservation benefits), and even there limits its justification to vague and unquantified assertions. *See id.* at 72,749.

94.    Moreover, while it is true that the 4(d) Rule exempts certain land use activities from its restrictions, *see* 87 Fed. Reg. at 72,749–51, in allowing these exemptions, the Service reversed the required analysis. The Service assumed the benefits of broadly applying section 9's prohibitions, before subjecting these prohibitions to three narrow carve-outs. *See id*. This approach—assuming the advisability of full take protection and narrowly exempting certain activities—closely resembles the Service's unlawful pre-2019 approach to promulgating "special"

4(d) rules under the former "blanket" approach to ESA section 4(d). But the blanket 4(d) rule was not in effect when the Service proposed, or finalized, the current 4(d) Rule.

### The Service's Failure to Conduct an RFA Analyses for the 4(d) Rule

95.    When it proposed to extend protective regulations to the Northern DPS of the lesser prairie-chicken, the Service did not include an initial regulatory flexibility analysis, as required by 5 U.S.C. § 603. *See* 86 Fed. Reg. 29,432, *et seq*. Nor did it alternatively certify that the proposed 4(d) rule will not have a significant impact on a substantial number of small entities, as required by 5 U.S.C. § 605(b). *See id.*

96.    In public comments, KNRC identified this omission and brought the Service's attention to the significant burdens the proposed 4(d) rule would impose upon small governmental jurisdictions and small businesses within the Northern DPS of the lesser prairie-chicken's range. *See* Comment from Kansas Natural Resource Coalition, *supra*; Comment from Pacific Legal Foundation, Kansas Natural Resource Coalition, Kenneth Klemm, and Beaver Creek Buffalo Company, *supra*.

97.    However, when it published the final 4(d) Rule, the Service did not include a final regulatory flexibility analysis, as required by 5 U.S.C. § 604. Nor did it alternatively certify that the 4(d) Rule will not have a significant impact on a substantial number of small entities, as required by 5 U.S.C. § 605(b).

98.    Instead, the Service disavowed any obligation to consider the costs and burdens of actions taken pursuant to ESA section 4(d) and refused to engage the RFA's requirements altogether. *See* 87 Fed. Reg. at 72,717.

**The Service's Delay of Effective Date for the 4(d) Rule**

99.   The 4(d) Rule was initially set to take effect on January 24, 2023. *See* 87 Fed. Reg. at 72,674. However, on January 24, 2023, the Service delayed the 4(d) Rule's effective date until March 27, 2023. *See* 88 Fed. Reg. 4087 (Jan. 24, 2023).

100.   In doing so, the Service belatedly recognized the significant compliance burdens created by the 4(d) Rule. *See id.* at 4087–88 ("We recognize that these changes in status will result in questions and concerns about establishing compliance under the Act for grazing, energy development, infrastructure, and many other projects within the five States that comprise the range of the lesser prairie-chicken.").

101.   It also acknowledged the impracticability of landowners' compliance with these significant regulatory burdens, prior to the original effective date. *See id.* at 4088 (acknowledging that as of January 24, 2023, there was only "one Service-approved provider of grazing management plans" throughout the entire five-state region).

**DECLARATORY AND INJUNCTIVE RELIEF ALLEGATIONS**

102.   The Counties and Private Landowners incorporate herein by reference the allegations set forth in the preceding paragraphs.

103.   The Counties and Private Landowners have been injured by the Final 4(d) Rule. If an injunction does not issue against the Service's enforcement of the Final 4(d) Rule, the Counties and Private Landowners will be irreparably harmed. Harms to the Counties and Private Landowners attributable to the 4(d) Rule include, but are not limited to, significant direct regulatory burdens on local governments' day-to-day ability to provide essential services to their citizens; significant encroachment upon local governments' abilities to plan and manage land use and natural resources within their boundaries; continued imposition of significant direct regulatory

burdens on the use and enjoyment of private property; and the outright prohibition of numerous economically beneficial activities conducted on private property.

104.    The Counties and Private Landowners have no plain, speedy, and adequate remedy at law for these injuries. Damages in this case are not available.

105.    The Counties and Private Landowners' claims for relief are ripe.

106.    If not enjoined by the Court, the Service will continue to enforce or rely on the 4(d) Rule in derogation of the Counties and Private Landowners' rights and interests.

