**Exhibit 1**

**60-day Notice**



April 12, 2023

The Honorable Debra A. Haaland                    **VIA CERTIFIED MAIL (PRIORITY)**
Secretary                                                         **RETURN RECEIPT REQUESTED**
U.S. Department of Interior
1849 C Street NW
Washington, DC  20240

The Honorable Martha Williams                    **VIA CERTIFIED MAIL (PRIORITY)**
Director                                                           **RETURN RECEIPT REQUESTED**
U.S. Fish and Wildlife Service
1849 C Street NW, Room 3331
Washington, DC  20240

Re:    60-Day Notice of Intent to Bring a Citizen Suit Pursuant to 16 U.S.C. § 1540(g)

### Table of Contents

Introduction ...................................................................................................................2

Background ...................................................................................................................4

   I.   Statutory Background ...........................................................................4

     A.  Section 4(d) of the ESA ...............................................................4

     B.  The Regulatory Flexibility Act ...................................................6

   II.   The 4(d) Rule for the Northern DPS of the Lesser Prairie-Chicken .........................7

Parties ...........................................................................................................................9

Violations of the Endangered Species Act ...................................................................12

   I.   By ignoring effects on private landowners and local governments, the 4(d)
     Rule fails to explain how it is "necessary and advisable" to the conservation
     of the species, in violation of the unambiguous requirements of the ESA,
     16 U.S.C. § 1533(d) ...........................................................................................12

     A.  The ESA requires the Service to determine that the extension of the take
       prohibition to a threatened species is "necessary and advisable" to the
       conservation of that species ............................................................................13

555 Capitol Mall, Suite 1290  •  Sacramento, CA 95814  •  plf@pacificlegal.org  •  916.419.7111  •  *pacificlegal.org*

The Honorable Debra A. Haaland
The Honorable Martha Williams
April 12, 2023
Page 2

B.   The Service's "necessary and advisable" analysis for the 4(d) Rule ignores effects on private landowners and local governments................................................15

C.   The ESA does not prohibit the consideration of economic costs when making decisions pursuant to section 4(d) ...................................................17

D.   The 4(d) Rule is *ultra vires*.........................................................................19

II.   The Service ignored important aspects of the problem and failed to consider all relevant factors, rendering the 4(d) Rule arbitrary and capricious..................20

Violations of the Regulatory Flexibility Act .............................................................20

Conclusion...................................................................................................................21

Dear Secretary Haaland and Director Williams:

Pursuant to 16 U.S.C. § 1540(g)(2), this letter provides notice of intent to commence civil litigation for violation of the Endangered Species Act, 16 U.S.C. §§ 1531–1544, as well as for violation of the Regulatory Flexibility Act, 5 U.S.C. §§ 601–612. This notice is submitted on behalf of the Kansas Natural Resource Coalition (KNRC); Cameron Edwards; Lone Butte Farm, LLC; Schilling Land, LLC; and JDC Farms, Inc.

## Introduction

Section 4(a) of the Endangered Species Act authorizes the United States Fish and Wildlife Service—exercising authority delegated from the Secretary of the Interior—to list species as endangered or threatened. 16 U.S.C. § 1533(a)(1). An "endangered species" is "any species which is in danger of extinction throughout all or a significant portion of its range." *Id*. § 1532(6). A "threatened species" is any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range. *Id*. § 1532(20). As an additional safeguard for endangered species, befitting their greater risk of extinction, section 9 of the ESA prohibits "take" of such species. *See id*. §§ 1532(19); 1538(a). But for threatened species, take is presumptively unregulated. *See id*. In section 4(d) of the ESA, Congress permitted that the take prohibition could be extended to particular threatened species, but only if "necessary and advisable" for the protection of that species. *See id*. § 1533(d).

On November 25, 2022, the Service finalized a rule to add two distinct population segments (DPS) of the lesser prairie-chicken to the federal list of threatened and endangered wildlife, pursuant to the ESA. *See* Endangered and Threatened Wildlife and Plants; Lesser Prairie-Chicken; Threatened Status With Section 4(d) Rule for the Northern

The Honorable Debra A. Haaland
The Honorable Martha Williams
April 12, 2023
Page 3

Distinct Population Segment and Endangered Status for the Southern Distinct Population Segment, 87 Fed. Reg 72,674 (Nov. 25, 2022). The Service listed a Southern DPS—found in New Mexico and Texas—as endangered, and a Northern DPS—found in Colorado, Kansas, Oklahoma, and Texas—as threatened. *Id*. Additionally, the Service issued species-specific protections for the Northern DPS pursuant to section 4(d) of the ESA. *See id*. at 72,748–52 (the "4(d) Rule").

The 4(d) Rule broadly prohibits "take" of the Northern DPS, subject to three narrow exceptions. *See id*. at 72,748–52. In doing so, it effectively prohibits a staggering array of ordinary land use activities throughout the species' range—imposing significant regulatory burdens on private landowners and local government entities. And the 4(d) Rule will have a devastating impact on the industries which drive local economies across a region spanning Colorado, Kansas, Oklahoma, and Texas.

The 4(d) Rule is illegal for three reasons:

*First*, under the ESA, section 4(d) rules can be issued only if "necessary and advisable" for the conservation of a threatened species. *See* 16 U.S.C. § 1533(d). In *Michigan v. EPA*, the United States Supreme Court held that statutory standards like "necessary and advisable" must involve consideration of all relevant factors, especially costs imposed on private parties. *See* 576 U.S. 743, 751–52 (2015). As such, the Service can only determine whether a section 4(d) rule is "necessary and advisable" to the conservation of a species if it first thoroughly analyzes the costs and benefits of the rule. *Cf. id*. Here, the Service disclaimed any obligation to make a "necessary and advisable" determination, and it refused to assess the 4(d) Rule's costs and benefits. 87 Fed. Reg. at 72,717, 72,748–52. The 4(d) Rule was therefore promulgated in violation of the unambiguous requirements of the ESA, 16 U.S.C. § 1533(d).

*Second*, by disavowing any obligation to consider the economic impacts of the 4(d) Rule, the Service failed to consider "all relevant factors" and ignored "important aspect[s] of the problem." *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 55 (1983). This failure to consider all relevant factors violates the basic administrative law principle of reasoned decision-making, rendering the 4(d) Rule arbitrary and capricious.

*Third*, despite the rulemaking record reflecting numerous impacts on small entities, the 4(d) Rule does not include a final regulatory flexibility analysis, nor does it include a certification that the 4(d) Rule will not have a significant economic impact on a substantial number of small entities, in violation of the Regulatory Flexibility Act, 5 U.S.C. §§ 604, 605(b).

