**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION**

| | | |
|---|---|---|
| KANSAS NATURAL RESOURCE COALITION, et al., | ) ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | No. 7:23-cv- 00159-DC -RCG |
| v. | ) | |
| | ) | |
| UNITED STATES FISH AND WILDLIFE SERVICE, et al., | ) ) | |
| | ) | |
| *Defendants.* | ) | |

**DEFENDANTS' COMBINED CROSS-MOTION FOR SUMMARY JUDGMENT AND
RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**INTRODUCTION** ............................................................................................................... 1

**LEGAL BACKGROUND** ................................................................................................. 3

   I.   Endangered Species Act ........................................................................................... 3

   II.   The Regulatory Flexibility Act ............................................................................... 5

**STATEMENT OF FACTS** ................................................................................................ 6

   I.   The Lesser Prairie-Chicken ..................................................................................... 6

      A.   Species Characteristics and Decline ................................................................... 6

      B.   ESA Listing History ........................................................................................... 7

   II.   Listing Determination and 4(d) Rule ..................................................................... 8

   III.   The 4(d) Rule's effects ......................................................................................... 10

**STANDARD OF REVIEW** ............................................................................................ 12

**ARGUMENT** .................................................................................................................. 13

   I.   Extending Section 9's prohibition against "take" is within the Service's Congressionally delegated authority under the ESA .......................................................................... 13

   II.   Congress explicitly delegated to the Secretary the ability to extend take prohibitions to threatened species within the bounds of Section 9 of the ESA. ................................ 15

   III.   The major questions doctrine is not implicated by the 4(d) Rule. ................................ 18

   IV.   Even if the "necessary and advisable" standard applied, the 4(d) Rule satisfies that standard. ............................................................................................................ 21

   V.   Section 4(d)'s "necessary and advisable" standard does not require the consideration of economic costs. ...................................................................................................... 22

A.   The structure and surrounding provision of Section 4(d) of the ESA confirm that consideration of costs is not required. ................................................................... 22

B.   *Michigan v. EPA* is distinguishable................................................................ 24

C.   Because the 4(d) Rule was coextensive with the listing rule, the Service could not consider costs when determining whether the 4(d) Rule was "necessary  and advisable." .. 25

VI.   Because assessing costs is prohibited, an RFA analysis was not required. ................... 28

VII.   The Service provided a rational explanation and considered all relevant factors. .......... 28

**CONCLUSION** .................................................................................................. **30**

# TABLE OF AUTHORITIES

STATUTES

5 U.S.C. § 601 ........................................................................................................... 5

5 U.S.C. § 602 ..................................................................................................... 5, 6, 7

5 U.S.C. § 603 ........................................................................................................... 5

5 U.S.C. § 604 ........................................................................................................... 6

5 U.S.C. § 706 ......................................................................................................... 13

16 U.S.C. § 1531 ............................................................................................. 3, 4, 17

16 U.S.C. § 1532 ........................................................................................... 1, 3, 23

16 U.S.C. § 1533 ....................................................... 3, 4, 5, 13, 17, 23, 25, 27

16 U.S.C. § 1536 ..................................................................................... 4, 5, 10

16 U.S.C. § 1538 ........................................................................................... 4

16 U.S.C. § 1539 ................................................................................. 5, 10, 12

42 U.S.C. § 7412 ....................................................................................... 24


FEDERAL REGULATIONS

50 C.F.R. § 17.32 ....................................................................................... 5

50 C.F.R. § 424.11 ..................................................................................... 4

61 Fed. Reg. 4722, 4725 (Feb. 7, 1996) ............................................... 1

CASES

*Alabama Association of Realtors v. Department of Health & Human Services*,
    594 U.S. 758 (2021) ........................................................................... 19

*Alsea Valley All. v. Lautenbacher,*.
    No. 06-6093-HO, 2007 WL 2344927 (D. Or. Aug. 14, 2007) ............... 14

*Am. Power & Light Co. v. SEC*,
    329 U.S. 90 (1946) ............................................................................. 17

*Big Time Vapes, Inc. v. FDA*,
    963 F.3d 436 (5th Cir. 2020) ....................................................... 17-18

*Cal. State Grange v. Nat'l Marine Fisheries Serv.*,
    620 F. Supp. 2d 1111 (E.D. Cal. 2008) ............................................. 21

*Defs. of Wildlife v. Babbitt*,
    958 F. Supp. 670 (D.D.C. 1997)(d) ................................................... 26

*Delta Talent, LLC v. Wolf,*
 448 F. Supp. 3d 644 (W.D. Tex. 2020) ................................................ 12

*Turtle Island Restoration Network v. U.S. DOC,*
 878 F.3d 725 (9th Cir. 2017) ............................................................ 27

*Gulf Restoration Network v. U.S. Dep't of Transp.,*
 452 F.3d 362 (5th Cir. 2006) ............................................................ 13

*Gundy v. United States,*
 588 U.S. 128 ...................................................................................... 16

*Hibbs v. Winn,*
 542 U.S. 88 (2004) ............................................................................ 23

*In re Polar Bear Endangered Species Act Listing,*
 818 F. Supp. 2d 214 (D.D.C. 2011) .................................................. 14

*Lamie v. U.S. Trustee,*
 540 U.S. 526 (2004) .......................................................................... 24

*Louisiana v. Verity,*
 853 F.2d 322 (5th Cir. 1988) ..................................... 13, 15, 20, 28, 29

*Michigan v. U.S. E.P.A.,*
 576 U.S. 743 (2015) ...................................................................... 24, 25

*Miss. River Basin All. v. Westphal,*
 230 F.3d 170 (5th Cir. 2000) ............................................................ 13

*Mistretta v. United States,*
 488 U.S. 361 (1989) ...................................................................... 16, 17

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
 463 U.S. 29, 43 (1983)) ................................................................ 27, 28

*National Federation of Independent Business v. Department of Labor, OSHA,*
 595 U.S. 109 (2022) .......................................................................... 19

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.,*
 515 U.S. 687 (1995) .................................................................. 16, 17, 20

*Permian Basin Petroleum Ass'n v. Dep't of Interior,*
 127 F. Supp. 3d 700 (W.D. Tex. 2015) ............................................ 7, 8

*Ring Precision, Inc. v. Jones,*
 722 F.3d 711 (5th Cir. 2013) ............................................................ 13

*Safari Club Int'l v. Babbitt,*
 No. MO-93-CA-001, 1993 U.S. Dist. LEXIS 21795 (W.D. Tex. Aug. 12, 1993) ................ 20

*Safari Club Int'l v. Jewell,*
   960 F. Supp. 2d 17 (D.D.C. 2013) ........................................................................ 4

*Sierra Club v. U.S. Fish & Wildlife Serv.,*
   245 F.3d 434 (5th Cir. 2001) ........................................................................ 3, 17

*Sweet Home Chapter of Cmtys for a Great Or. v. Babbitt,*
   1 F.3d 1 (D.C. Cir. 1993) ........................................................................ 14, 15

*Sweet Home Chapter of Cmtys. for a Great Or. v. Lujan,*
   806 F. Supp. 279 (D.D.C. 1992) ........................................................................ 21

*Tenn. Valley Auth. v. Hill,*
   437 U.S. 153 (1978) ........................................................................ 3, 20

*Trout Unlimited v. Lohn,*
   559 F.3d 946 (9th Cir. 2009) ........................................................................ 21

