**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION**

KANSAS NATURAL RESOURCE            )
COALITION, et al.,                 )
                                   )
    *Plaintiffs*,                   )
                                   )     No. 7:23-CV-00159-DC-RCG
    v.                             )
                                   )
UNITED STATES FISH AND WILDLIFE    )
SERVICE, et al.,                   )
                                   )
    *Defendants*.                   )

---

**PLAINTIFFS' COMBINED REPLY IN SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO
<u>DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................................... ii

INTRODUCTION ......................................................................................................... 1

ARGUMENT ................................................................................................................. 1

I.    Section 4(d) does not contain two independent grants of authority...................... 1

    A.  Ordinary principles of statutory interpretation demonstrate that
the two sentences of Section 4(d) must be read together ................................ 2

    B.  The Service's cited authority does not save its flawed statutory analysis ..................... 4

    C.  The Service's reading of Section 4(d) raises grave constitutional concerns ................ 6

II.   The Service was required to consider the costs of the 4(d) Rule ......................... 7

    A.  The phrase "necessary and advisable" requires the Secretary
to consider economic costs ........................................................................... 7

    B.  The Service is not precluded from considering the economic
costs of 4(d) rules ......................................................................................... 9

III.  The 4(d) Rule's effects are not as limited as the Service alleges....................... 12

IV.  The 4(d) Rule is arbitrary and capricious ......................................................... 14

CONCLUSION ............................................................................................................. 15

CERTIFICATE OF SERVICE ..................................................................................... 17

# TABLE OF AUTHORITIES

## Cases

*Alsea Valley All. v. Lautenbacher*,
　No. 06-6093-HO, 2007 WL 2344927 (D. Or. Aug. 14, 2007),
　*aff'd*, 319 F. App'x 588 (9th Cir. 2009) .................................................................4

*Biden v. Nebraska*,
　600 U.S. 482 (2023) ...............................................................................................10

*Boyd v. Carroll*,
　624 F.2d 730 (5th Cir. 1980) ...................................................................................2

*Cal. State Grange v. Nat'l Marine Fisheries Serv.*,
　620 F. Supp. 2d 1111 (E.D. Cal. 2008) .................................................................15

*Chamber of Commerce of United States of America v. U.S. Dep't of Labor*,
　885 F.3d 360 (5th Cir. 2018) ...................................................................................8

*Chevron, U.S.A., Inc. v. NRDC*,
　467 U.S. 837 (1984) .................................................................................................5

*Connecticut Nat'l Bank v. Germain*,
　503 U.S. 249 (1992) ...............................................................................................14

*Corley v. United States*,
　556 U.S. 303 (2009) .................................................................................................8

*Davis v. Michigan Dep't of Treasury*,
　489 U.S. 803 (1989) .................................................................................................3

*FEC v. Cruz*,
　596 U.S. 289 (2022) ...............................................................................................13

*Home Depot U.S.A., Inc. v. Jackson*,
　139 S. Ct. 1743 (2019) .............................................................................................3

*In re Nowlin*,
　576 F.3d 258 (5th Cir. 2009) ...................................................................................2

*In re Polar Bear Endangered Species Act Listing*,
　818 F. Supp. 2d 214 (D.D.C. 2011) .........................................................................5

*Inhabitants of Montclair Tp. v. Ramsdell*,
　107 U.S. (17 Otto) 147 (1883) .................................................................................4

*Inhance Techs., L.L.C. v. U.S. Env't Prot. Agency*,
　96 F.4th 888 (5th Cir. 2024) ....................................................................................7

*Jennings v. Rodriquez*,
   583 U.S. 281 (2018) ................................................................................................. 7

*Kisor v. Wilkie*,
   588 U.S. 558 (2019) ................................................................................................. 6

*Louisiana ex rel. Guste v. Verity*,
   853 F.2d 322 (5th Cir. 1988) .............................................................................. 4, 14

*La. Pub. Serv. Comm'n v. FCC*,
   476 U.S. 355 (1986) ............................................................................................ 10, 13

*Loper Bright Enters. v. Raimondo*,
   No. 22-1219, 2024 WL 3208360 (U.S. June 28, 2024) ...................................... 5-6

*Mackey v. Lanier Collection Agency & Service, Inc.*,
   486 U.S. 825 (1988) ................................................................................................. 4

*Maine Lobstermen's Ass'n v. NMFS*,
   70 F.4th 582 (D.C. Cir. 2023) ................................................................................ 11