107.    An actual and substantial controversy exists between the Counties and Private Landowners and the Service as to their legal rights and duties with respect to the ESA, APA, and RFA in the 4(d) Rule for the Northern DPS of the lesser prairie-chicken.

108.    This case is justiciable because the Service's failure to comply with these laws is the direct result of final agency action that has caused and will continue to cause immediate and concrete injury to the Counties and Private Landowners. Because the 4(d) Rule has imposed substantial regulatory burdens on the economically beneficial use of their property and their day-to-day activities, the Counties and Private Landowners have a vital interest in knowing whether the 4(d) Rule, to which they are subject, is statutorily valid.

109.    Therefore, declaratory and injunctive relief is appropriate to resolve this controversy.

**FIRST CLAIM FOR RELIEF**
***Failure to determine that the 4(d) Rule is "necessary and advisable"***
**(Violation of ESA, 16 U.S.C. § 1533(d); Alternatively, APA, 5 U.S.C. § 706(2)(A))**

110.    The Counties and Private Landowners incorporate herein by reference the allegations set forth in the preceding paragraphs.

111.    In section 4(d) of the ESA, Congress permitted that the take prohibition could be extended to particular threatened species, but only if "necessary and advisable to provide for the conservation" of that species. 16 U.S.C. § 1533(d).

112.    The extension of protective regulations to a threatened species is a necessarily distinct regulatory action to the initial listing of the species and is subject to a separate statutory standard. *See* 16 U.S.C. § 1533(d).

113.    The 4(d) Rule does not contain key information required for making a "necessary and advisable" determination.

114.    In *Michigan v. EPA*, the Supreme Court held that broad standards like "necessary and advisable" may give agencies discretion, but that discretion can only be exercised after thorough consideration of all relevant factors, especially costs imposed on private parties. *See* 576 U.S. 743, 751–52 (2015) (discussing "appropriate" a term similarly as "broad and all-encompassing" as advisable "that naturally and traditionally includes consideration of all the relevant factors" (citation omitted)).

115.    Therefore, the Service can only issue an ESA section 4(d) Rule if it first thoroughly considers the conservation, economic, and other benefits of a rule, and compares these to the conservation, economic, and other costs of the rule.

116.    The Service expressly disavowed any requirement that it consider the economic costs of the 4(d) Rule. Instead, the Service vaguely focused only on the conservation *benefits* of extending such protections to the lesser prairie-chicken.

117.    The Service likewise failed to justify the extent to which the 4(d) Rule would apply section 9's prohibitions to common land use activities, beyond its vague conclusion that a "range" of activities have the "potential to affect" the species. 87 Fed. Reg. at 72,749. Yet it made no

attempt to target the subset of land use activities that are most harmful to the species. This justification for extending the significant restrictions, and imposing the significant costs, associated with section 9's prohibitions of intentional and incidental take, is insufficient under the "necessary and advisable" standard.

118.    While it is true that the 4(d) Rule exempts certain land use activities from its restrictions, in allowing these exemptions the Service fatally reversed the required analysis. The Service simply assumed the benefits of broadly applying section 9's prohibitions, before subjecting these prohibitions to three narrow carve-outs. This approach—which closely resembles the Service's pre-2019 practice of promulgating "special" 4(d) rules under the former "blanket" 4(d) rule—is inadequate under the ESA's "necessary and advisable" standard.

119.    By these acts or omissions, the Service violated the ESA, 16 U.S.C. § 1533(d), or alternatively the APA, 5 U.S.C. § 706(2)(A). Therefore, the 4(d) Rule for the threatened Northern DPS of lesser prairie-chicken is invalid and must be set aside.

## SECOND CLAIM FOR RELIEF
### *Failure to consider all relevant factors*
**(Violation of ESA, 16 U.S.C. § 1533(d); Alternatively, APA, 5 U.S.C. § 706(2)(A))**

120.    The Counties and Private Landowners incorporate herein by reference the allegations set forth in the preceding paragraphs.

121.    An agency's consideration of all relevant factors to guide its decision-making is essential to reasoned administrative decision-making. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 55 (1983).

122.    Consideration of all relevant factors necessarily requires an agency to consider both the advantages *and* disadvantages of pursuing a particular course of action, especially the economic costs of regulation. *See Michigan*, 576 U.S. at 753.