The Honorable Debra A. Haaland
The Honorable Martha Williams
April 12, 2023
Page 4


If the foregoing legal errors, more fully described below, are not corrected within the next 60 days, KNRC; Cameron Edwards; Lone Butte Farm, LLC; Schilling Land, LLC; and JDC Farms, Inc., will seek recourse through the courts.

## Background

### I.    Statutory Background

#### A.    Section 4(d) of the ESA

Section 4(a) of the ESA authorizes the Service to list any "species" as "endangered" or "threatened," based on the risk of extinction the species faces. 16 U.S.C. §§ 1532(6), (20), 1533(a)(1). A "species" includes any "subspecies of fish or wildlife or plants," as well as any "distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." *Id*. § 1532(16).

An "endangered species" is "any species which is in danger of extinction throughout all or a significant portion of its range." *Id*. § 1532(6). A "threatened species" is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id*. § 1532(20). This distinction has significant implications for the federal regulation of private property that is authorized by the ESA. As an additional safeguard for endangered species, befitting their greater risk of extinction, section 9 of the ESA prohibits "take" of such species. 16 U.S.C. §§ 1532(19); 1538(a). The Service interprets its authority to regulate take broadly to include not only intentional actions to harm or capture species, but also common land use activities that might incidentally affect species through the modification of their habitats. *See* 50 C.F.R. § 17.3 (defining "harm" for purposes of the take prohibition to include habitat modification). *See also Babbitt v. Sweet Home Chapter of Communities for a Great Or.*, 515 U.S. 687, 696–704 (1995) (upholding the Service's broad definition of "harm"). This take prohibition is backed by severe civil and criminal penalties. *See* 16 U.S.C. § 1540. *See also* 88 Fed. Reg. 5796 (Jan. 30, 2023).

Under certain circumstances a landowner may seek a permit to allow for incidental take of a species. *See* 16 U.S.C. § 1539(a)(1)(B). *See also* 50 C.F.R. § 17.32. However, the process for obtaining such a permit is time consuming, costly, and burdensome. *See* 16 U.S.C. § 1539(a)(2). To receive such a permit a landowner must create a conservation plan and will generally be required to agree to significant project modifications and costly mitigation. *See id. Cf.* Robert Gordon, *"Whatever the Cost" of the Endangered Species Act*, *It's*

The Honorable Debra A. Haaland
The Honorable Martha Williams
April 12, 2023
Page 5

*Huge*, Competitive Enterprise Institute OnPoint No. 247, Competitive Enter. Inst., at 9 (Aug. 20, 2018).[1]

Recognizing the take prohibition's stringency—and concerned with its implications for landowners and businesses—Congress expressly limited its application to endangered species, explaining that it should "be absolutely enforced *only* for those species on the brink of extinction." Congressional Research Service, A Legislative History of the Endangered Species Act of 1973, as Amended in 1976, 1977, 1978, 1979, and 1980 (hereafter, "ESA Legislative History") at 357 (1982) (statement of Sen. Tunney) (emphasis added). *See also* 16 U.S.C. § 1538(a) (prohibiting take only "with respect to any endangered species").

In section 4(d) of the ESA, Congress permitted that the take prohibition could be extended to particular threatened species, but only if "necessary and advisable" for the conservation of that species. 16 U.S.C. § 1533(d). *See also* S. Rep. No. 93-307, at 8 (1973) ("[O]nce he has listed a species of fish or wildlife as a threatened species," the Secretary may prohibit take "as to the particular threatened species.").[2] But take of threatened species would be presumptively unregulated because Congress wished for states to take the lead on regulating these species. *See* ESA Legislative History, *supra*, at 357 (statement of Sen. Tunney) ("States . . . are encouraged to use their discretion to promote the recovery of threatened species . . . .").

In 1975, the Service issued a regulation, commonly known as the "blanket" 4(d) rule. *See* 40 Fed. Reg. 44,412, 44,414, 44,425 (Sept. 26, 1975), *codified at* 50 C.F.R. § 17.31 (2018). That rule prohibited the take of all threatened species, including any subsequently listed threatened species, unless the Service issued a separate rule to relax the prohibition for a particular species. *See* 50 C.F.R. § 17.31 (2018). This regulation was illegal,[3] and in 2019

---

[1] Available at https://cei.org/studies/whatever-the-cost-of-the-endangered-species-act-its-huge/.

[2] ESA section 4(d) reads in relevant part:

> Whenever any species is listed as a threatened species . . . the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species. The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under section 1538(a)(1) . . . or section 1538(a)(2) . . . with respect to endangered species . . . .

[3] *See* Nat'l Fed'n of Independent Business' Petition to Repeal Title 50 of the Code of Federal Regulations' Section 17.31 (Mar. 15, 2016), a*vailable at* https://pacificlegal.org/wp-content/uploads/2016/03/NFIB-petition-1.pdf. *See also* Jonathan Wood, *Take it to the Limit: The Illegal*

The Honorable Debra A. Haaland
The Honorable Martha Williams
April 12, 2023
Page 6

the Service prospectively repealed it. *See* 84 Fed. Reg. 44,753 (Aug. 27, 2019). The illegal "blanket" approach was briefly revived between July 5, 2022, and September 21, 2022, following a district court's vacatur of the 2019 repeal rule. *See* Order Granting Motion to Remand and Vacating Challenged Regulations, *Ctr. for Biological Diversity v. Haaland*, No. 4:19-cv-05206 (N.D. Cal. July 5, 2022), ECF No. 168. However, a subsequent appellate decision ensured the continued operation of the 2019 non-"blanket" approach. *See In re Washington Cattlemen's Ass'n*, No. 22-70194, 2022 WL 4393033, at *1 (9th Cir. Sept. 21, 2022) (staying district court's order and reinstating 2019 repeal rule). *See also* Amended Order Granting Motion to Remand, *Ctr. for Biological Diversity v. Haaland*, No. 4:19-cv-05206 (N.D. Cal. July 5, 2022), ECF No. 198 (amending previous order and leaving 2019 repeal rule in place pending further agency rulemaking). As such, the section 4(d) rule for the Northern DPS of the lesser prairie-chicken was promulgated pursuant to the 2019 non-"blanket" approach. *See* 87 Fed. Reg. at 72,682–83. That is, the 4(d) Rule operates to independently impose special protections for the species, over and above the statutory default of no protection. *See* 84 Fed. Reg. at 44,753.

### B.     The Regulatory Flexibility Act

Congress's concern about the impact that endangered species regulation may have on landowners and businesses extends beyond the ESA itself. When a regulatory action—such as an ESA section 4(d) rule—will affect small entities, the Service must perform an initial and final regulatory flexibility analysis under the RFA, 5 U.S.C. §§ 601–612.