*Wash. Env't Council v. Nati'l Marine Fisheries Serv.,*
   No. C00-1547R, 2002 WL 511479 (W.D. Wash. Feb. 27, 2002) ........................................................................ 14

*West Virginia v. EPA,*
   142 S. Ct. 2587 (2022) ........................................................................ 18, 19, 20

*Whitman v. Am. Trucking Ass'ns,*
   531 U.S. 457–75 (2001) ........................................................................ 16, 18

# INTRODUCTION

For the past several decades, the lesser prairie-chicken has faced a drastic decline in suitable habitat, which is threatening the species' future existence. Although the species once occupied grasslands throughout the Southern Great Plains, human development activities, related to agriculture and oil and gas exploration, among other things, have dramatically degraded or destroyed much of the habitat within the  lesser prairie-chicken's historic range. As a result, the species' remaining populations are much smaller and much more fragmented, making them more vulnerable to extirpation from environmental stressors and extreme weather events. Pursuant to the requirements of the Endangered Species Act ("ESA"), the U.S. Fish and Wildlife Service ("the Service") conducted an extensive scientific review of the lesser prairie-chicken. This review included an analysis of the extensive conservation efforts and partnership initiatives of private landowners, federal and state agencies and other interested groups. While these entities have worked together for years to craft land management plans and voluntary programs that incentivize conservation,  the Service ultimately concluded that existing conservation measures have proven inadequate to prevent the lesser prairie-chicken's continued decline. In recognition of these shortcomings, the Service determined that two distinct population segments ("DPS")[1] of the lesser prairie-chicken met the statutory requirements to warrant listing under the ESA. The Service listed the Southern DPS as endangered, and the Northern DPS – which is the population segment of the species regulated by the rule being challenged in this case – as threatened.

At issue in this case is a regulation extending prohibitions equivalent to those of ESA

---

[1] Under the ESA, a "species" includes "any [DPS] of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16). To be classified as a "distinct population segment," a population of a species must be both "discrete" and "significant." Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act, 61 Fed. Reg. 4722, 4725 (Feb. 7, 1996).

Section 9's prohibition against "take" to the Northern DPS. Although Section 9 of the ESA prohibits take of any endangered species, Section 4(d) of the ESA delegates to the Service the ability to extend these protections to threatened species as well. To that end, concurrent with listing the Northern DPS as threatened, the Service promulgated a protective regulation (a "4(d) Rule"), in which the agency exercised its authority to extend Section 9 prohibitions to the Northern DPS of the lesser prairie-chicken. Extending Section 9's protections to the Northern DPS through the 4(d) Rule is important because the ability to regulate habitat degradation, which is the primary threat to the species, is extremely limited absent specific regulations applying to private landowners. Indeed, the primary reason existing conservation measures were not expected to prevent continued declines in habitat quantity and quality is that the vast majority of existing lesser prairie-chicken habitat (approximately 97 percent) is on privately-owned land. Thus, as part of the listing rule designating the Northern DPS as a threatened species, the Service determined that the prohibitions set forth in Section 9 of the ESA should be extended to the Northern DPS and that the 4(d) Rule would promote the conservation of the species by encouraging efforts to conserve and manage the species' habitat.

While Plaintiffs take issue with the 4(d) Rule for a variety of reasons, their fundamental argument is based on an incorrect interpretation of Section 4(d) of the ESA. Plaintiffs myopically focus on the first sentence of Section 4(d), arguing that the Service was required to show that the 4(d) Rule was "necessary and advisable" to provide for the conservation of the species. In making this argument, Plaintiffs fail to account for the broad latitude afforded to the Service through the second sentence of Section 4(d), which explicitly authorizes the Secretary of the Interior to extend to threatened species any act prohibited under Section 9. Moreover, even if it were true that the Service must first find that the 4(d) Rule was "necessary and advisable" to

provide for the conservation of the species before promulgating any regulation extending Section 9's prohibitions, the 4(d) Rule easily meets that standard as well. The Service acted within its Congressionally delegated authority and provided a rational explanation for its decisions in promulgating the 4(d) Rule. Accordingly, the 4(d) Rule should be upheld.

## LEGAL BACKGROUND

### I.    Endangered Species Act

In 1973, Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). As the Supreme Court has noted, the ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation," and "[t]he plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180, 184 (1978). "[T]he objective of the ESA is to enable listed species not merely to survive, but to recover from their endangered or threatened status." *Sierra Club v. U.S. Fish & Wildlife Serv.*, 245 F.3d 434, 438 (5th Cir. 2001).

Section 4 of the ESA directs the Secretary of the Interior[2] ("Secretary") to determine whether any species should be listed as endangered or threatened. 16 U.S.C. § 1533(a). "Species" includes "any [DPS] of any species of vertebrate fish or wildlife which interbreeds when mature." *Id.* § 1532(16). An endangered species is one that "is in danger of extinction throughout all or a significant portion of its range," and a threatened species is one that is "likely

---

[2] The Secretaries of the Interior and Commerce share responsibility for listing species under the ESA. 16 U.S.C. § 1532(15). The Secretary of the Interior, acting through the Service, is generally responsible for all terrestrial and freshwater species, including the lesser prairie-chicken.

to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(6), (20). The Secretary must make listing determinations based upon five factors: (1) the present or threatened destruction, modification, or curtailment of the species' habitat or range; (2) overutilization for commercial, recreational, scientific, or educational purposes; (3) disease or predation; (4) the inadequacy of existing regulatory mechanisms; and (5) other natural or manmade factors affecting its continued existence. *Id.* § 1533(a)(1); 50 C.F.R. § 424.11(c). The Secretary must make a decision whether to list a species "solely on the basis of the best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A). Under this standard, the Secretary cannot consider economic costs in making listing decisions. *See Safari Club Int'l v. Jewell*, 960 F. Supp. 2d 17, 30 (D.D.C. 2013) (cleaned up) (citations omitted) (Because a listing decision "is a biological, not economic, question" it "must be made without reference to economic costs or private property impacts.").

Once a species is listed as endangered or threatened, several provisions of the statute help ensure the survival and recovery of the species. *See, e.g.*, 16 U.S.C. § 1533(f) (requirement to develop and implement recovery plans for listed species); *id.* § 1536(a)(2) (federal agencies must ensure their action is not likely to jeopardize listed species or adversely modify designated critical habitat). In addition to these protections, which apply equally to threatened and endangered species, Section 9 of the ESA prohibits the "take" of any endangered species of fish or wildlife without prior authorization. *Id.* § 1538 (a)(1)(A), (B). For any species listed as endangered, Section 9 of the ESA makes it unlawful for any person to "import any such species into, or export any such species from, the United States," or to "take any such species within the United States." *Id*. The statute defines "take" as "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19).

By contrast, Section 9 does not automatically prohibit take of threatened species. Rather, Section 4(d) of the ESA authorizes the Service to extend by regulation the Section 9(a)(1) prohibitions to the threatened species. *Id.* § 1533(d). Section 4(d) also requires the Service to issue any other protective measures that the Secretary deems "necessary and advisable to provide for the conservation of such species." *Id.*

If a private party plans to engage in activity that may result in unlawful take of a species, they may develop a habitat conservation plan and apply for an "incidental take permit" that would allow prohibited take that is incidental to otherwise lawful activity. *Id.* § 1539(a)(1)(B); (a)(2)(A); 50 C.F.R. § 17.32(b)(1)(iii)(C). Taking of a listed species in compliance with the terms of an incidental take permit does not violate Section 9 of the ESA. *Id.* § 1539(a)(1)(B). Likewise, a private party can receive regulatory assurances under Section 7 of the ESA if they participate in certain federal programs with associated incidental take permits. *See* 16 U.S.C. § 1536(o)(2) ("[A]ny taking" by an agency or applicant "that is in compliance with the terms and conditions" specified in a Section 7 incidental take permit "shall not be considered to be a prohibited taking of the species concerned.").