*Martinez v. Mukasey*,
   519 F.3d 532 (5th Cir. 2008) ................................................................................... 3

*Mertens v. Hewitt Assocs.*,
   508 U.S. 248 (1993) ................................................................................................. 3

*Mexican Gulf Fishing Co. v. U.S. Dep't of Commerce*,
   60 F.4th 956 (5th Cir. 2023) ................................................................................. 8-9

*Michigan v. EPA*,
   576 U.S. 743 (2015) ............................................................................................. 7-8

*Miles v. Apex Marine Corp.*,
   498 U.S. 19 (1990) ................................................................................................... 8

*Moreland v. Federal Bureau of Prisons*,
   431 F.3d 180 (5th Cir. 2010) ................................................................................... 2

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ................................................................................................. 15

*Panama Refining Co. v. Ryan*,
   293 U.S. 388 (1935) ................................................................................................. 6

*Rodriguez v. United States*,
   480 U.S. 522 (1987) ............................................................................................... 11

*SAS Inst., Inc. v. Iancu*,
   138 S. Ct. 1348 (2018) ........................................................................................................4

*Sweet Home Chapter of Communities for a Greater Oregon v. Babbitt*,
   1 F.3d 1 (D.C. Cir. 1993) ...................................................................................................5

*Sweet Home Chapter of Communities for a Greater Oregon v. Lujan*,
   806 F. Supp. 279 (D.D.C. 1992) .......................................................................................15

*Trout Unlimited v. Lohn*,
   559 F.3d 946 (9th Cir. 2009) ....................................................................................... 14-15

*United States v. Koutsostamatis*,
   956 F.3d 301 (5th Cir. 2020) ............................................................................................3

*United States v. Menasche*,
   348 U.S. 528 (1955) ..........................................................................................................4

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
   570 U.S. 338 (2013) ..........................................................................................................4

*Utility Air Regul. Grp. v. EPA*,
   573 U.S. 302 (2014) ...................................................................................................11, 14

*Wash. Env't Council v. NMFS*,
   No. C00-1547R, 2002 WL 511479 (W.D. Wash. Feb. 27, 2002) ....................................5

*West Virginia v. EPA*,
   597 U.S. 697 (2022) ........................................................................................................13

## U.S. Constitution

U.S. Const. art. I ....................................................................................................................13

## Statutes

16 U.S.C. § 1531(b) ...............................................................................................................9

16 U.S.C. § 1533(a)(3)(A)(i) ..................................................................................................9

16 U.S.C. § 1533(b)(1)(A) ................................................................................................7, 10

16 U.S.C. § 1533(b)(2) ........................................................................................................ 7-8

16 U.S.C. § 1533(d) .............................................................................................................2, 9

16 U.S.C. § 1540(a) ...............................................................................................................12

16 U.S.C. § 1540(b) ...............................................................................................................12

16 U.S.C. § 1801(b) ...................................................................................................................9

16 U.S.C. § 1853(b)(14) ...........................................................................................................8

**Other Authorities**

88 Fed. Reg. 21,844 (Apr. 11, 2023) .......................................................................................10

89 Fed. Reg. 48,034 (June 4, 2024) .........................................................................................10

Gordon, Robert, *"Whatever the Cost" of the Endangered Species Act, It's Huge*,
    Competitive Enterprise Institute OnPoint No. 247, Competitive Enter. Inst.
    (Aug. 20, 2018), https://cei.org/studies/whatever-the-cost-of-the-endangered-
    species-act-its-huge/ ...........................................................................................................12

## INTRODUCTION

Plaintiffs Kansas Natural Resource Coalition, et al. (the "Counties and Private Landowners") offer the following combined reply in support of their Motion for Summary Judgment, ECF 28, and response to the Cross-Motion for Summary Judgment, ECF 29, of Defendants United States Fish and Wildlife Service, et al. (the "Service"). The Service's 4(d) Rule for the Northern distinct population segment of the lesser prairie-chicken is illegal for three reasons. First, a straightforward reading of the Endangered Species Act (ESA) confirms that Section 4(d) contains a single grant of authority for the Service to issue 4(d) Rules. Before issuing such a rule, the Service must determine that the rule is "necessary and advisable," which determination requires the consideration of costs. The Service violated the plain terms of the ESA by refusing to consider the economic costs of the 4(d) Rule here. Second, by refusing to consider these costs, the Service violated the principle of reasoned decision-making. And third, by refusing to consider costs, the Service did not comply with the Regulatory Flexibility Act.