123.     In promulgating the 4(d) Rule, the Service expressly disavowed any requirement that it consider the economic costs of the 4(d) Rule. Instead, the Service vaguely focused only on the conservation *benefits* of extending such protections to the lesser prairie-chicken.

124.     While any benefit to the conservation of the species is a relevant consideration, it is not the only relevant factor the Service must consider.

125.     The Service's justification for the 4(d) Rule is, on its face, insufficient. It addresses only one side of the ledger (conservation benefits), and even there its analysis amounts to nothing more than vague and unquantified assertions.

126.     This failure to consider all relevant factors violates the basic administrative law principle of reasoned decision-making, rendering the 4(d) Rule arbitrary and capricious.

127.     By these acts or omissions, the Service violated the ESA, 16 U.S.C. § 1533(d), or alternatively the APA, 5 U.S.C. § 706(2)(A). Therefore, the 4(d) Rule for the threatened Northern DPS of lesser prairie-chicken is invalid and must be set aside.

### THIRD CLAIM FOR RELIEF
*The 4(d) Rule is ultra vires*
**(Violation of ESA, 16 U.S.C. § 1533(d); Alternatively APA, 5 U.S.C. § 706(2)(C))**

128.     The Counties and Private Landowners incorporate herein by reference the allegations set forth in the preceding paragraphs.

129.     The Administrative Procedure Act requires this Court to hold unlawful and set aside any agency action that exceeds statutory authority. 5 U.S.C. § 706(2)(C).

130.     When an agency claims broad authority "to exercise powers of vast economic and political significance," it "must point to 'clear congressional authorization' for the power it claims." *West Virginia v. EPA*, 142 S. Ct. 2587, 2605, 2609 (2022) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

131.    In the absence of such a clear statement, the agency necessarily lacks the authority it claimed. *See id.*

132.    In rejecting any suggestion that it analyze the costs and benefits of the 4(d) Rule, the Service claims breathtakingly broad authority to regulate pursuant to section 4(d) of the ESA.

133.    In the 4(d) Rule, the Service categorically and indiscriminately forbids an enormous range of private activities across a region spanning Colorado, Kansas, Oklahoma, and Texas. Such regulation will result in significant harm to private landowners, small businesses, and local governments across this region.

134.    The Service has identified no clear statement authorizing it to exercise this sweeping power. And the text of ESA section 4(d) contains no such clear statement.

135.    The Service therefore exceeded its statutory authority under the ESA in issuing the 4(d) Rule.

136.    By these acts or omissions, the Service violated the ESA, 16 U.S.C. § 1533(d), or alternatively the APA, 5 U.S.C. § 706(2)(C). Therefore, the 4(d) Rule for the threatened Northern DPS of lesser prairie-chicken is invalid and must be set aside.

### FOURTH CLAIM FOR RELIEF
*Failure to Issue Regulatory Flexibility Analyses*
**(Violation of RFA, 5 U.S.C. §§ 603, 604, 605(b);**
**Alternatively, APA 5 U.S.C. § 706(2)(A))**

137.    The Counties and Private Landowners incorporate herein by reference the allegations set forth in the preceding paragraphs.

138.    The RFA requires federal agencies to issue initial and final regulatory flexibility analyses detailing the impact of any final agency action on small entities. Each federal agency must do so unless it can certify that the action will not have a significant impact on a substantial number of small entities.

139.    The 4(d) Rule forbids a wide variety of private and public activities, including those likely to be undertaken by small entities covered by the RFA. As such, the 4(d) Rule will both directly and indirectly regulate numerous small businesses and small governmental jurisdictions.

140.    Yet the Service has refused to publish initial and final regulatory flexibility analyses, as required by 5 U.S.C. §§ 603–604. Nor has the Service certified that the 4(d) Rule will not have a significant impact on a substantial number of small entities, as required by 5 U.S.C. § 605(b).

141.    The Service's failure to issue initial and final regulatory flexibility analyses, or alternatively certify that the 4(d) Rule will not have a significant economic impact on a substantial number of small entities, violates the RFA.