The RFA, was passed by Congress to minimize unnecessary impacts of federal regulations on "small entities." A "small entity" is any small business, small organization, or small governmental organization. *Id*. § 601(6). The term "small business" has the same meaning as the term "small business concern" used in the Small Business Act. *Id*. § 601(3). Under the Small Business Act, the Administrator of the Small Business Administration has specified detailed standards by which an entity will qualify as a "small business concern." 15 U.S.C. § 632(a)(2)(A). *See also* 13 C.F.R. § 121.201. The RFA defines "small governmental jurisdiction" to mean any government of a city, county, town, township, village, school district, or special district, with a population of less than 50,000 people. 5 U.S.C. § 601(5).

The RFA requires that whenever an agency publishes a general notice of proposed rulemaking, it must also "prepare and make available for public comment" an "initial regulatory flexibility analysis," describing the impact of the proposed rule on small

---

*Regulation Prohibiting the Take of Any Threatened Species Under the Endangered Species Act*, 33 Pace Envtl. L. Rev. 23 (2015).

The Honorable Debra A. Haaland
The Honorable Martha Williams
April 12, 2023
Page 7

entities. 5 U.S.C. § 603(a). The RFA also requires the agency to complete a final regulatory flexibility analysis when adopting a final rule. *See* 5 U.S.C. § 604. This analysis must include, among other things, "a description of the steps the agency has taken to minimize the significant economic impact on small entities." *Id*. An agency may not avoid these requirements unless the head of the agency "certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." *Id*. § 605(b).

## II.    The 4(d) Rule for the Northern DPS of the Lesser Prairie-Chicken

The lesser prairie-chicken (*Tympanuchus pallidicinctus*) is a species of grouse endemic to the Southern Great Plains Region of Southeastern Colorado, Southwestern Kansas, Western Oklahoma, and the Panhandle and South Plains of Texas. 87 Fed. Reg. at 72,675–76. The lesser prairie-chicken relies upon open grassland and shrubland habitats across this region. *Id*. at 72,677. The Service has identified habitat loss, degradation, and fragmentation resulting from woody vegetation encroachment and conversion of grassland to cropland, as the primary threat to the species. *See id*. at 72,683–94. The Service estimates that 97% of the species' range is under private ownership. *See* 86 Fed. Reg. 29,432, 29,444, 29,454 (June 1, 2021). As such, a number of voluntary programs and cooperative efforts with landowners have been critical to the species' conservation. *See id*.[4]

Nevertheless, the Service has now disavowed these cooperative efforts in favor of broadly regulating private activity. On November 25, 2022, the United States Fish and Wildlife Service finalized a rule to add two distinct population segments of the lesser prairie-chicken to the federal list of threatened and endangered wildlife, pursuant to the ESA. *See* 87 Fed. Reg at 72,674, 72,744–45. The Service listed a Southern DPS—found in New Mexico and Texas—as endangered, and a Northern DPS—found in Colorado, Kansas, Oklahoma, and Texas—as threatened. *Id*. Additionally, the Service issued species-specific protections for the Northern DPS pursuant to ESA section 4(d). *Id*. at 72,748–52.

The 4(d) Rule broadly prohibits "take" of the species. The lone exceptions are for the continuation of certain routine agricultural practices on existing cultivated lands

---

[4] As a result of these voluntary conservation efforts, the species' population doubled between 2013 and 2018. *See* Western Association of Fish and Wildlife Agencies, *The 2018 Lesser Prairie-Chicken Range-wide Conservation Plan Annual Progress Report* (2019), https://wafwa.org/wp-content/uploads/2020/07/LPCRWP_AnnualReport_2018.pdf. Essential to the continuation of this progress is the maintenance of landowners' incentives to conserve and improve lesser prairie-chicken habitat.

The Honorable Debra A. Haaland
The Honorable Martha Williams
April 12, 2023
Page 8

(meaning lands cultivated within the preceding five years); grazing pursuant to a site-specific grazing plan; and the implementation of prescribed fire for the purpose of grassland management. *See* 87 Fed. Reg. at 72,748–52.

The breadth of land use activities regulated by the 4(d) Rule is staggering. Activities that may constitute take—and are therefore effectively prohibited—under the 4(d) Rule include (but are not limited to) grazing activities not conducted in accordance with a site-specific grazing plan developed by an entity approved by the Service; conversion of native grassland to cropland or any other land use; seeding of non-native plant species in occupied habitat; herbicide applications resulting in sustained alteration of the lesser prairie-chicken's preferred vegetative features; the installation of power lines and fences (and other vertical structures, such as windmills); the ownership of existing power lines and fences (and other vertical structures) occasioning collisions with the lesser prairie-chicken; native shrub removal; insecticide applications killing native invertebrates upon which the species feeds; and motorized vehicle or machinery use causing the lesser prairie-chicken to avoid an area. 87 Fed. Reg at 72,749

The rule therefore effectively prohibits a large range of ordinary land use activities that might indirectly harm the species by altering its habitat or disturbing its life processes. *See id*. As a result, the 4(d) Rule will impose significant burdens on private landowners and local government entities across Colorado, Kansas, Oklahoma, and Texas. And it will have a devastating impact on the industries which drive local economies within this region, such as energy development, farming, and ranching.

The rule was initially set to take effect on January 24, 2023. *See* 87 Fed. Reg. at 72,674. However, on January 24, 2023—in recognition of the significant burdens placed on private landowners—the Service delayed the 4(d) Rule's effective date until March 27, 2023. *See* 88 Fed. Reg. 4087 (Jan. 24, 2023) (delaying effective date of the listing and 4(d) rules). In doing so, the Service specifically recognized the significant compliance burdens created by the 4(d) Rule. *See id*. at 4087–88 ("We recognize that these changes in status will result in questions and concerns about establishing compliance under the Act for grazing, energy development, infrastructure, and many other projects within the five States that comprise the range of the lesser prairie-chicken."). And it acknowledged the impracticability of landowners complying with these significant regulatory burdens, prior to the original effective date. *See id*. at 4088 (acknowledging that as of January 24, 2023, there was only "one Service-approved provider of grazing management plans" throughout the entire five-state region).

The Honorable Debra A. Haaland
The Honorable Martha Williams
April 12, 2023
Page 9

**Parties**

The **Kansas Natural Resource Coalition** (KNRC) is a collaboration of 30 Kansas Boards of County Commissioners located throughout western and south-central Kansas.[5] KNRC sponsors and promotes government-to-government participation between member counties and federal agencies during administrative policymaking. KNRC typically emphasizes natural resources, conservation, and related policy issues. Member counties fund and govern KNRC, and KNRC employs an Executive Director to oversee the day-to-day operations and communicate decisions and positions taken by the organization.