## II.    The Regulatory Flexibility Act

The Regulatory Flexibility Act ("RFA") is a primarily procedural statute that requires federal agencies to determine whether a proposed rule will have "a significant economic impact on a substantial number of small entities," including small businesses, small governmental jurisdictions, and certain small nonprofit organizations. 5 U.S.C. § 602(a)(1); *id.* § 601(3)-(6). If an agency determines a proposed rule is likely to have a significant economic impact on a substantial number of small entities, the agency is required to complete an "initial regulatory flexibility analysis" at the proposed rule stage. *Id.* § 603(a). If the agency determines that the rule

will have a significant impact on small entities during this initial analysis, they also must complete a "final regulatory flexibility analysis" when promulgating the final rule. *Id.* § 604(a). The RFA does not require agencies to choose any particular outcome based on these analyses; rather, it only requires agencies to consider the economic impacts of a rule on small entities and to assess the feasibility of alternative options.

**STATEMENT OF FACTS**

I.      **The Lesser Prairie-Chicken**

A.      **Species Characteristics and Decline**

The lesser prairie-chicken is a stout, ground-dwelling species of prairie grouse historically found in the southern and central high plains of the United States. FWS17971 (Final Rule). The lesser prairie-chicken is commonly recognized by its "lek" mating behavior where males traditionally gather to conduct a courtship display to attract females for mating. *Id.* The species prefers large areas of native prairies for most of their essential life functions such as mating and nesting, but they tend to avoid using areas with trees, vertical structures, and other disturbances in areas with otherwise adequate habitat conditions. FWS17973. To maintain healthy populations, the species requires large areas of ecologically diverse grasslands and shrublands with limited trees and human-made structures. *Id.* Males tend to exhibit strong breeding site fidelity, meaning they often return to the same lek even in cases where female attendance or habitat conditions are  in decline. FWS17971. Females usually build nests close to a lek, where they incubate their eggs and raise broods of young throughout the summer. *Id.* Adequate vegetative cover along with a lack of large vertical structures are vital elements for nesting sites as eggs and young lesser prairie-chickens are highly susceptible to predation and environmental stressors. *Id.*

6

Available grassland habitat for the lesser prairie-chicken has drastically declined over the past century, with the species now occupying only 10 to 20 percent of their historical range. FWS17972. A variety of sources, including conversion of grassland to cropland, petroleum and natural gas production, wind energy development and powerlines, woody vegetation encroachment, and roads and electrical distribution lines, have contributed to widespread habitat loss for the lesser prairie-chicken. FWS17981. This massive decline in suitable habitat has caused the remaining lesser prairie-chicken populations to be smaller and more isolated, which reduces the species' ability to survive catastrophic events. *Id.* Moreover, temperate grasslands are among the most threatened ecosystems in North America, as well as one of the least conserved. *Id.* Because nearly 97 percent of available grassland habitat is on privately-owned land, the majority of grasslands lack regulatory protective measures to help prevent their continued decline. FWS17991. As a result, the remaining lesser prairie-chicken population is now restricted to small, fragmented grassland patches. *Id.*

B.     **ESA Listing History**

The Service has recognized the need for listing the lesser prairie-chicken due to the species' clear, long-term decline since 1998, when the Service determined that a petition to list the species was warranted but precluded by other higher priority listing actions. FWS17301 (Proposed Rule). The Service published a final rule listing the lesser prairie-chicken as threatened in 2014 concurrently with a 4(d) rule for the species. *Id.* Multiple parties challenged the listing rule and, as a result, in September 2015, this Court vacated the 2014 listing decision, which also mooted the accompanying 4(d) rule. *Permian Basin Petroleum Ass'n v. Dep't of Interior*, 127 F. Supp. 3d 700 (W.D. Tex. 2015).

In 2016, the Service received a new petition to list the lesser prairie-chicken and

subsequently published a 90-day finding concluding that the petitioned action may be warranted. FWS17301. After petitioners challenged the Service's alleged failure to complete the required 12-month finding, pursuant to the settlement agreement in that case, the Service in 2021 proposed to list one DPS of the lesser prairie-chicken as endangered and another as threatened with an accompanying a proposed 4(d) rule. *Id.* The Service published a final rule on November 25, 2022 listing the Northern DPS of the lesser prairie-chicken as threatened and the Southern DPS of the lesser prairie-chicken as endangered and concurrently published protective regulations for the Northern DPS under Section 4(d). *See* FWS17970.

## II.     Listing Determination and 4(d) Rule

At the outset of the listing process, the Service prepared a species status assessment report ("SSA") for the lesser prairie-chicken, which documents the results of a "comprehensive biological review of the best scientific and commercial data regarding the status of the species, including an assessment of the potential threats to the species." FWS17979. The Service uses data from the SSA as the scientific basis to inform its regulatory decisions, including listing decisions and any contemporaneous protections issued pursuant to those decisions. *Id.* Based on this information, the Service determined that the lesser prairie-chicken consists of two distinct populations – the Southern DPS, found in New Mexico and Texas, and the Northern DPS, found in Texas, Oklahoma, Colorado, and Kansas. *See* FWS17970. For the Northern DPS specifically, the Service determined that, when evaluating the likely future condition of the landscape, the best available scientific information suggests that because future habitat loss and fragmentation is likely to outpace efforts to restore habitat, remaining habitat is likely to become smaller and more isolated which will further decrease the species' ability to persist. FWS18041-42. Accordingly, the Service concluded that the Northern DPS is likely to become endangered in the

foreseeable future, and thus listed the Northern DPS as threatened. *Id.*

From there, the Service turned its attention to analyzing the primary threats to the Northern DPS outlined in the SSA to develop a 4(d) rule designed to address the specific threats and conservation needs of the species. FWS18045. First, the Service determined that habitat loss and fragmentation are the primary threats to the species. *Id.* Specifically, the activities affecting lesser prairie-chicken habitat are largely land use practices and land development. FWS17991. Additionally, 97 percent of viable lesser prairie-chicken habitat occurs on private lands without regulations ameliorating the primary threats to the lesser prairie-chicken. *Id.* This means that, absent a 4(d) rule specifically regulating private land, most existing conservation measures for the Northern DPS would be voluntary, incentive-based actions rather than regulatory mechanisms, which the Service determined would be inadequate to recover the species. FWS17991. Accordingly, the Service determined that to prevent further population declines, it was necessary to apply prohibitions equivalent to those of Section 9 of the ESA to the Northern DPS while carving out exceptions for specific activities that either incentivize conservation or are not expected to have a negative impact on the species' conservation. *Id.* These exceptions include incidental take resulting from (1) routine agricultural activities on existing cultivated lands; (2) implementation of prescribed fire for the purposes of grassland management; and (3) implementation of prescribed grazing following a site-specific grazing management plan developed by a Service-approved party. FWS18046-47. As a result, while the Northern DPS will be treated as an endangered species by regulating take of the species, these exceptions provide multiple avenues for the continuation of existing land uses that will not negatively impact the species. Taken in conjunction with the existing permit coverage provided by several ongoing conservation efforts, and the availability of new permits through Section 7 or Section 10 of the

ESA, the majority landowners have multiple opportunities to continue existing land use practices with minimal, if any, disruption to conserve the species.