In short, the Service's response is founded upon a flawed approach to statutory interpretation, proceeding from an incorrect presumption that the ESA is intrinsically cost-adverse. Because the Counties and Private Landowners are entitled to judgment as a matter of law, this Court should grant the Counties and Private Landowners' Motion for Summary Judgment, deny the Service's Cross-Motion for Summary Judgment, and vacate the 4(d) Rule for the lesser prairie-chicken.

## ARGUMENT

### I. Section 4(d) does not contain two independent grants of authority.

The Service's principal argument is that it did not have to make a "necessary and advisable" finding to support its 4(d) Rule for the lesser prairie-chicken because the ESA independently authorizes it to extend ESA Section 9's take prohibition to a threatened species. *See* ECF 29 at 13-

15. This is wrong. Not only does the Service's position rest on an interpretation of Section 4(d) that elevates policy over text, its adoption would raise substantial constitutional concerns.

### A. Ordinary principles of statutory interpretation demonstrate that the two sentences of Section 4(d) must be read together.

The Service's argument that it was not required to make a necessary and advisable finding for the lesser prairie-chicken—and therefore that the agency was not required to consider the economic costs of the 4(d) Rule—is not supported by the statutory text. Interpreting the ESA is just like interpreting any other statute, and "when interpreting a statute, we begin by examining its language." *In re Nowlin*, 576 F.3d 258, 261 (5th Cir. 2009). In relevant part, Section 4(d) of the ESA reads:

> Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species. The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under Section 1538(a)(1) of this title[.]

16 U.S.C. § 1533(d).

The first sentence makes clear that regulations for threatened species are limited to those the Secretary finds to be "necessary and advisable" to conserve the threatened species. The second sentence—on which the Service stakes its claim of authority—"cannot be read in isolation." *Boyd v. Carroll*, 624 F.2d 730, 733 (5th Cir. 1980). Even if standing alone the second sentence might suggest that the Secretary has authority to prohibit acts mentioned in Section 9 without reference to whether those prohibitions are "necessary and advisable" to conserve the lesser prairie-chicken, the second sentence of Section 4(d) cannot bear this meaning in context. *See Moreland v. Federal Bureau of Prisons*, 431 F.3d 180, 187-88 (5th Cir. 2010) (recognizing that where a provision read in isolation "could arguably mean" one of two things, the court should adopt the construction that is reasonable "in context"). When placed alongside Section 4(d)'s first sentence, the best reading

of the second sentence is that it gives a helpful example of the outer bounds of the Secretary's authority granted in the first sentence. Far from focusing on the first sentence at the expense of the second, *see* ECF 29 at 20, the Counties and Private Landowners' reading places both "in their context and with a view to their place in the overall statutory scheme." *Home Depot U.S.A., Inc. v. Jackson*, 139 S. Ct. 1743, 1748 (2019) (quoting *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989)); *see also* ECF 28 at 28-29. In short, the best reading of the statute indicates that the Secretary must justify all 4(d) Rules with a "necessary and advisable" determination. *See also* ECF 28 at 29.

Rather than analyzing the text, the Service's argument boils down to reliance on broad statements of purpose and legislative history. *See* ECF 29 at 23-24 (noting that when promulgating rules, "the Service is guided by the overall purpose of the ESA"). But "plain statutory language is the most instructive and reliable indicator of Congressional intent." *Martinez v. Mukasey*, 519 F.3d 532, 543 (5th Cir. 2008). And here, the plain statutory language of Section 4(d) shows that the grant of authority in the second sentence is tied to the "necessary and advisable" requirement in the first sentence. Suggesting that Section 4(d) should be read with a thumb on the scale to the ESA's overarching purpose ignores the principle that "vague notions of a statute's 'basic purpose' are inadequate to overcome the words of its text regarding the *specific* issue under consideration." *United States v. Koutsostamatis*, 956 F.3d 301, 310-11 (5th Cir. 2020) (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 261 (1993)) (internal quotation marks omitted). Here, the *specific issue* is whether the Service was required to determine that extending Section 9's take prohibition to the lesser prairie-chicken through the 4(d) rule was necessary and advisable. The plain text of Section 4(d) must govern that analysis.