142.    By these acts or omissions the Service violated the RFA, 5 U.S.C. §§ 603, 604, 605(b), or alternatively the APA, 5 U.S.C. § 706(2)(A). Therefore, the 4(d) Rule for the threatened Northern DPS of lesser prairie-chicken is invalid and must be set aside.

**PRAYER FOR RELIEF**

Wherefore, Petitioners and Plaintiffs respectfully request the following relief:

**As to the First Claim for Relief:**

1.    Declare that the Respondents and Defendants acted arbitrarily, capriciously, abused their discretion, or otherwise failed to act in accordance with law, when they failed to properly determine that the protective regulations for the Northern DPS of the lesser prairie-chicken were "necessary and advisable" for the conservation of that species, in violation of the ESA, 16 U.S.C. § 1533(d), or alternatively 5 U.S.C. § 706(2)(A).

**As to the Second Claim for Relief:**

2.      Declare that the Respondents and Defendants acted arbitrarily, capriciously, abused their discretion, or otherwise failed to act in accordance with law, when they failed to consider all relevant factors—including economic costs—when extending protective regulations to the Northern DPS of the lesser prairie-chicken, in violation of the ESA, 16 U.S.C. § 1533(d), or alternatively 5 U.S.C. § 706(2)(A).

**As to the Third Claim for Relief:**

3.      Declare that the Respondents and Defendants exceeded their statutory authority in extending protective regulations to the Northern DPS of the lesser prairie-chicken, in violation of the ESA, 16 U.S.C. § 1533(d), or alternatively 5 U.S.C. § 706(2)(C).

**As to the Fourth Claim for Relief**

4.      Declare that ESA section 4(d) rules are not exempt from the requirements of the RFA, and that Respondents and Defendants therefore violated the RFA, 5 U.S.C. §§ 603, 604, and 605(b), by failing to complete initial and final regulatory flexibility analyses prior to extending protective regulations to the Northern DPS of the lesser prairie-chicken, or alternatively certify that extending protective regulations to the Northern DPS of the lesser prairie-chicken would not have a significant economic impact on a substantial number of small entities.

**As to the First, Second, and Third Claims for Relief:**

5.      Set aside the Final Rule extending protective regulations to the Northern DPS of the lesser prairie-chicken or enjoin its enforcement.

6.      Remand the Final Rule for further action in accordance with the ESA and APA.

**As to the Fourth Claim for Relief**

7.    Set aside the Final Rule extending protective regulations to the Northern DPS of the lesser prairie-chicken or enjoin its enforcement against small entities, including the Petitioners and Plaintiffs.

8.    Remand the Final Rule for further action in accordance with the RFA.

**As to all Claims for Relief:**

9.    Award Petitioners and Plaintiffs' reasonable attorney fees and costs, pursuant to 16 U.S.C. § 1540(g)(4), 28 U.S.C. § 2412, or any other appropriate authority; and

10.    Award Petitioners and Plaintiffs any other relief the Court deems just and proper under the circumstances of this case.

DATED: July 20, 2023.

Respectfully submitted,

/s/ Glenn Kerbs

| | |
|---|---|
| CHARLES T. YATES | GLENN KERBS |
| Cal. Bar No. 327704* | D. Kan. No. 09754 |
| DAMIEN M. SCHIFF | Attorney for Petitioners and Plaintiffs |
| Cal. Bar No. 235101* | Kerbs Law Office |
| Attorneys for Petitioners and Plaintiffs | P.O. Box 1473 |
| Pacific Legal Foundation | Dodge City, KS 67801 |
| 555 Capitol Mall, Suite 1290 | Telephone: (620) 225-0238 |
| Sacramento, CA 95814 | Facsimile: (620) 225-0318 |
| Telephone: (916) 419-7111 | Email: gkerbs@kerbslaw.com |
| Facsimile: (916) 419-7747 | |
| Email: cyates@pacificlegal.org | |
| Email: dschiff@pacificlegal.org | |
| | |
| PAIGE E. GILLIARD | * *Pro hac vice forthcoming* |
| Cal. Bar No. 330051* | |
| Attorney for Petitioners and Plaintiffs | |
| Pacific Legal Foundation | |
| 3100 Clarendon Blvd., Suite 1000 | |
| Arlington, VA 22201 | |
| Telephone: (202) 888-6881 | |
| Facsimile: (916) 419-7747 | |
| Email: PGilliard@pacificlegal.org | |