KNRC believes that local governments and citizenry are in the best position to study, understand, and manage natural resources within their jurisdictions. It therefore advocates that natural resource and conservation policy must take place within the context of preeminent property rights, and with meaningful deference to the economic and tax implications that will lead to a balancing of the needs of both the human and natural environments.

The majority of KNRC's member counties are located within the areas identified in the Service's published range maps for the Northern DPS of the lesser prairie-chicken. *See* 87 Fed. Reg. at 72,682. As a result, many of KNRC's member counties engage in resource management activities, and provide essential public services, in native grassland areas containing lesser prairie-chicken habitat. These activities include the regular use of heavy machinery to blade gravel roads; the use of machinery to maintain bridges and culverts; the spraying of herbicides to control noxious weeds in grassland areas; and the erection and maintenance of radio towers for emergency management. According to the Service, these activities may lead to incidental take of the species and will therefore be regulated under the 4(d) Rule. *See id.* at 72,749. As such, KNRC's member counties are deeply concerned by the 4(d) Rule's impact on their ability to provide basic and essential services to their citizens. The 4(d) Rule will also have a devastating impact on the industries that drive the local economies of KNRC's member counties—such as ranching and energy development—negatively impacting county tax receipts.

Additionally, KNRC has played an active role in the conservation of the lesser prairie-chicken by facilitating voluntary cooperation between its member counties. Every KNRC

---

[5] KNRC's member counties are: Barton, Clark, Coffey, Comanche, Edwards, Finney, Ford, Gove, Graham, Haskell, Hodgeman, Kearny, Kiowa, Lane, Logan, Meade, Morton, Ness, Pawnee, Rooks, Rush, Russell, Seward, Sheridan, Sherman, Stafford, Stevens, Thomas, Trego, and Wallace counties.

The Honorable Debra A. Haaland
The Honorable Martha Williams
April 12, 2023
Page 10

member but one has adopted a conservation program for the lesser prairie-chicken into its local county ordinances. And efforts are underway to educate members about the elements and responsibilities incorporated as part of those plans. *See Lesser Prairie Chicken Conservation, Management and Study Plan*, KNRC (Oct. 14, 2013).[6] KNRC expects the 4(d) Rule to frustrate existing cooperative efforts between its members to conserve the lesser prairie-chicken—imposing a federal mandate at the expense of local control.

Each of KNRC's member-counties has a population of less than 50,000 people, and are therefore small entities for purposes of the RFA. *See* 5 U.S.C. § 601(5). KNRC submitted comments in opposition to the proposed ESA section 4(d) rule for the Northern DPS of the lesser prairie-chicken.[7]

**Lone Butte Farm, LLC**, is a Kansas limited liability company that grows corn, ranches cattle, and operates two oil wells on approximately 7,000 acres of privately owned land, leased from private landowners in Logan County, Kansas. This land is owned by **Cameron Edwards**, other members of the Edwards family, and several additional private landowners. Lone Butte Farm is owned and operated by Mr. Edwards and other members of the Edwards family.

The Edwards' land was first purchased by Mr. Edwards' grandfather. And three generations of Mr. Edwards' family have worked to produce the fuel, fiber, and food that are essential to the growth and flourishing of the United States. The Edwards family are proud stewards of their land. And due to the importance of maintaining healthy rangeland to conduct their cattle grazing operations, operating the Edwards' family property to its highest and best use has required the maintenance of approximately 3,000 contiguous acres of native grassland. The Edwards family's herd thrives under the same conditions that the lesser prairie-chicken does. And as result, their property contains a large amount of high-quality native grassland habitat.

That stewardship is now being punished. Because the Edwards' property is identifiable within the Service's published range maps for the lesser prairie-chicken, *see* 87 Fed. Reg.

---

[6] *Available at* https://knrc.org/Files/LPC/LPC_CONSERVATION_PLAN_REVISED_FINAL_101413-1.pdf.

[7] *See* Comment from Kansas Natural Resource Coalition, Federal Comment ID No. FWS-R2-ES-2021-0015-0347, *available at* https://www.regulations.gov/comment/FWS-R2-ES-2021-0015-0347. *See also* Comment from Pacific Legal Foundation, Kansas Natural Resource Coalition, Kenneth Klemm, and Beaver Creek Buffalo Company, Federal Comment ID No. FWS-R2-ES-2021-0015-0327, *available at* https://www.regulations.gov/comment/FWS-R2-ES-2021-0015-0327.

The Honorable Debra A. Haaland
The Honorable Martha Williams
April 12, 2023
Page 11

at 72,682, and because the Edwards have maintained large areas of native grassland habitat, the 4(d) Rule will place significant restrictions on their business operations. For example, the rule requires ranchers wishing to avoid potential liability for take to conduct grazing activities in accordance with a site-specific grazing plan. *See* 87 Fed. Reg. at 72,750. This condition effectively requires the Edwards to engage a Service-approved consultant to develop a grazing plan before they can turn cattle out on their property— leading to significant compliance costs and costly alterations to their operations. Additionally, the Edwards operate motorized vehicles on their property; maintain trails; repair and erect vertical structures such as windmills and fences; and perform various activities to develop and maintain the existing oil and gas infrastructure on their property. Each of these activities will be heavily regulated if not effectively prohibited by the 4(d) Rule. *See id*. at 72,749. The 4(d) Rule will also severely restrict the Edwards' future land use planning decisions, by effectively prohibiting the conversion of native grasslands to other land uses—such as row crop agriculture. *See id*. As such, the 4(d) Rule will place significant restrictions on the Edwards' business operations. And it will stifle their ability to productively use their land, limiting their options for growing their business in the future.

Lone Butte Farm, LLC, is a beef cattle ranching and corn farming operation with less than $2.5 million in annual receipts, and is an oil and gas extraction operation with less than 1,250 employees. It therefore qualifies as a small business for purposes of the RFA. *See* 13 C.F.R. § 121.201.

**JDC Farms, Inc.**, is a Kansas for-profit corporation that grows grain and raises cattle on approximately 10,000 acres of privately owned land in Wallace County, Kansas. This land is owned by **Schilling Land, LLC**, a Kansas limited liability company. JDC Farms, Inc., and Schilling Land, LLC, are owned and operated by Ronald and Marsha Schilling.

The Schillings are proud stewards of their land and have conserved approximately 6,000 acres of native grassland on their property. Prior to the finalization of the 4(d) Rule for the lesser prairie-chicken, the Schillings saw no conflict between their cattle grazing operations, and the maintenance of high-quality native grassland habitats. Indeed, during the past five years, the Schillings have converted significant amounts of previously cultivated farmland to native grassland.