## III.    The 4(d) Rule's effects

Although Defendants' do not challenge Plaintiffs' standing in this case, Plaintiffs' descriptions of the potential impact of the 4(d) Rule largely misrepresent the actual effects of the 4(d) Rule on private landowners. First, the Private Landowner Plaintiffs assert that they have "voluntarily conserved" large areas of native grasslands and will be liable to enforcement action if they continue to convert areas of their property to native grassland under the 4(d) Rule. ECF No. 28-5 ¶¶ 7, 18; ECF No. 28-4 ¶ 7. But the 4(d) Rule does not prevent such actions; areas that are not already native grasslands are not considered lesser prairie-chicken habitat and thus disturbances within those areas would not constitute "take" within the meaning of the ESA. *See* FWS18046 (explaining that habitat restoration would not result in take violations); FWS18015 ("[I]mpacts that result in modifications to habitat would constitute a taking of a listed species under the definition of 'harm' if the action results in significant modification of habitat that significantly impairs an essential behavioral pattern that would likely result in killing or injuring that species.").

Moreover, Plaintiffs' description of how livestock grazing activities interact with the 4(d) Rule is inaccurate. Contrary to Plaintiffs' assertions, the 4(d) Rule does not "require" landowners to implement a grazing plan developed by a Service-approved party, rather, the 4(d) Rule grants an exception to take prohibitions for any take resulting from grazing for landowners following such grazing plan. *See* FWS18045. If landowners are concerned that grazing activities may result in prohibited take, they can also apply for a permit pursuant to Section 10 of the ESA. *See* 16 U.S.C. § 1539(1)(B). In addition, because incidental take statements issued under Section 7 of

the ESA can apply to third parties in addition to federal agencies, landowners can receive regulatory assurances if they participate in certain federal programs. *See* 16 U.S.C. § 1536(o)(2). For example, Plaintiff Landowners discuss their enrollment or desire to enroll in the Natural Resources Conservation Service's Environmental Quality Incentives Program ("EQIP"), which is a voluntary United States Department of Agriculture ("USDA") conservation program that offers financial incentives and cost-share and technical assistance to farmers for implementing beneficial conservation measures on their land. Environmental Quality Incentives Program, USDA Natural Resources Conservation Service, https://www.nrcs.usda.gov/programs-initiatives/eqip-environmental-quality-incentives (last visited May 17, 2024). That is why, as Plaintiffs acknowledge, ranchers that receive federally funded EQIP grants are required to implement grazing plans developed through mandatory Section 7 compliance procedures developed between USDA and the Service. Implementation of these grazing plans provide regulatory assurances to ranchers receiving EQIP grants for lesser prairie-chicken take that is incidental to grazing activities. As long as ranchers continue to implement such grazing plans included in their EQIP contracts, the associated grazing plans will provide take coverage even after their contract expires.

Plaintiffs also express concern about potential liability for activities that will not – or are extremely unlikely to – result in prohibited take under the 4(d) Rule. These activities include road maintenance, maintenance of radio towers, and the spraying of noxious weeds. *See* ECF No. 28 at 11, 24-25. First, existing roads and radio towers themselves, as well as the spaces immediately adjacent to these features are not suitable habitat for lesser prairie-chickens. *See* FWS18039. To that end, maintenance of these structures (as opposed to new construction) is exceedingly unlikely to result in take of the species. *Id.* ("[N]o exception from the prohibitions is

needed" for "activities [that] are taking place in areas that are not suitable habitat for lesser prairie-chicken[.]"). Moreover, only the application of herbicides that would result in "sustained alteration" of native vegetation in preferred lesser prairie-chicken habitat would result in Section 9 take. FWS18011. Thus, the spraying of invasive or "noxious" weeds in areas dominated by invasive species is highly unlikely to result in take because lesser prairie-chickens do not occupy these areas. *Id.*

Finally, Plaintiffs misleadingly contend that the 4(d) Rule eliminates all previous opportunities for landowners to convert grasslands to cropland or to expand oil drilling on their land. *See* ECF No. 28 at 21. But while Plaintiffs are correct that these activities may result in take, as explained above, landowners have the ability to apply for a permit through Section 10 of the ESA, which would provide take coverage for any activities covered by the permit. *See* 16 U.S.C. § 1539(1)(B). In addition, the Service has worked to ensure that there are various streamlined ESA-compliance options available for interested parties across multiple industries, including oil and gas, renewable energy, and livestock grazing. *See*, *e.g.*, FWS17991-93 (describing a variety of existing conservation plans and agreements with associated incidental take permits). Many of these options involve simply enrolling in existing conservation plans or conservation agreements. *See id.*; *e.g.*, FWS18039 ("[A]ny take associated with activities" within existing Candidate Conservation Agreements with Assurances "would be covered by the associated [S]ection 10(a)(1)(A) permit.").

## STANDARD OF REVIEW

Where the Court is reviewing an agency decision under the Administrative Procedure Act ("APA"), summary judgment is the appropriate means for resolving claims because "the entire case on review is a question of law." *Delta Talent, LLC v. Wolf*, 448 F. Supp. 3d 644, 650 (W.D.

Tex. 2020) (citations omitted). Under the APA, the Service's decision must be upheld unless the decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Review under that standard is 'narrow' and [courts] must be mindful 'not to substitute [their] judgment for that of the agency.'" *10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 723 (5th Cir. 2013) (citation omitted). Rather, the Court must only ensure that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action" and "consider whether the decision was based on a consideration of relevant factors and whether there was a clear error of judgment." *Id.* (alteration in original) (citation omitted). Courts must be particularly deferential to agency determinations made within the scope of the agency's expertise. *Miss. River Basin All. v. Westphal*, 230 F.3d 170, 175 (5th Cir. 2000); *Gulf Restoration Network v. U.S. Dep't of Transp.*, 452 F.3d 362, 368 (5th Cir. 2006).

## ARGUMENT

### I.     Extending Section 9's prohibition against "take" is within the Service's Congressionally delegated authority under the ESA.

Section 4(d) of the ESA expressly provides that the Secretary of the Interior "may by regulation prohibit with respect to any threatened species any act prohibited under [S]ection 1538(a)(1)" of the Act. 16 U.S.C. § 1533(d). In addition, the immediately preceding sentence of that section of the ESA requires the Secretary to "issue regulations as [she] deems necessary and advisable to provide for the conservation of [any threatened species]." *Id.* The combination of the two sentences of Section 4(d) provides the Secretary with wide latitude of discretion to select and promulgate appropriate regulations tailored to the specific conservation needs of the threatened species. Moreover, the second sentence grants particularly broad discretion to the Service when adopting one or more of the prohibitions under Section 9. Courts have frequently upheld, as a valid exercise of agency authority, rules developed under Section 4(d) that included

limited prohibitions against takings.  *See, e.g.*, *Louisiana v. Verity*, 853 F.2d 322 (5th Cir. 1988) (upholding a rule that required installation of certain fishing devices in order to reduce take); *Alsea Valley All. v. Lautenbacher*, No. 06-6093-HO, 2007 WL 2344927 (D. Or. Aug. 14, 2007) (upholding a rule that prohibits take of natural salmon populations but not hatchery stock), *aff'd*, 319 F. App'x 588 (9th Cir. 2009); *Wash. Env't Council v. Nati'l Marine Fisheries Serv.*, No. C00-1547R, 2002 WL 511479 (W.D. Wash. Feb. 27, 2002) (upholding a rule containing limited take prohibitions). Here, in issuing the 4(d) Rule, the Service plainly acted within the bounds of its authority under the ESA. The Service thoroughly contemplated the primary threats to the Northern DPS and outlined why existing conservation measures are inadequate to recover the species. *See* FWS18045. Then, the Service deliberately constructed a 4(d) rule to include protections, including Section 9 prohibitions, that specifically promote the conservation of the Northern DPS of the lesser prairie-chicken. *Id.* at FWS18045-48.