In over-stressing the statute's broad purpose, the Service ignores better evidence of congressional intent—namely, Congress' decision to treat endangered and threatened species differently. Congress intentionally separated the protections afforded endangered species in Section 9 from those that may be extended to threatened species in Section 4(d). *See* ECF 28 at 13-14. And "'[j]ust as Congress' choice of words is presumed to be deliberate' and deserving of judicial respect, 'so too are its structural choices.'" *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013)). The Service's desire to override this structural choice would render Section 4(d) unnecessary. This Court should be "hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law." *Mackey v. Lanier Collection Agency & Service, Inc*., 486 U.S. 825, 837 (1988). *See also United States v. Menasche*, 348 U.S. 528, 538-39 (1955) ("It is our duty 'to give effect, if possible, to every clause and word of a statute.'") (quoting *Inhabitants of Montclair Tp. v. Ramsdell*, 107 U.S. (17 Otto) 147, 152 (1883)).

**B. The Service's cited authority does not save its flawed statutory analysis.**

The Service's authority for the proposition that Section 4(d) provides two separate grants of authority is unpersuasive.[1] ECF 29 at 19-21. At most, *Louisiana ex rel. Guste v. Verity*, 853 F.2d 322 (5th Cir. 1988), stands for the proposition that when issuing 4(d) rules, the Service is not required to prove that the regulations will increase a species' chance of survival. *Id.* at 333. And *Verity* did not distinguish between threatened and endangered species, limiting its probative value in a case like this one where that distinction is paramount. *See id.* at 325 (noting that there were five species of sea turtles at issue, but not separating the endangered species from the threatened

---

[1] *Alsea Valley All. v. Lautenbacher*, No. 06-6093-HO, 2007 WL 2344927 (D. Or. Aug. 14, 2007), *aff'd*, 319 F. App'x 588 (9th Cir. 2009), another case cited by the Service, did not even address the "necessary and advisable" language of Section 4(d).

species in the following legal analysis). And to the extent that *Washington Environmental Council v. National Marine Fisheries Service* is persuasive, that case supports the Counties and Private Landowners. *See Wash. Env't Council*, No. C00-1547R, 2002 WL 511479 (W.D. Wash. Feb. 27, 2002). There, the court upheld exceptions to take in a 4(d) rule for salmon. In reaching that decision, the court noted that the ESA grants the Secretary "broad discretion under § 4(d) to promulgate such rules as he deems necessary and advisable, which '*may*' include a take prohibition." *Id.* at *7. Far from adopting the Service's position that Section 4(d) includes two separate grants of authority, the district court there impliedly presumed that the Secretary's power referenced in Section 4(d)'s second sentence—which may include promulgating prohibitions on take—is tied to the first sentence's "necessary and advisable" language.

    The Service's remaining authority fares no better. *Sweet Home Chapter of Communities for a Greater Oregon v. Babbitt*, 1 F.3d 1 (D.C. Cir. 1993), and *In re Polar Bear Endangered Species Act Listing*, 818 F. Supp. 2d 214 (D.D.C. 2011), are not binding on this Court, and would not help the Service even if they were. Both cases reflexively deferred to the agency under *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984), and thus neither conducted a thorough statutory analysis of Section 4(d). *See Sweet Home*, 1 F.3d at 6 ("In light of the substantial deference we thus owe the agency under the principles of *Chevron*, we uphold the challenged regulation as a reasonable interpretation of the statute.") (citation omitted). *See also Polar Bear*, 818 F. Supp. 2d at 228 ("In accordance with controlling D.C. Circuit precedent [in *Sweet Home*], the Court must reject plaintiffs' plain-language reading of Section 4(d), and it finds that the statute is ambiguous on this point" (citing *Sweet Home*, 1 F.3d at 8 )). But "*Chevron* is overruled." *Loper Bright Enters. v. Raimondo*, No. 22-1219, 2024 WL 3208360, at *22 (U.S. June 28, 2024). Moreover, this Court should not rely on out-of-circuit decisions that did not utilize the entire

"interpretive toolkit, full of canons and tiebreaking rules, to reach a decision about the best and fairest reading of the law." *Kisor v. Wilkie*, 588 U.S. 558, 600 (2019) (Gorsuch, J., concurring). *Cf. Loper Bright Enters.*, 2024 WL 3208360, at *22 ("Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires."). After all, "in the business of statutory interpretation, if it [the reading of the statute] is not the best, it is not permissible." *Id.* at *16. Neither *Sweet Home* nor *Polar Bear* should guide this Court.