The Schillings are now being punished. Because the Schillings' property is identifiable within the Service's published range maps for the lesser prairie-chicken, *see* 87 Fed. Reg. at 72,682, and because the Schillings have maintained and reclaimed large areas of native grassland habitat, the 4(d) Rule will place significant restrictions on their business operations. For example, the rule requires ranchers wishing to avoid potential liability

The Honorable Debra A. Haaland
The Honorable Martha Williams
April 12, 2023
Page 12

for take to conduct grazing activities in accordance with a site-specific grazing plan. *See* 87 Fed. Reg. at 72,750. Seeking such a permit will lead to significant compliance costs and costly alterations to the Schillings' operations. The Schillings also perform several other activities that are now regulated pursuant to the 4(d) Rule, within grassland habitats on their property. These activities include operating motorized vehicles; maintaining trails, roads, and water pipelines; and repairing and erecting vertical structures such as windmills and fences. Each of these activities will be heavily regulated if not effectively prohibited by the 4(d) Rule. *See id*. at 72,749. The 4(d) Rule will also severely restrict the Schillings' future land use planning decisions, by effectively prohibiting the conversion of native grasslands to other land uses—such as farmland for growing wheat and corn. *See id*. As such, the 4(d) Rule will place significant restrictions on the Schillings' business operations. And it will limit their options for growing their business in the future.

Schilling Land, LLC, is a lessor of real estate property with less than $34.0 million in annual receipts. It therefore qualifies as a small business for purposes of the RFA. *See* 13 C.F.R. § 121.201.

### Violations of the Endangered Species Act

I.      **By ignoring effects on private landowners and local governments, the 4(d) Rule fails to explain how it is "necessary and advisable" to the conservation of the species, in violation of the unambiguous requirements of the ESA, 16 U.S.C. § 1533(d)**

By refusing to consider the impacts of the 4(d) Rule to private landowners and local governments, the Service has failed to explain how the 4(d) Rule is "necessary and advisable" to the conservation of the lesser prairie-chicken. The Service has violated the unambiguous requirements of section 4(d) of the ESA for four reasons. *First*, the Service disclaims any obligation to make a "necessary and advisable" determination to support the extension of take protections to the Northern DPS of the lesser prairie-chicken, *see* 87 Fed. Reg. at 72,748, in contravention of the ESA's plain text, *see* 16 U.S.C. § 1533(d). *Second*, in *Michigan v. EPA*, the United States Supreme Court held that statutory standards like "necessary and advisable" must involve consideration of all relevant factors, especially costs imposed on private parties. *See* 576 U.S. at 751–52. Yet the Service has disclaimed any obligation to consider these costs. *See* 87 Fed. Reg. at 72,717. *Third*, the Service contends that it is prohibited from considering economic costs when making decisions pursuant to section 4(d), *see id*., a position that finds no support in the text of the ESA. *Finally*, in rejecting any suggestion that it analyze the costs and benefits of the 4(d) Rule, the Service has claimed breathtaking authority to promulgate a regulation of

The Honorable Debra A. Haaland
The Honorable Martha Williams
April 12, 2023
Page 13

vast economic and political significance. Yet, it has done so in the absence of any clear statement from Congress granting it such broad authority. As such, pursuant to the "major questions doctrine," the 4(d) Rule is *ultra vires*.

A.    **The ESA requires the Service to determine that the extension of the take prohibition to a threatened species is "necessary and advisable" to the conservation of that species**

The Service disclaims any obligation to make a "necessary and advisable" determination to support the extension of take protections to the Northern DPS of the lesser prairie-chicken. 87 Fed. Reg. at 72,748. Instead, the Service asserts that the grant of authority to extend section 9's take prohibition to any threatened species contained within the second sentence of section 4(d) functions as a separate grant that is untethered from the "necessary and advisable" standard contained within the first sentence of section 4(d). *Id*. This reading must be rejected as contrary to the ESA's plain text. *Cf. Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009) ("As with any question of statutory interpretation, our analysis begins with the plain language of the statute."). The first sentence of section 4(d) gives the agencies a broad authority to adopt *any* kind of regulation when a species is listed as threatened if it is "necessary and advisable to provide for the conservation of [the] species." 16 U.S.C. § 1533(d). A regulation prohibiting the take of any such species is merely a specific example of the type of regulation that could be adopted. Consequently, the power articulated in the second sentence must be a subset of that in the first sentence, and the first sentence's limitations must apply to it.[8]

Even if the text of section 4(d) were susceptible to the interpretation set forth by the Service, such a reading would raise significant constitutional concerns, counseling that it be rejected pursuant to the canon of constitutional avoidance. *See Jennings v. Rodriguez*,

---

[8] This reading is confirmed by the ESA's legislative history. The Senate Report explains that section 4(d):

> requires the Secretary, once he has listed a species of fish or wildlife as a threatened species, to issue regulations to protect that species. *Among other protective measures available*, he may make any or all of the acts and conduct defined as "prohibited acts" . . . as to "endangered species" also prohibited acts as to the particular threatened species.

S. Rep. No. 93-307, at 8 (1973), *reprinted in* ESA Legislative History, *supra*, at 307 (emphasis added). This language confirms that the power to prohibit take *is a subset* of the authority granted in section 4(d)'s first sentence. *See id*. ("Among other protective measures available . . . .").

The Honorable Debra A. Haaland
The Honorable Martha Williams
April 12, 2023
Page 14

138 S. Ct. 830, 842 (2018) ("When 'a serious doubt' is raised about the constitutionality of an act of Congress, 'it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.'" (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932))). If the "necessary and advisable" standard did not apply to section 4(d) rules extending the take prohibition to a threatened species, then no standard would govern the exercise of this power, rendering it an unconstitutional delegation.

The nondelegation doctrine forbids Congress from delegating discretionary power to administrative agencies without providing an "intelligible principle" to guide its exercise. *See Panama Refining Co. v. Ryan*, 293 U.S. 388, 414–16 (1935); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529–32 (1935). The nondelegation doctrine "is rooted in the principle of separation of powers" and the Constitution's provision that "[a]ll legislative Powers . . . shall be vested in . . . Congress." *Mistretta v. United States*, 488 U.S. 361, 371–72 (1989) (quoting U.S. Const. art. 1, § 1). The doctrine operates to forbid Congress from delegating that legislative power to any other branch. *Id*. To determine whether Congress has provided an intelligible principle, the most important inquiry is whether Congress, and not the agency, has made the fundamental or overarching policy choice governing the agency's exercise of its discretion. *See Gundy v. United States*, 139 S. Ct. 2116, 2131–37 (2019) (Gorsuch, J., dissenting). The nondelegation doctrine is frequently invoked by courts applying the avoidance canon. *See Mistretta*, 488 U.S. at 373.