Plaintiffs' key argument opposing the 4(d) Rule for the lesser prairie-chicken is based on a mischaracterization of the Service's authority and obligations under Section 4(d) of the ESA. Plaintiffs argue that Section 4(d) provides a single grant of authority pursuant to which the Service must issue regulations that it deems necessary and advisable to provide for the conservation of a threatened species. ECF No. 28 at 18-19. But as explained above, Section 4(d) of the ESA contains two sentences that confer authority upon the agency. The first requires the Secretary to issues regulations that she deems advisable for the conservation of the species and the second permits her to extend some or all of Section 9's take prohibitions.

Plaintiffs attempt to read out the second sentence and focus myopically on the first. Yet, in similar challenges to regulations promulgated pursuant to Section 4(d), courts have held it reasonable to interpret the provision as representing two separate grants of authority. *Sweet*

*Home Chapter of Cmtys for a Great Or. v. Babbitt*, 1 F.3d 1, 7-8 (D.C. Cir. 1993); *see also In re Polar Bear Endangered Species Act Listing*, 818 F. Supp. 2d 214, 229-30 (D.D.C. 2011). Specifically, the D.C. Circuit determined that the second sentence of Section 4(d) gives the Service the discretion to apply any or all of Section 9's prohibitions to threatened species without obliging it to support such actions with findings of necessity because only the first sentence of Section 4(d) contains the phrase "necessary and advisable." *Sweet Home*, 1 F.3d at 8. While Plaintiffs contend that *Sweet Home* is unpersuasive, ECF No. 28 at 21, they provide no conflicting caselaw to support their position.

Nor could they in this Circuit, as the Fifth Circuit has also distinguished the two grants of authority in Section 4(d), describing the first sentence as instilling a "mandatory duty" upon the Secretary, and characterizing the second sentence as a "discretionary authority to prohibit by regulation the taking of *any* threatened species of fish and wildlife" that "supplements the statutory prohibition against the taking of endangered species[.]" *Verity*, 853 F.2d at 333. Thus, the Service's extension of some of the Section 9 prohibitions as part of the 4(d) Rule are plainly a valid exercise of the authority conferred by the ESA.

## II.      Congress explicitly delegated to the Secretary the ability to extend take prohibitions to threatened species within the bounds of Section 9 of the ESA.

As explained above, the plain language of the ESA grants the Service, through the Secretary of the Interior, the authority to extend some or all of Section 9's take prohibitions. Plaintiffs argue that this reading of the statute raises concerns under the non-delegation doctrine. ECF No. 28 at 19-21. To avoid any alleged conflict, Plaintiffs propose that this Court require the Service to adopt an interpretation that relies on the "necessary and advisable language" of the first sentence of Section 4(d), ignoring the second independent grant of authority provided by Congress. Plaintiffs' interpretation is neither proper nor required, as the Service's interpretation

of its authority under Section 4(d) is neither "boundless" nor does not conflict with the nondelegation doctrine. *Cf. id.* at 21.

Under the nondelegation doctrine, when Congress confers legislative authority to another branch of government, it must formulate "an intelligible principle" to which the person or body authorized to exercise the delegated authority is directed to conform. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474–75 (2001). This standard is a lenient one, as the Supreme Court has recognized that "in our increasingly complex society, . . . Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Mistretta v. United States,* 488 U.S. 361, 372 (1989). This is especially true for tasks that require "an expertise and attention to detail that exceeds the normal province of Congress." *Babbitt v. Sweet Home Chapter of Cmtys*. for a Great Or., 515 U.S. 687, 708 (1995). Indeed, the Supreme Court has only invalidated two statutes for violating this principle: one statute that "provided literally no guidance for the exercise of discretion," and another statute that "conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'" *Whitman*, 531 U.S. at 474 (citing *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935), and *A. L. A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935)).

Plaintiffs propose that this Court construe Section 4(d)'s two authorizing sentences together so that any limits imposed by the "necessary and advisable" language in the first sentence apply to regulations authorized by the second sentence. ECF No. 28 at 20. That interpretation is not necessary given the plain language of the statute. *Gundy v. United States*, 588 U.S. 128, 136, *reh'g denied*, 140 S. Ct. 579 (2019) ("Given that standard, a nondelegation inquiry always begins (and often almost ends) with statutory interpretation. [T]he answer requires construing the challenged statute to figure out what task it delegates and what

instructions it provides."). Here, Congress has plainly spoken that pursuant to the second sentence of Section 4(d), the Service may apply some or all of the prohibitions equivalent to those listed in Section 9 of the statute. 16 U.S.C. § 1533(d). Plaintiffs' argument that the Service's interpretation of Section 4(d) authorizes it to forbid "*any* activity for that affects *any* threatened species, for any reason or no reason whatsoever" ECF No. 28 at 20, fully ignores that this provision only allows the Service to extend prohibitions exclusive to Section 9(a)(1) of the ESA. The Service has not put forth an interpretation of the second grant of authority conferred by Section 4(d) that suggests the agency can freely regulate threatened species outside the bounds of Section 9.

Moreover, the specific provision of Section 4(d) of the ESA that the Service relied on to promulgate the 4(d) Rule should not be "tested in isolation," but should instead be viewed in light of the purpose of the ESA and the "statutory context in which [it] appear[s]." *See Am. Power & Light Co. v. SEC*, 329 U.S. 90, 104 (1946). In promulgating rules pursuant to § 1533(d), the Service is guided by the overall purpose of the ESA, which is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b). The ESA's rich legislative history adds further context to its purpose. *See, e.g.*, 119 Cong. Rec. 42913 (1973) ("The purposes of the bill included the conservation of the species and of the ecosystems upon which they depend, and every agency of government is committed to see that those purposes are carried out."). Likewise, courts have consistently acknowledged that the ESA's "plain intent" was to "halt and reverse the trend toward species extinction." *Sierra Club v. U.S. Fish & Wildlife Serv.*, 245 F.3d 434, 438 (5th Cir. 2001) (quoting *Hill*, 437 U.S. at 184); *see also Babbitt*, 515 U.S. at 698 ("[T]he broad purpose of the ESA supports the Secretary's decision to extend protection against activities that cause the

17

precise harms Congress enacted the statute to avoid."). These additional sources of guidance are sufficient to satisfy the intelligible principle requirement. *See Mistretta,* 488 U.S. at 376 n.10; *see also Big Time Vapes, Inc. v. FDA*, 963 F.3d 436, 443 (5th Cir. 2020) ("[W]hen evaluating whether Congress laid down a sufficiently intelligible principle, we're meant also to consider the 'purpose of the [statute], its factual background[,] and the statutory context.'") (quoting *Am. Power & Light Co.,* 329 U.S. at 104)).