### C.  The Service's reading of Section 4(d) raises grave constitutional concerns.

The Service's reading of Section 4(d) also leads to a substantial nondelegation problem which this Court can and should avoid. The Service resists this conclusion, arguing that the statute provides an intelligible principle because it limits 4(d) prohibitions to those listed in Section 9 of the ESA. ECF 29 at 23-24. But this misses the point. The problem is not that the prohibitions in Section 9 are vague, but that the second sentence of Section 4(d), standing alone, provides no guidance about *when* Section 9's prohibitions may be applied to threatened species. ECF 28 at 30. It is this lack of guidance that causes the nondelegation problem. *See Panama Refining Co. v. Ryan*, 293 U.S. 388, 415 (1935) (invalidating a delegation that did "not state whether or in what circumstances or under what conditions" the President was to regulate).

The Service tries to infer an intelligible principle from the broad statutory purposes of the ESA. *See* ECF 29 at 23-24. But the Supreme Court rejected a similar argument in *Panama Refining. See Pan. Refining Co.*, 293 U.S. at 417-18 (The general statement of policy in the National Industrial Recovery Act "speaks in general terms of the conservation of natural resources, but it prescribes no policy for the achievement of that end. It is manifest that this broad outline is simply an introduction of the act, leaving the legislative policy as to particular subjects to be

declared and defined, if at all, by the subsequent sections."). Self-serving statements about the ESA's general purpose provide no intelligible principle sufficient to save the Service's reading of the statute. And because the Service's interpretation raises serious constitutional concerns, this Court should avoid adopting it. *See Inhance Techs., L.L.C. v. U.S. Env't Prot. Agency*, 96 F.4th 888, 893 (5th Cir. 2024) ("When statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems." (quoting *Jennings v. Rodriquez*, 583 U.S. 281, 286 (2018))).

## II.    The Service was required to consider the costs of the 4(d) Rule.

### A.   The phrase "necessary and advisable" requires the Secretary to consider economic costs.

The Service follows its strained reading of Section 4(d) with an equally implausible interpretation of the required "necessary and advisable" determination. As an initial matter, *Michigan v. EPA*, 576 U.S. 743 (2015), is more on point than the Service admits. ECF 29 at 30-31. To be sure, *Michigan* concerned a different statutory scheme. Yet the reasoning in that case is directly applicable here. Like the Clean Air Act in *Michigan*, the ESA also mentions costs in some sections and not others. *See, e.g.*, 16 U.S.C. § 1533(b)(1)(A) (detailing the basis for listing a species under the ESA and not mentioning economic costs); 16 U.S.C. § 1533(b)(2) (consideration of costs required when designating critical habitat for a listed species). And although the references to costs were closer in proximity to the subject provision in *Michigan*, the Supreme Court did not consider this dispositive. Instead, the Court thought it was "unreasonable to infer that, by expressly making cost[s] relevant to other decisions, the Act implicitly makes cost[s] irrelevant" to the subject section. *Michigan*, 576 U.S. at 755. The same can be said here—there is no reason to read a general aversion to the consideration of costs into Section 4(d) simply because other sections of the ESA

mention costs. Far from adding words to Section 4(d), *see* ECF 29 at 30, the Counties and Private Landowners' reading merely recognizes that Congress uses "distinct terms"—like necessary and advisable—"deliberately." *Corley v. United States*, 556 U.S. 303, 315 (2009).

Moreover, the language at issue here—"necessary and advisable"—is quite similar to the "appropriate and necessary" limitation construed in *Michigan*. The Fifth Circuit has recognized that "Congress is presumed to have acted against a background of shared understanding of the terms it uses in statutes." *Chamber of Commerce of United States of America v. U.S. Dep't of Labor*, 885 F.3d 360, 373 (5th Cir. 2018) ("We assume that Congress is aware of existing law when it passes legislation." (quoting *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990))). Though not identical, the similarities in these formulations outweigh the differences. While both phrases are "broad and all encompassing," that does not mean that they imply carte blanche authority to ignore relevant factors. As the Court recognized in *Michigan*, "the term ['appropriate and necessary'] plainly subsumes consideration of cost." 576 U.S. at 756.