To interpret section 4(d) of the ESA in the manner proposed by the Service raises significant nondelegation concerns. The only principle to guide the Services' exercise of its power to extend protective regulations to a threatened species is the "necessary and advisable" standard contained in section 4(d)'s first sentence. The grant of authority in the second sentence, divorced from the limiting principle contained in the first, would authorize the Service to forbid or exert regulatory control over *any* activity that affects *any* threatened species, for any reason or no reason whatsoever. The Service could forbid private activity, or not, as it sees fit. Delegation of such unbounded authority would be a classic violation of the Supreme Court's "intelligible principle" rule. *See Panama Refining*, 293 U.S. at 415 (finding that a grant of authority, which did "not qualify the President's authority," did "not state whether or in what circumstances or under what conditions the President" was to regulate, "establishe[d] no creterion [sic] to govern" the exercise of that power; and did "not require any finding by the President as a condition of his action," contained no intelligible principle). Indeed, it is difficult to imagine a more obvious example of the delegation of legislative power to an administrative agency than that contained in the second sentence of section 4(d), standing alone. These nondelegation problems can only be avoided by construing section 4(d)'s two sentences

The Honorable Debra A. Haaland
The Honorable Martha Williams
April 12, 2023
Page 15

together so that the limits in the first sentence apply to any regulation of take authorized by the second.[9]

### B.    The Service's "necessary and advisable" analysis for the 4(d) Rule ignores effects on private landowners and local governments

The Service asserts, without elaboration, that the rule "as a whole" satisfies the "necessary and advisable" standard. 87 Fed. Reg. at 72,749. However, the 4(d) Rule does not contain key information required for making a "necessary and advisable" determination. The Service can only determine whether a 4(d) Rule is necessary and advisable to the conservation of a species if it first thoroughly analyzes the costs and benefits of that rule.

In *Michigan v. EPA*, the Supreme Court held that vague standards like "necessary and advisable" may give agencies significant discretion, but that discretion can only be exercised after thorough consideration of all relevant factors, especially costs imposed on private parties. *See* 576 U.S. 743, 751–52 (2015) (discussing "appropriate" a term similarly as "broad and all-encompassing" as advisable "that naturally and traditionally includes consideration of all the relevant factors"). Therefore, the Service can only issue an ESA section 4(d) Rule if it first thoroughly considers the conservation, economic, and other benefits of a rule, and compares these to the conservation, economic, and other costs of the rule.

Yet the Service expressly disavowed any requirement that it consider the economic costs of the 4(d) Rule. *See* 87 Fed. Reg. at 72,717. Instead, the Service vaguely (and without any attempt at quantification) focused only on the conservation *benefits* of extending such protections to the lesser prairie-chicken. *Id.* at 72,749–50. While any benefit to the

---

[9] There exists one decision from the District of Columbia Circuit deferring to the Service under *Chevron* on the reasonableness of interpreting the second sentence of section 4(d) as an independent and boundless grant of authority, divorced from the "necessary and advisable" standard in the first sentence. *See Sweet Home Chapter of Communities for a Great Or. v. Babbitt*, 1 F.3d 1, 6 (D.C. Cir. 1993). This decision is unpersuasive given the unambiguous text of the statute and the constitutional avoidance canon. *See supra* 12–19. The decision in *Sweet Home* is also inconsistent with Supreme Court case law concerning the *Chevron* doctrine. The Service offered no interpretation of section 4(d) in the regulation at issue in *Sweet Home*—that is, the Service's 1975 regulation extending the take prohibition to all threatened species. *See* 40 Fed. Reg. at 44,414. As such, the interpretation to which the court in *Sweet Home* deferred was articulated only as the Service's litigation position. *Chevron* deference must not be afforded to an agency interpretation under such circumstances. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate.").

The Honorable Debra A. Haaland
The Honorable Martha Williams
April 12, 2023
Page 16

conservation of the species is a relevant consideration, it is not the only relevant factor the Service must consider under the necessary and advisable standard. Other factors, although by no means the only other factors, include: the true *extent* of any benefits to the species; the costs the 4(d) Rule would impose on states, local governments, private landowners, and others; and the potential recovery actions that the 4(d) Rule will discourage by making a species' presence a significant liability for landowners.

To paraphrase *Michigan*, it is not "rational," never mind "advisable," to impose significant economic and other costs for meager benefits to a threatened species. *See Michigan*, 576 U.S. at 752 ("One would not say that it is even rational, never mind 'appropriate,' to impose billions of dollars in economic costs in return for a few dollars in health or environmental benefits."). Indeed, if vague and unquantified benefit to a threatened species' conservation were enough to justify a section 4(d) rule, Congress's decision to exclude threatened species from section 9's prohibition would make little sense. Instead, the logical reason for Congress to have done so is, as Senator Tunney explained at the time, to "minimize the use of the most stringent [federal] prohibitions" and preserve state "discretion to promote the recovery of threatened species." *See* ESA Legislative History, *supra*, at 357 (statement of Sen. Tunney).

The Service's justification for the 4(d) Rule is, on its face, insufficient. It addresses only one side of the ledger (conservation benefits), and even there limits its justification to vague and unquantified assertions. *See* 87 Fed. Reg. at 72,749. The Service does not attempt to justify the extent to which the 4(d) Rule would apply section 9's prohibitions to common land use activities, beyond its vague conclusion that a "range" of activities have the "potential to affect" the species. *Id*. The Service then lists virtually every form of land use activity that might conceivably occur within the lesser prairie-chicken's range, and broadly concludes that regulation of these activities is justified to prevent "potential" harm to the species. *Id*. But this is not a sufficient justification for extending the significant restrictions, and imposing the significant costs, associated with section 9's prohibitions of intentional and incidental take. The Service makes no effort to balance the conservation and other costs of broadly restricting these land use activities against the conservation and other benefits of doing so. And it does not attempt to target the subset of these land use activities that are most harmful to the species.

It is true that the 4(d) Rule exempts certain land use activities from its restrictions. *See* 87 Fed. Reg. at 72,749–50. However, in allowing these exemptions, the Service fatally reverses the required analysis. The Service assumes the benefits of broadly applying section 9's prohibitions, before subjecting these prohibitions to three narrow carve-outs. *See id*. But this approach—baldly assuming the advisability of full take protection and

The Honorable Debra A. Haaland
The Honorable Martha Williams
April 12, 2023
Page 17

narrowly exempting certain activities—is inadequate under the ESA's "necessary and advisable" standard.[10]

As such, the Service has violated the ESA's unambiguous requirement to make a "necessary and advisable" finding by refusing to engage with costs to private landowners. *See* 16 U.S.C. § 1533(d).