In sum, the Service's 4(d) Rule does not run afoul of the non-delegation doctrine. Congress has plainly spoken that the Service, through the authority granted by the second sentence of Section 4(d), may extend Section 9's take prohibitions so long as those prohibitions fall within the bounds of Section 9. All that is left for the Service to determine, based on its scientific expertise, is which of those prohibitions to extend. That is sufficient to demonstrate the existence of an intelligible principle.

### III.    The major questions doctrine is not implicated by the 4(d) Rule.

For the reasons described above, the 4(d) Rule is also not at odds with the major questions doctrine. *Cf.* ECF No. 28 at 27-28. The Supreme Court has recognized that when an agency asserts statutory authority, there are sometimes "extraordinary cases in which the history and the breadth of the authority that the agency has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority." *West Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022) (citing *FDA v. Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 159-60) (cleaned up). In such cases, there must be clear congressional authorization for the power asserted by the agency because "Congress does not alter a regulatory scheme's fundamental details in vague terms or ancillary provisions[.]" *Whitman*, 531 U.S. at 462 (citing *MCI Telecomm. Corp. v. Am. Tel. & Tel. Co.,*

512 U.S. 218 (1994)).

Extending take prohibitions to one DPS of the lesser prairie-chicken with exemptions for continuation of routine agricultural practices on cultivated lands, implementation of prescribed fire for grassland management, and grazing activities that follow a site-specific grazing management plan, is not the type of "extraordinary" regulatory actions the *West Virginia* court identified as triggering the major questions doctrine. Those examples include a rule mandating vaccinations for a quarter of the population, *National Federation of Independent Business v. Department of Labor, OSHA,* 595 U.S. 109 (2022); a rule granting permitting authority over millions of pollution sources, *Utility Air Regulatory Group v. E.P.A.*, 573 U.S. 302, 324 (2014); and a rule imposing a moratorium on evictions that was applicable to at least 80% percent of the country and had an economic impact of approximately $50 billion, *Alabama Association of Realtors v. Department of Health & Human Services,* 594 U.S. 758, 764 (2021). Here, in contrast, the agency has promulgated an ordinary rule adjusting the protections that apply to one DPS of a species under the ESA. Neither "the history and the breadth of the authority that the agency has asserted" nor "the economic and political significance of that assertion" is extraordinary.  *West Virginia*, 142 S. Ct. at 2608. Rather, this is plainly an "ordinary case[]" where the traditional rules of statutory construction, including the "words of a statute" and "their place in the overall statutory scheme," define the scope of agency authority. *Id*. at 2607-08.

Moreover, in *West Virginia* the Court found that the statutory provision at issue was "obscure" and "ancillary" to the statute's primary authority, and thus it did not clearly authorize the Environmental Protection Agency ("EPA") to promulgate a regulatory scheme that would result in an "aggressive transformation in the domestic energy industry." *Id.* at 2602-04. By contrast, Section 4(d) of the ESA uses specific terms to effectuate the essential purpose of the

ESA – promoting the conservation of at-risk species – by granting the Service authority to extend to threatened species protections that are automatically afforded to endangered species. While Plaintiffs argue that the authority conferred to the Service by the second sentence of Section 4(d) is too broad, on its face, the authority is actually quite narrow – it allows, at most, the Service to clone specific prohibitions expressly dictated by Congress and apply them to threatened species. But even accepting Plaintiffs' assertion that Section 4(d) authority is *broad*, this does not mean that it is not *clear*. In fact, courts have consistently upheld regulations where the Service has asserted broad authority pursuant to the ESA, including 4(d) rules. *See, e.g.*, *Verity*, 853 F.2d at 333 ("[T]he ESA also provides the Secretary discretionary authority to prohibit by regulation the taking of *any* threatened species of fish and wildlife."); *Safari Club Int'l v. Babbitt, No.* MO-93-CA-001, 1993 U.S. Dist. LEXIS 21795, at *38 (W.D. Tex. Aug. 12, 1993) ("It is clear, therefore, Congress intended the [ESA] to be read broadly to ensure the Congressional intent to protect threatened and endangered species for the benefit of mankind.").

While the lesser prairie-chicken 4(d) Rule may have economic impacts on private landowners within the region that constitutes the DPS's range, this is far from the assertions of "extravagant statutory power over the national economy" that the Court found must be met with "skepticism." *West Virginia*, 142 S. Ct. at 2609 (quoting *Util. Air,* 573 U.S. at 324). And the ESA's history supports that Congress intended to grant the Service authority to promulgate such rules. Indeed, the Supreme Court has held that "[t]he plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost. This is reflected not only in the stated policies of the Act, but in literally every section of the statute." *Hill*, 437 U.S. at 184. The ESA's legislative history further confirms Congress's intent: "[w]hereas predecessor statutes [to the ESA] enacted in 1966 and 1969 had not contained any

sweeping prohibition against the taking of endangered species except on federal lands . . . the [ESA, as enacted] applied to *all* land in the United States and to the Nation's territorial seas." *Babbitt*, 515 U.S. at 698. Accordingly, Congress granted the Service clear authority to extend Section 9 prohibitions to threatened species.

IV.    **Even if the "necessary and advisable" standard applied, the 4(d) Rule satisfies that standard.**

The Service has broad discretion to determine what it deems necessary and advisable to provide for the conservation of threatened species. *See, e.g.*, *Trout Unlimited v. Lohn*, 559 F.3d 946, 950 (9th Cir. 2009) ("A threatened species . . . is subject to [the Service's] discretionary protection."); *Cal. State Grange v. Nat'l Marine Fisheries Serv.*, 620 F. Supp. 2d 1111, 1200 (E.D. Cal. 2008) ("Section 4(d) gives [the Service] the discretion to extend or not extend take protections as 'deem[ed] necessary for the conservation of such species.'"); *Sweet Home Chapter of Cmtys. for a Great Or. v. Lujan*, 806 F. Supp. 279, 287 (D.D.C. 1992) ("The statute gives the Secretary broad discretion to issue regulations 'as he deems necessary and advisable.'"). Courts in these cases have upheld a wide variety of regulations pursuant to the agency's scientific expertise and the expansive authority conferred on the Service when crafting 4(d) rules.

Although not required, here the Service also determined that the lesser prairie-chicken 4(d) Rule as a whole was necessary and advisable for the conservation of the species. *See* FWS18045. Specifically, the Service determined that extending Section 9 take prohibitions is necessary to curb the primary threats contributing to the species' decline. *Id.* The Service also considered activities that are critical to the conservation of the species and explored opportunities to provide exceptions for those activities to further the conservation value of the 4(d) Rule. *Id* at FWS18045-48. The Service ultimately determined that although short-term adverse effects may occur from activities related to prescribed fire, livestock grazing, and routine agriculture

practices, regulating incidental take related to these activities is not necessary and advisable for the conservation of the species. *See id.* at FWS18046. ("[T]he 4(d) rule will also provide for the conservation of the species by allowing exceptions that incentivize conservation actions or that, while they may have some minimal level of take of the Northern DPS of the lesser prairie-chicken, are not expected to rise to the level that would have a negative impact ( i.e., would have only de minimis impacts) on the species' conservation."). By crafting a rule that both regulates the sources of threats identified through analyzing the best available science and provides exceptions for actions deemed essential to the conservation of the species, the Service easily meets the "necessary and advisable" standard. Thus, even if the Court were to conclude that in extending Section 9 prohibitions the Service must also find that such action is "necessary and advisable," for all the reasons provided above, the rule meets the standard and should be upheld.