The Service does not even address the Fifth Circuit cases that analyzed language that is quite similar to "necessary and advisable" under *Michigan*. ECF 28 at 32-33. *Mexican Gulf Fishing Company* is particularly instructive here. *See Mexican Gulf Fishing Co. v. U.S. Dep't of Commerce*, 60 F.4th 956 (5th Cir. 2023). That case, concerning the Magnuson-Stevens Fishery Conservation and Management Act (MSA), demonstrates that the *Michigan* principle—namely, language like "appropriate and necessary" requires the consideration of costs—is not unique to the Clean Air Act. Further, *Mexican Gulf Fishing* shows how *Michigan* applies to a conservation statute. Indeed, the similarity between the relevant provisions of the ESA and the MSA is striking. *Compare Mexican Gulf Fishing Co.*, 60 F.4th at 965 ("determined to be necessary and appropriate for the conservation and management of the fishery." (quoting 16 U.S.C. § 1853(b)(14))), *with* 16

U.S.C. § 1533(d) ("deems necessary and advisable to provide for the conservation of such species"). And like the ESA, the MSA contains a statement of purpose that concerns conservation. *Compare* 16 U.S.C. § 1531(b) (statement of purpose for the ESA), *with* 16 U.S.C. § 1801(b) (statement of purpose for the MSA). Despite this conservation orientation in the MSA, *Mexican Gulf Fishing* still determined that "the adjectives necessary and appropriate limit the authorization contained in this provision. . . . For this reason, the rule is authorized . . . only if it is necessary and appropriate, which at a minimum requires that its benefits reasonably outweigh its costs." 60 F.4th at 965. The same analysis applies here. The Service is wrong to disclaim any responsibility to consider costs under Section 4(d).

**B. The Service is not precluded from considering the economic costs of 4(d) rules.**

The Service then shifts to arguing that it *couldn't* have considered costs because the 4(d) rule was issued contemporaneously with the species' listing. ECF 29 at 31-33. This point is meritless. The Service routinely considers costs at the same time as listing a species. The ESA generally requires the Service to designate critical habitat at the same time as listing a species. *See* 16 U.S.C. § 1533(a)(3)(A)(i) ("The Secretary . . . to the maximum extent prudent and determinable—(i) shall, concurrently with making a determination under paragraph (1) that a species is an endangered or threatened species, designate any habitat of such species which is then considered to be critical habitat[.]"). Designation of critical habitat requires the consideration of costs. *See* 16 U.S.C. § 1533(b)(2) ("The Secretary shall designate critical habitat . . . on the basis of the best scientific data available and after taking into consideration the economic impact . . . of specifying any particular area as critical habitat."). If the Service is capable of separating listing a species (a process that forecloses the consideration of economic costs) from designating critical habitat (a process that requires such consideration), then there is no plausible reason the Service

9

cannot do the same when promulgating 4(d) rules. *See, e.g.*, 89 Fed. Reg. 48,034 (June 4, 2024) (final rule listing six species as either endangered or threatened, with an accompanying 4(d) rule, and designating critical habitat); 88 Fed. Reg. 21,844 (Apr. 11, 2023) (listing a species as threatened with a 4(d) rule, while also designating critical habitat). Simply put, the Service cannot collapse two distinct statutory actions—listing and issuing a 4(d) rule—to avoid considering costs merely because the actions may be done at the same time. *See, e.g.*, *Biden v. Nebraska*, 600 U.S. 482, 494 (2023) (Agencies are not permitted "rewrite [] statute[s] from the ground up."); *see also La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 376 (1986) ("As we so often admonish, only Congress can rewrite this statute."). And, as the above examples make clear, the Service has considered costs at the same time as *both* listing a species *and* issuing 4(d) rules.

Equally unpersuasive is the Service's argument that the structure, purpose, and legislative history of the ESA preclude the Service from considering the economic costs of the 4(d) Rule for the lesser prairie-chicken. ECF 29 at 28-30. The Service's argument rests upon the flawed premise that the ESA as a whole is averse to the consideration of costs. This goes too far. That some sections of the ESA—like the determination that a species meets the technical requirements for listing— do not require the consideration of costs does not mean that the entire scheme disfavors cost consideration. After all, economic costs may be irrelevant to some determinations, like whether a species is in fact threatened or endangered. *See* 16 U.S.C. § 1533(b)(1)(A) (instructing that the basis of the determination to list a species should be made "solely on the basis of the best scientific and commercial data available"). But that does not mean that economic costs are never relevant to determinations under the ESA, especially when the Service is exercising its discretion in a manner that substantially impairs the use of private property.

The Service again places far too much weight on the general purpose of the ESA. "[N]o legislation pursues its purposes at all costs." *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987) (per curiam). Indeed, the "necessary and advisable" limitation is a clear example of this, as it limits the Secretary's power to issue regulations that might otherwise further the ESA's purpose. Moreover, regardless of the ESA's general purpose, the Service may not read a "presumption in favor of the species" where Congress has directed it to consider other factors. *See Maine Lobstermen's Ass'n v. NMFS*, 70 F.4th 582, 595-96 (D.C. Cir. 2023) (construing Section 7's "not likely to jeopardize the continued existence" of a listed species and concluding that Section 7 does not have a "presumption in favor of the species" in part because "Congress did not want economic activity stopped in its tracks"). It is a "core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014).