> **C.    The ESA does not prohibit the consideration of economic costs when making decisions pursuant to section 4(d)**

The Service contends that it is prohibited from considering economic costs when making decisions pursuant to section 4(d). The Service argues that any decision to extend protective regulations to threatened species pursuant to section 4(d) is subject to section 4(b)(1)'s injunction that listing decisions made pursuant to Section 4(a)(1) must be made "solely on the basis of the best scientific and commercial data available." *See* 87 Fed. Reg. at 72,717 (quoting *See* 16 U.S.C. § 1533(b)(1)(A)). This argument must fail. The parties do not contend that the Service was required to consider costs and benefits when deciding whether to *list* the northern DPS of the lesser prairie-chicken as threatened, pursuant to section 4(a). But the text and structure of the ESA make clear that the extension of protective regulations to a threatened species via the issuance of a section 4(d) rule is an independent regulatory action that is subject to a distinct statutory standard than that for the listing of a species under section 4(a). There are at least two reasons why this is the case.

*First*, there is nothing in the text of sections 4(a)(1) or 4(b)(1) to suggest that determinations made pursuant to section 4(d) are subject to section 4(b)(1)'s limitation. Section 4(a)(1) lists five factors which the Service must consider in determining that a species is threatened or endangered. 16 U.S.C. § 1533(a)(1). Section 4(b)(1)(A) adds that "[t]he Secretary shall make *determinations required by subsection (a)(1)* solely on the basis of the best scientific and commercial data available to him." *Id*. § 1533(b)(1)(A) (emphasis added). Section 4(b)(1)(A)'s limitation is expressly directed to "determinations required by subsection (a)(1)." *See id*. But the Service's decision to extend protective regulations to a threatened species pursuant to section 4(d) is not a "determination[] required by subsection (a)(1)." *Id*. Instead, it is a determination *permitted* by subsection (d). Nothing in

---

[10] In fact, this approach closely resembles the Service's pre-2019 approach to promulgating "special" 4(d) rules under the former "blanket" approach to ESA section 4(d). But the blanket 4(d) rule was repealed in 2019. *See* 84 Fed. Reg. at 44,753. And for good reason: it was illegal. *See* Nat'l Fed'n of Independent Business' Petition to Repeal Title 50 of the Code of Federal Regulations' Section 17.31, *supra* note 3. *See also* Wood, *supra* note 3.

The Honorable Debra A. Haaland
The Honorable Martha Williams
April 12, 2023
Page 18

section 4(b)(1) directs that determinations permitted by subsection (d) are covered by its limitation. *Cf. Yates v. Collier*, 868 F.3d 354, 369 (5th Cir. 2017) ("The principle that a matter not covered is not covered is so obvious that it seems absurd to recite it." (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 93 (Thomas/West 2012))).

*Second*, the structure of section 4 of the ESA counsels against the Service's strained interpretation of section 4(d). *See King v. Burwell*, 576 U.S. 473, 486 (2015) (holding that to ascertain a statute's plain meaning a reviewing court must "read the words 'in their context and with a view to their place in the overall statutory scheme'" (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000))). Section 4 of the ESA grants authority to the Service in three separate ways. Pursuant to section 4(a)(1), the Service is authorized to list species as threatened or endangered. *See* 16 U.S.C. § 1533(a)(1). Pursuant to section 4(b)(2), the Service is authorized to designate critical habitat for a listed species. *See id.* § 1533(b)(2). And pursuant to section 4(d), the Service is authorized to extend protective regulations to a species listed as threatened. *See id.* § 1533(d).

Importantly, each grant of authority is explicitly subject to a distinct statutory standard. Section 4(a)(1) listing determinations must be made on the basis of the five listing factors and "the best scientific and commercial data available." *See* 16 U.S.C. § 1533(a)(1), (b)(1)(A). Critical habitat designations made pursuant to section 4(b)(2) must be made "on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact." *See id.* § 1533(b)(2). And decisions to extend protective regulations pursuant to section 4(d) shall be made where the Secretary "deems [such regulation] necessary and advisable to provide for the conservation of such species." *See id.* § 1533(d). To subject section 4(d) decisions to the same statutory standard as section 4(a) decisions would ignore the ESA's explicit use of distinct terms to govern each exercise of authority in section 4. This is inconsistent with the ESA's text and structure. *Cf. Corley v. United States*, 556 U.S. 303, 315 (2009) (presuming that Congress uses "distinct terms . . . deliberately"); *Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972))).

As such, *Michigan*'s rule that broad standards like "necessary and advisable" require the consideration of all costs and benefits, *see* 576 U.S. at 751–55, does not conflict with the ESA's requirement that *listing* decisions be based only upon biological considerations, *see* 16 U.S.C. § 1533(a)(1), (b)(1)(A).

The Honorable Debra A. Haaland
The Honorable Martha Williams
April 12, 2023
Page 19

       **D.**      **The 4(d) Rule is *ultra vires***

"It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Georgetown Univ. Hosp.*, 488 U.S. at 208. Thus, "an agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. Fed. Commc'ns Comm'n*, 476 U.S. 355, 374 (1986). In rejecting any suggestion that it analyze the costs and benefits of the 4(d) Rule, the Service claims breathtakingly broad authority to regulate pursuant to section 4(d) of the ESA. *See* 87 Fed. Reg. at 72,748. In the 4(d) Rule, the Service categorically and indiscriminately forbids an enormous range of private activities across a region spanning Colorado, Kansas, Oklahoma, and Texas. *See* 87 Fed. Reg. at 72,749. Such regulation will have dramatic consequences for private landowners, small businesses, and local governments across this region. *See supra* 9–12. *Cf.* Randy T. Simmons & Kimberly Frost, *Accounting for Species: The True Costs of the Endangered Species Act*, PERC (2004) (assessing the public and private costs of ESA regulation).[11] *See also* Gordon, *supra* (analyzing the costs of ESA regulation). Yet, the Service rejects any suggestion that it is constrained by the limiting language in the first sentence of section 4(d), *see* 87 Fed. Reg. at 72,748, and it argues that section 4(d) imposes no affirmative duty to justify such regulation through the analysis of costs and benefits, *see* 87 Fed. Reg. at 72,717. This amounts to a contention that section 4(d) of the ESA provides the Service with virtually boundless authority to promulgate rules that will fundamentally alter local economies across a vast region of the country.

The Supreme Court has recently clarified that where an agency claims broad authority "to exercise powers of vast economic and political significance," it "must point to 'clear congressional authorization' for the power it claims." *West Virginia v. EPA*, 142 S. Ct. 2587, 2605, 2609 (2022) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). *See also Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 142 S. Ct. 661, 665 (2022) (quoting *Alabama Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2489 (2021) (per curiam)). In the absence of such a clear statement, the agency necessarily lacks the authority it has claimed. *See West Virginia*, 142 S. Ct. at 2605, 2609. The Service has identified no clear statement authorizing it to exercise the sweeping power it has claimed in finalizing the 4(d) Rule. *See* 87 Fed. Reg. at 72,748 (vaguely asserting that "the combination of the two sentences of section 4(d) provides the Secretary with wide latitude of discretion"). And the text of ESA section 4(d) contains no such clear statement. Indeed, to the contrary, the first sentence of section 4(d) contains language expressly limiting the Service's authority to act, by requiring the Service first make a finding that any protective

---

[11] *Available at* http://perc.org/sites/default/files/esa_costs.pdf.