**V.     Section 4(d)'s "necessary and advisable" standard does not require the consideration of economic costs.**

The principal aspect of Plaintiffs' argument in this case rests on the assertion that the phrase "necessary and advisable" within Section 4(d) of the ESA requires the Service to consider economic costs when promulgating a 4(d) rule. However, Plaintiffs' argument fails for two reasons: (1) the context and construction of the ESA support that the Service is not required to consider costs; and (2) the lesser prairie-chicken 4(d) Rule is inherently part of the listing process and thus the Service could not consider costs when promulgating the rule.

**A.     The structure and surrounding provision of Section 4(d) of the ESA confirm that consideration of costs is not required.**

As established above, the ESA provides two grants of authority by which the Service may promulgate protective regulations. Yet, even if the Court requires the Service to interpret its authority by reading both sentences in Section 4(d) together, Plaintiffs' contention that the

Service's necessary and advisable analysis is deficient because it is devoid of any assessment of costs, ECF No. 28 at 22, is also without merit.

As an initial matter, by focusing on only the phrase "necessary and advisable" in the first sentence of Section 4(d), Plaintiffs' argument fails to analyze the full text of the statutory provision, which reads: "Whenever any species is listed as a threatened species . . . the Secretary shall issue such regulations as he deems necessary and advisable *to provide for the conservation of such species.*" 16 U.S.C. § 1533(d) (emphasis added). While Plaintiffs focus only on the term "necessary and advisable," the inclusion of the phrase's subsequent modifier is crucial to analyzing its meaning because "conservation" is defined elsewhere in the statute as "all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." 16 U.S.C. § 1532(3). Taken together, the phrase means the Secretary must promulgate regulations that are necessary and advisable to bring the species to the point at which the ESA's restrictions are no longer necessary. Analyzing the provision as a whole gives the provision the full meaning Congress intended rather than singling out an individual term that, by itself, might be more ambiguous. *See Hibbs v. Winn*, 542 U.S. 88, 101 (2004). ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . ." (citations omitted)).

The language in other parts of the statute also give context to the meaning of Section 4(d). For example, where Congress intended the Service to consider costs related to other actions that the Service must undertake pursuant to Section 4, that direction is explicit in the statute. First, the Service must designate critical habitat "after taking into consideration the economic impact," and second, the Service must estimate "the cost to carry out those measures needed to

achieve [a recovery plan's] goal.[]" 16 U.S.C. § 1533(b)(2); *id.* § 1533(f)(1)(B)(iii). While

Plaintiffs argue this demonstrates that Section 4(d) requires the Service to consider costs in

promulgating 4(d) rules, ECF No. 28 at 27, Supreme Court precedent in fact suggests the

opposite. *See, e.g.*, *Lamie v. U.S. Trustee*, 540 U.S. 526, 537 (2004) (holding that courts should

not add an "absent word" to a statute and that "there is a basic difference between filling a gap

left by Congress' silence and rewriting rules that Congress has affirmatively and specifically

enacted" (quoting *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978)); *Russello v.*

*United States*, 464 U.S. 16, 23 (1983) (holding that if Congress had intended to add a restrictive

phrase to a statutory provision, it "presumably would have done so expressly as it did in the

immediately following subsection"). Indeed, in *Whitman*, the Supreme Court has expressly stated

that it would not "infer[]" a "provision for costs" from ambiguous provisions of the Clean Air

Act because other provisions of the statute "often expressly grant[] the EPA the authority to

consider [] costs[.]" *Whitman,* 531 U.S. at 462 (citing *Union Elec. Co. v. EPA,* 427 U.S. 246, 257

and n.5 (1976)). Thus, the plain meaning of Section 4(d) does not incorporate any requirement to

undertake an economic analysis.

> **B.** *Michigan v. EPA* **is distinguishable.**

Plaintiffs' focus on *Michigan v. EPA* is also misplaced because Section 4(d) of the ESA

lacks the statutory attributes that were pivotal to the Court's decision in that case. In *Michigan*,

the Supreme Court interpreted a provision of the Clean Air Act that "directs the [EPA] to

regulate power plants if it 'finds such regulation is appropriate and necessary.'" *Michigan v. U.S.*

*E.P.A.,* 576 U.S. 743, 751 (2015) (quoting 42 U.S.C. § 7412(n)(1)(A)). The Court rejected

EPA's interpretation, which asserted that cost was irrelevant under this standard, and instead

held that EPA "must consider cost . . . before deciding whether regulation is appropriate and

necessary." *Id.* at 759.

While the Clean Air Act's "appropriate and necessary" standard may appear similar on its face to the "necessary and advisable" standard in Section 4(d) of the ESA, the language and context of the two statutes are substantially different. First, the Clean Air Act provision at issue in *Michigan* directs the EPA to conduct a study of hazardous emissions, and, after considering the results of such study, to issue regulations "only if" the agency finds it "appropriate and necessary." *Id.* at 752. In stark contrast, Section 4(d) of the ESA *requires* the Service to issue protective regulations that it deems necessary and advisable for the conservation of threatened species. 16 U.S.C. § 1533(d). The Clean Air Act provision at issue in *Michigan* was also part of three subparagraphs under a larger subsection governing regulation of power plants, one of which required the consideration of costs. *See Michigan,* 576 U.S. at 753. Section 4(d) of the ESA, however, does not reference costs, and the only provisions in Section 4 that do consider costs govern entirely different subjects. *See* 16 U.S.C. § 1533(b)(2) (procedures governing critical habitat); *id.* § 1533(f)(1)(B)(iii) (procedures governing recovery planning). And, as discussed above, the term "necessary and advisable" is modified by the phrase "to provide for the conservation of such species," whereas the term "appropriate and necessary" in the Clean Air Act provision at issue in *Michigan* is a standalone phrase. *See Michigan,* 576 U.S. at 753. Thus, the decision in *Michigan v. EPA* does not apply in the context of rules promulgated pursuant to Section 4(d) of the ESA.

**C.     Because the 4(d) Rule was coextensive with the listing rule, the Service could not consider costs when determining whether the 4(d) Rule was "necessary and advisable."**

Plaintiffs correctly acknowledge that the Service cannot consider costs when making a listing decision. Yet, Plaintiffs fail to acknowledge that, when promulgating a 4(d) rule

concurrently with a listing determination, the 4(d) rule is an extension of the listing process. As explained above, the Service promulgates 4(d) rules using the same "best available science" and analysis it relies upon to make a listing determination for that species. FWS18045. In 1982, when Congress amended the ESA to require the Service to make listing determinations "solely" on the basis of the best scientific and commercial data available, the legislative history indicated that Congress intended for this prohibition to be applied broadly. *See* H.R. Rep. No. 97-835, at 19 (1982) (Conference Report) (explaining the amendment was made to ensure that "decisions in *every phase of the process pertaining to the listing or delisting of species* are based solely upon biological criteria and to *prevent non-biological considerations from affecting such decisions*.") (emphasis added). This language in the legislative history applies equally to species listed as endangered and as threatened. Moreover, because a concurrent 4(d) rule is a necessary phase of the listing process to put in place protections for threatened species, the prohibition on consideration of costs must apply in that situation as well. FWS18013.