Nor is the ESA's legislative history a license to ignore the requirement to consider costs. As discussed above, *see supra* Part II(A), the best reading of the statute is that the Service is required to consider the economic costs of 4(d) rules. "Legislative history therefore cannot bind the executive branch and compel a presumption in favor of the species not required by statute." *Maine Lobstermen's Ass'n*, 70 F.4th at 598.

Because the Service was not precluded from considering the costs of the 4(d) Rule for the lesser prairie-chicken, it was required to do an analysis under the Regulatory Flexibility Act (RFA). *See* ECF 28 at 39-40. The Service's only defense against the Counties and Landowners' claim that an RFA analysis was required is that such an analysis was impossible because the 4(d) Rule was issued contemporaneously with listing. Thus, if the Service is incorrect, then the RFA applies. And, as discussed more fully above, *see supra* Part I, the Service's position rests on

unsound statutory interpretation that this Court should reject. ECF 29 at 34. Nor does the legislative history relied on by the Service support its argument. *See id.* (referencing a conference report suggesting that listing of a species is not subject to the RFA). Section 4(d) rules are separate from listing decisions. The question here is not whether the listing of the lesser prairie-chicken was subject to the RFA, but whether the 4(d) Rule was. Because the Service was required to consider the costs of the 4(d) Rule for the lesser prairie-chicken, it also had to comply with the RFA.

### III.   The 4(d) Rule's effects are not as limited as the Service alleges.

The Service's attempts to downplay the significant effects of the 4(d) Rule are unpersuasive. ECF 29 at 16, 24-27. As an initial matter, the Service's assertion that the 4(d) Rule does not "require" landowners to conduct their operations with a grazing plan mistakenly assumes that landowners have a meaningful choice. But a grazing plan is necessary to avoid liability for take resulting from grazing activities. *See* FWS18045 (Final Rule). Proceeding without a grazing plan would leave the Counties and Private Landowners open to significant liability, including fines and imprisonment. *See* 16 U.S.C. § 1540(a)-(b). A choice between possible criminal penalties or obtaining a grazing plan is no real choice at all.

Nor does obtaining a Section 10 permit for take minimize the significant effects of the 4(d) Rule. Obtaining a Section 10 incidental take permit is no easy task. According to the Service's own 4(d) Guidance, a landowner must develop and submit a habitat conservation plan and possibly participate in compensatory mitigation to obtain a Section 10 permit. FWS17361 (4(d) Guidance). This process is time-consuming and expensive. *See* Robert Gordon, *"Whatever the Cost" of the Endangered Species Act, It's Huge*, Competitive Enterprise Institute OnPoint No. 247, Competitive Enter. Inst., at 9 (Aug. 20, 2018).[2] This additional regulatory burden exists only

---

[2] Available at https://cei.org/studies/whatever-the-cost-of-the-endangered-species-act-its-huge/.

because of the 4(d) Rule. Contrary to the Service's argument, the availability of Section 10 incidental take permits does not alleviate the significant burdens the 4(d) Rule imposes.

It is this substantial effect that renders the Service's attempt to avoid the major questions doctrine ineffective. To be sure, the 4(d) Rule is different in kind from the rule at issue in *West Virginia v. EPA*, 597 U.S. 697 (2022), but its effect is still significant. Most importantly, Congress—and Congress alone—has the power to make or change the law. *See* U.S. Const. art. I. An administrative agency, as a creature of the Executive Branch, has "'no power to act'—including under its regulations—unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (quoting *La. Pub. Serv. Comm'n*, 476 U.S. at 374). Thus, agency action must be tied to a clear congressional grant of authority. But here, the Service has disclaimed any requirement to abide by Congress's direction that a protective regulation under Section 4(d) be "necessary and advisable." The result is a 4(d) Rule that regulates and forbids a wide variety of normal land-use activities throughout a four-state region. ECF 28 at 38. Far from merely being the result of "broad" authority like the Service alleges, the 4(d) Rule is so untethered from its authorizing grant of authority that it assumes a broad power to regulate land use, something that has traditionally been the province of the states. *Id.* And the Service concedes that the 4(d) Rule will have an economic impact on landowners. ECF 29 at 26. Because there was no "clear congressional authorization" for the Service's action, and because the resulting 4(d) Rule has significant impacts, the major questions doctrine applies and, given the absence of any clear statement in the ESA supporting the Service's position, provides an independent reason to vacate the 4(d) Rule.