The Honorable Debra A. Haaland
The Honorable Martha Williams
April 12, 2023
Page 20

regulation is "necessary and advisable" to the conservation of the species. *See supra* 12–15. As such, pursuant to the "major questions doctrine," the 4(d) Rule is *ultra vires*. *Cf. West Virginia*, 142 S. Ct. at 2609 ("Extraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle device[s].'" (quoting *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001))).

## II. The Service ignored important aspects of the problem and failed to consider all relevant factors, rendering the 4(d) Rule arbitrary and capricious

In promulgating the 4(d) Rule, the Service failed to present "an adequate basis and explanation" for its decision, rendering the rule "arbitrary and capricious." *See Motor Vehicle Mfrs.*, 463 U.S. at 34. By categorically and indiscriminately forbidding an enormous range of private activities across an enormous region of the country, the rule will have significant economic impacts. Yet, the Service categorically refused to consider these impacts. *See* 87 Fed. Reg. at 72,717. As such, the Service failed to consider "all relevant factors" and ignored "important aspect[s] of the problem." *See Motor Vehicle Mfrs.*, 463 U.S. at 43, 55. *See also Michigan*, 576 U.S. at 752 (applying the *State Farm* standard to conclude that EPA's failure to consider economic costs was arbitrary and capricious in the context of a grant of authority to regulate where "appropriate and necessary"); *id.* at 753 ("Consideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions."); *id.* at 765 (Kagan, J., dissenting) ("I agree with the majority—let there be no doubt about this—that . . . [the] regulation would be unreasonable if '[t]he Agency gave cost no thought *at all*.'" (quoting *id.* at 749–51) (emphasis in original)). This failure to consider all relevant factors violates the basic administrative law principle of reasoned decision-making, rendering the 4(d) Rule arbitrary and capricious.

### Violations of the Regulatory Flexibility Act

The 4(d) Rule effectively forbids a wide variety of private activities, including those likely to be undertaken by small entities covered by the RFA. Farming operations and cattle ranching businesses with less than $2.5 million in annual revenue, petroleum and natural gas extraction businesses with fewer than 1,250 employees, and wind energy generation businesses with less than 250 employees are small entities for purposes of the RFA[12] and, according to the Service, engage in activities that will be regulated under the 4(d) Rule. *See* 87 Fed. Reg. at 72,749. Likewise, numerous small governmental

---

[12] 13 C.F.R. § 121.201 (detailing standards by which an entity will qualify as a "small business" for purposes of the Small Business Act).

The Honorable Debra A. Haaland
The Honorable Martha Williams
April 12, 2023
Page 21

jurisdictions, including many of KNRC's member counties,[13] exist within the range of the Northern DPS of the lesser prairie-chicken. As discussed above, the 4(d) Rule will impose additional costs on resource management and essential public service activities performed by these counties.

As such, the 4(d) Rule will both directly and indirectly regulate numerous small businesses and small governmental jurisdictions. Consequently, the Service was required to prepare and publish initial and final regulatory flexibility analyses. *See* 5 U.S.C. §§ 603–604. Yet the Service has refused to do so. *See* 87 Fed. Reg. at 72,717. Nor has the Service certified that the 4(d) Rule will not have a significant impact on a substantial number of small entities, as required by 5 U.S.C. § 605(b).

### Conclusion

If the Service does not promptly remedy these legal errors, Kansas Natural Resource Coalition; Cameron Edwards; Lone Butte Farm, LLC; Schilling Land, LLC; and JDC Farms, Inc., will commence a civil action to require their correction following expiration of the statutory 60-day notice period.

Respectfully submitted,

PAIGE E. GILLIARD
Attorney*
Pacific Legal Foundation
3100 Clarendon Boulevard
Arlington, VA 22201
pgilliard@pacificlegal.org
(202) 888-6881

* Licensed attorney in California

CHARLES T. YATES
Attorney
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
cyates@pacificlegal.org
(916) 419-7111

DAMIEN M. SCHIFF
Senior Attorney
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
dschiff@pacificlegal.org
(916) 419-7111

*Counsel for Kansas Natural Resource Coalition; Cameron Edwards; Lone Butte Farms, LLC; Schilling Land, LLC; and JDC Farms, Inc.*

---

[13] KNRC members Clark, Ford, Haskell, Hodgeman, Kearny, Lane, Logan, Morton, Seward, Sherman, Stanton, Stevens, Trego, and Wallace counties, are located within the range of the Northern DPS of the lesser prairie-chicken and have populations of less than 50,000 people, and are therefore "small governmental jurisdictions" for purposes of the RFA. *See* 5 U.S.C. § 601(5).

 **UNITED STATES POSTAL SERVICE** ®    |    www.pitneybowes.com



**US POSTAGE & FEES PD** IMI
04/12/2023
From 95814

Zone 8

**Pitney Bowes CommPrice**

Flat Rate Envelope

028W0002310118

9062327595

## USPS PRIORITY MAIL®

Kiren Mathews
555 Capitol Mall, Ste 1290
Sacramento CA 95814-4605

Expected Delivery Date: 04/14/2023

**0021**

**C000**

THE HON. DEBRA A. HAALAND
U.S. DEPARTMENT OF INTERIOR
1849 C ST NW
WASHINGTON DC 20240-0002

**USPS CERTIFIED MAIL**



**9402 8091 0515 6019 4744 69**

SOP-2022-DR-035-CY/60-Day
Notice

 **UNITED STATES POSTAL SERVICE** ®  |  www.pitneybowes.com

 **P**

**US POSTAGE & FEES PD** IMI
04/12/2023
From 95814

Zone 8



**Pitney Bowes CommPrice**
Flat Rate Envelope

028W0002310106

9062327595

## USPS PRIORITY MAIL®

Kiren Mathews
555 Capitol Mall, Ste 1290
Sacramento CA 95814-4605

Expected Delivery Date: 04/14/2023

**0021**

**C000**

THE HON. MARTHA WILLIAMS, DIRECTOR
UNITED STATES FISH & WILDLIFE SERVICE
1849 C ST NW, RM 3331
WASHINGTON DC 20240-1000

**USPS CERTIFIED MAIL**



**9402 8091 0515 6019 4759 92**

SOP-2022-DR-035-CY/60-Day
Notice