Further, throughout the legislative history of the ESA, Congress has made clear its intention that the Service take preventative action to protect species sooner rather than later. *Defs. of Wildlife v. Babbitt*, 958 F. Supp. 670, 680 (D.D.C. 1997) (citing *Leg. Hist.* at 204 (H.R. Rep. No. 412, 93d Cong., 1st Sess. 5 (1973)).[3] Because the ESA does not automatically extend protections for threatened species, the Service must accomplish this through finalizing 4(d) rules

---

[3] For example: "In the past, little action was taken until the situation became critical and the species was dangerously close to total extinction. This legislation provides us with the means of preventive action" (remarks of Rep. Clausen); "In approving this legislation, we will be giving authority for the inclusion of those species which . . . might be threatened by extinction in the near future. Such foresight will help avoid the regrettable plight of repairing damages already incurred. By heeding the warnings of possible extinction today, we will prevent tomorrow's crisis" (remarks of Rep. Gilman), *id.* at 205; "Sheer self-interest impels us to be cautious," and "the institutionalization of that caution lies at the heart of the [ESA]," *id.* at 144.

at the same time as a species' listing to ensure there are appropriate protections immediately upon listing to provide conservation for the species. *See* FWS17355 (4(d) Guidance). As applied here, the Service exercised its authority to promulgate regulations to conserve the Northern DPS concurrently with the listing decision. This concurrent 4(d) rule, which targets the same threats that warranted listing in the first instance, allowed the Service to establish protections specifically tailored to prevent further decline of the Northern DPS. FWS18045.

Because of the intertwined nature between the listing rule and the 4(d) Rule, it would be inconsistent with the ESA, if not impossible, for the Service to assess the costs of the 4(d) Rule separate from the species' listing. This is because costs associated with the decision to list a species are driven by the protections that the listing affords to the species. As a result, evaluating the costs of a particular 4(d) rule is tantamount to evaluating the costs of listing the species as threatened. Thus, to avoid introducing invalid considerations into the listing decision, in practice the Service works to separate listing decisions from any information about impacts or costs of that decision to ensure there is no conflict with the statutory requirement to make listing decisions solely on the basis of the best scientific and commercial data available. *See* 16 U.S.C. § 1533(a)(1), (b)(1)(A). This practice is especially important because, if an agency relies on factors that Congress has not intended it to consider, the agency's rule will be found to be arbitrary and capricious. *See Turtle Island Restoration Network v. U.S.  DOC*, 878 F.3d 725, 732-33 (9th Cir. 2017) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Accordingly, when the Service promulgates a 4(d) rule concurrently with a listing determination, the Service must do so solely based on the best available science, and thus cannot consider economic costs.

**VI.     Because assessing costs is prohibited, an RFA analysis was not required.**

For the reasons outlined above, the Service cannot consider economic costs when promulgating a 4(d) rule concurrently with a listing determination. To that end, because the basis for conducting an analysis pursuant to the RFA is a consideration of economic costs, the Service is prohibited from conducting such analysis. Thus, the RFA does not apply. Indeed, when Congress amended the ESA to require determinations requiring the status of species be made solely on the best available science, the accompanying Conference Report specifically states that the RFA "will not apply to any phase of the listing process." H.R. Rep. No. 97–835, at 20. Because developing a 4(d) rule was an integral phase of the listing process for the Northern DPS of the lesser prairie-chicken, the Service was not required to conduct an RFA analysis.

**VII.    The Service provided a rational explanation and considered all relevant factors.**

Finally, the 4(d) Rule meets the APA standard for reasoned decision-making. Plaintiffs' sole argument as to why the 4(d) Rule should be rendered "arbitrary and capricious" is that the Service did not consider the economic impacts of the rule. ECF No. 28 at 29. But, as outlined above, the statutory standard for promulgating 4(d) rules does not require consideration of costs, it only requires that the 4(d) Rule promote the conservation of the species. *See supra* Section IV. Thus, the Service need only "articulate a satisfactory explanation for its action" that is "based on a consideration of relevant factors" pursuant to its authority in Section 4(d). *See Motor Vehicle Mfrs Ass'n*, 463 U.S. at 43. In addition, this Circuit has held that the Service's explanation for promulgating a 4(d) rule that includes take prohibitions does not require a "showing" that the rule's take prohibitions will "operate to restore the species" because the ESA itself "simply presumes that prohibited takings will deplete the species." *Verity*, 853 F.2d at 333.

Here, the Service provided a thorough analysis of how each provision of the 4(d) Rule

directly promotes the conservation of the Northern DPS of the lesser prairie-chicken. While

Plaintiffs contend that the Service "simply assumed" the benefits of incorporating take

prohibitions into the rule, ECF No. 28 at 34, the 4(d) Rule clearly lays out a meticulous analysis

of how take prohibitions will directly address the primary threats to the species. *See* FWS18045.

Indeed, the Service determined that habitat loss and fragmentation are the primary threats to the

Northern DPS, and that because the majority of viable habitat is on privately owned land,

prohibiting take is fundamental to the species' conservation. *Id*. Yet even accepting Plaintiffs'

contention that the Service applied take prohibitions by "default," *Verity* clearly holds that this

approach still satisfies the APA's standard. *See* 853 F.2d at 333 ("[T]he record need only show

that [take prohibitions promulgated under Section 4(d)] do in fact prevent prohibited takings of

protected species.").

At any rate, the Service also carefully tailored the 4(d) Rule to provide exceptions to the

take prohibition for activities that promote the conservation of the species. *Id.* at FWS18045-48.

For example, the 4(d) Rule deliberately allows grazing activities that follow a management plan

developed by a Service-approved party because livestock grazing is "not inherently detrimental

to the lesser prairie-chicken," and in fact can be "an invaluable tool necessary for managing

healthy grasslands" when managed compatibly." FWS18046. The Service also exempted take

incidental to routine agricultural practices on cultivated land because, although not native habitat,

cropland can provide valuable food resources for lesser prairie-chickens part of the Northern

DPS. FWS18047. In crafting both these exceptions and the 4(d) Rule's take prohibitions, the

Service considered all factors relevant to the species' conservation and its decision is amply

supported by the text of the rule and the administrative record. Accordingly, the 4(d) Rule

satisfies the APA standard and should be upheld.

## CONCLUSION

As demonstrated above, the Service acted in accordance with the relevant statutory and regulatory authorities in issuing the 4(d) Rule for the Northen DPS of the lesser prairie-chicken. Thus, the Court should deny Plaintiffs' summary judgment motion and enter judgment in favor of Defendants.


Dated: May 17, 2024                       Respectfully Submitted,

                                          TODD KIM
                                          Assistant Attorney General
                                          S. JAY GOVINDAN
                                          Section Chief
                                          NICOLE SMITH
                                          Assistant Section Chief

                                          */s/ Bonnie Ballard*
                                          BONNIE BALLARD
                                          Trial Attorney, MD Bar No. 2211280027
                                          United States Department of Justice
                                          Environment & Natural Resources Division
                                          Wildlife & Marine Resources Section
                                          Ben Franklin Station
                                          P.O. Box 7611
                                          Washington, DC 20044-7611
                                          bonnie.m.ballard@usdoj.gov | (202) 305-1513
                                          Fax: (202) 305-0275


                                          *Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 17, 2024 I electronically filed the foregoing Unopposed

Motion For Extension of Time with the Clerk of the Court using the CM/ECF system, which will

send notification of this filing to the attorneys of record.


/s/ Bonnie Ballard
BONNIE BALLARD