## IV.   The 4(d) Rule is arbitrary and capricious.

The Service's argument that the 4(d) Rule satisfies the "necessary and advisable" standard cannot be squared with the plain text of the ESA. As discussed above, the Service was required to consider the costs of the 4(d) Rule as part of its determination that the Rule is "necessary and advisable." *See supra* Part II(A). In response, the Service principally argue that the Service has "broad discretion to determine what it deems necessary and advisable." ECF 29 at 27. But the Service confuses broad discretion with a license to ignore plain statutory text. While the phrase "necessary and advisable" may be broad, it is not an invitation to rewrite Section 4(d). *See, e.g.*, *Utility Air Regul. Grp.*, 573 U.S. at 325 ("An agency has no power to 'tailor' legislation bureaucratic policy goals by rewriting unambiguous statutory terms."); *see also Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there."). And *Michigan* is clear that regardless of how broad the authority, standards like "necessary and advisable" require the consideration of costs. *See supra* Part II(A). *Cf. Verity*, 853 F.2d at 331 (suggesting that the consideration of costs may be considered in the ESA, and stating that the Court did "not mean to imply that economic impact can never be considered in determining whether a particular regulation promulgated under the ESA is arbitrary or capricious").

None of the out-of-circuit cases the Service cites change this analysis. The Service cites *Trout Unlimited v. Lohn*, 559 F.3d 946, 950 (9th Cir. 2009), for the proposition that "[a] threatened species . . . is subject to [the Service's] discretionary protection." ECF 29 at 27. This is true, but irrelevant. The Counties and Private Landowners do not dispute that the Service may extend

protections to threatened species; the issue instead is what is required to substantiate that decision.[3] If anything, *Trout Unlimited* is helpful to the Counties and Private Landowners. In the cited portions, the Ninth Circuit recognized that Congress intentionally structured the ESA to treat endangered and threatened species differently. *Trout Unlimited*, 559 F.3d at 950. Yet the Service's reading of Section 4(d) conflates the protections for endangered and threatened species. *See supra* Part I(A). *Sweet Home Chapter of Communities for a Greater Oregon v. Lujan*, 806 F. Supp. 279, 287 (D.D.C. 1992), is equally unpersuasive, as it suggests that the Service is not required to make a necessary and advisable determination when issuing Section 4(d) rules. This is contrary to the plain meaning of the statute. *See supra* Part I(A).

The Service also cannot plausibly allege that the 4(d) Rule "as a whole" satisfies the necessary and advisable standard. ECF 29 at 21-22. As already discussed, the "necessary and advisable" standard contemplates consideration of the economic impacts of the 4(d) Rule. *See supra* Part II(A). Because the Service has disavowed any obligation to consider the costs of the 4(d) Rule for the lesser prairie-chicken, the 4(d) Rule is arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (An agency acts arbitrarily and capriciously when it "entirely failed to consider an important aspect of the problem[.]").

## CONCLUSION

For the foregoing reasons, this Court should grant the Counties and Private Landowners' Motion for Summary Judgment and deny the Service's Cross-Motion for Summary Judgment. In doing so, it should vacate the 4(d) Rule, consistent with the default rule for unlawful agency action.

---

[3] *Cal. State Grange v. Nat'l Marine Fisheries Serv.*, 620 F. Supp. 2d 1111, 1200 (E.D. Cal. 2008), was offered for a similar reason and is unhelpful to the Service for the same reason as *Trout Unlimited*.

Respectfully submitted this 5th day of July, 2024.

*/s/ Paige E. Gilliard*

PAIGE E. GILLIARD
Cal. Bar No. 330051*
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
Telephone: (202) 888-6881
Facsimile: (916) 419-7747
Email: pgilliard@pacificlegal.org

CHARLES T. YATES
Cal. Bar No. 327704*
DAMIEN M. SCHIFF
Cal. Bar No. 235101*
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
Email: cyates@pacificlegal.org
Email: dschiff@pacificlegal.org

ERIN E. WILCOX
Cal. Bar No. 337427
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
Email: ewilcox@pacificlegal.org

*Pro Hac Vice*

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 5, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Western District of Texas by using the CM/ECF system, which will serve a copy of the same on the counsel of record.

*/s/ Paige E. Gilliard*
Paige E. Gilliard
*Attorney for Plaintiffs*