# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# MIDLAND/ODESSA DIVISION

|  |  |
|---|---|
| KANSAS NATURAL RESOURCE COALITION, et al., | )<br>)<br>) |
| *Plaintiffs*, | )<br>) No. 7:23-cv- 00159-DC-RCG |
| v. | )<br>) |
| UNITED STATES FISH AND WILDLIFE SERVICE, et al., | )<br>)<br>) |
| *Defendants*. | )<br>) |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT**

# Table of Contents

**INTRODUCTION** ................................................................................................................. 1

**ARGUMENT** ........................................................................................................................ 2

I.   Section 4(d) of the ESA grants the Service broad discretion to issue prohibitions against "take" to threatened species. ................................................................................................ 2

   A.   The plain language of Section 4(d) of the ESA clearly contains two separate grants of authority allowing the agency to develop prohibitions for threatened species separate from regulations that may be necessary and advisable to conserve the species. .............................. 2

   B.   The Service's reading of Section 4(d) does not raise constitutional concerns. .............. 7

      1.   The Service's reading of Section 4(d) does not conflict with the nondelegation doctrine. ................................................................................................................................ 7

      2.   The 4(d) Rule does not implicate the major questions doctrine. ............................... 9

II.  The phrase "necessary and advisable" in the ESA does not compel consideration of costs. 11

III. The Service was precluded from considering costs when it promulgated the 4(d) Rule concurrently with the listing decision for the Northern DPS of the lesser prairie-chicken. ...... 13

**CONCLUSION** ................................................................................................................. 15

## Table of Authorities

**STATUTES**

16 U.S.C. § 1531 .................................................................................................................. 9, 12

16 U.S.C. § 1533 ............................................................................................. 1, 2, 4, 6, 8, 11, 13, 14

16 U.S.C. § 1538 ..................................................................................................................... 4, 8

16 U.S.C. § 1801 ......................................................................................................................... 12

16 U.S.C. § 1802 ......................................................................................................................... 13

16 U.S.C. § 1851 ......................................................................................................................... 12

16 U.S.C. § 1853 ......................................................................................................................... 12

**CASES**

*10 Ring Precision, Inc. v. Jones*,
  722 F.3d 711 (5th Cir. 2013) ................................................................................................. 13

*Am. Power & Light Co. v. SEC*,
  329 U.S. 90 (1946) ............................................................................................................... 7, 9

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council*,
  467 U.S. 837 (1984) ................................................................................................................ 5

*ESA, Tennessee Valley Authority v. Hill*,
  437 U.S. 153 (1978) .............................................................................................................. 10

*Gundy v. United States*,
  588 U.S. 128 (2019) ........................................................................................................ 7, 8, 9

*Hibbs v. Winn*,
  542 U.S. 88 (2004) ................................................................................................................ 11

*Michigan v. EPA*
  576 U.S. 743 (2015) .............................................................................................................. 11

*Loper Bright Enterprises v. Raimondo*,
  144 S. Ct. 2244 (2024) ........................................................................................................ 5, 6

*Mexican Gulf Fishing Co. v. U.S. Department of Commerce*,
  60 F.4th 956 (5th Cir. 2023) ............................................................................................ 11, 12

*Mistretta v. United States*,
  488 U.S. 361 (1989) ............................................................................................................ 8, 9

*Panama Refining Co. v. Ryan*,
  293 U.S. 388 (1935) ............................................................................................................ 7, 8

*Rule Litigation*,
  818 F. Supp. 2d 214 (D.D.C. 2011) ....................................................................................... 5

*Russello v. United States*,
    464 U.S. 16 (1983) .................................................................................................... 3

*Sweet Home Chapter of Communities for a Greater Oregon v. Babbitt*,
    1 F.3d 1 (D.C. Cir. 1993) ...................................................................................... 5, 6

*La. ex rel. Guste v. Verity*,
    853 F.2d 322 (5th Cir. 1988) ................................................................................ 1, 5

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001) .................................................................................................... 3

*Turtle Island Restoration Network v. U.S. Dept' of Com.*,
    878 F.3d 725 (9th Cir. 2017) .................................................................................. 14

*United States v. Naftalin*,
    441 U.S. 768 (1979) .................................................................................................. 3

*Util. Air Regulatory Grp. v. EPA*,
    573 U.S. 302 (2014) ................................................................................................ 10

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ................................................................................................ 10

*White v. INS*,
    75 F.3d 213 (5th Cir. 1996) ...................................................................................... 3

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457–75 (2001) ............................................................................................ 8

# INTRODUCTION

The plain language of Section 4(d) of the Endangered Species Act ("ESA") is clear – the statute confers upon the United States Fish and Wildlife Service ("Service") two separate grants of authority to issue protective regulations to threatened species. As directed by Congress, the agency shall issue regulations "necessary and advisable to provide for the conservation of [a] species," 16 U.S.C. § 1533(d), and may also extend through regulation the prohibitions enumerated in Section 9 of the Act. That Section 4(d) provides two separate grants of authority is the best interpretation of the statute and is constitutionally sound. Yet, Plaintiffs continue to advance an interpretation of the statute that combines these two separate lines of authority into one. Such an interpretation is not supported by the text of the statute and has already been rejected by the Fifth Circuit. *La. ex rel. Guste v. Verity*, 853 F.2d 322, 332-33 & n.22 (5th Cir. 1988). Equally unsupported is Plaintiffs' argument that, for any regulation prohibiting "take" of the species, the Service must consider the economic cost of such action. As described below, the Service acted within its Congressionally delegated authority when it promulgated a rule that included "take" protections for the Northern Distinct Population Segment ("DPS") of the lesser prairie-chicken pursuant to Section 4(d) of the ESA (the "4(d) Rule"). Despite Plaintiffs' contentions, the Service's reading that Section 4(d) grants two separate grants of authority is the best interpretation of the statute and raises no constitutional issues. In addition, the Service considered all relevant factors and provided a rational explanation for its decisions in promulgating the 4(d) Rule as required by the Administrative Procedure Act ("APA"). Accordingly, the 4(d) Rule should be upheld and Plaintiffs' Motion for Summary Judgment should be denied.

# ARGUMENT

I.  **Section 4(d) of the ESA grants the Service broad discretion to issue prohibitions against "take" to threatened species.**

The Service acted within one of the two grants of discretionary authority conferred by Section 4(d) of the ESA when it promulgated a regulation establishing "take" prohibitions for the Northern DPS of the lesser prairie-chicken. Although Plaintiffs advocate for an interpretation of Section 4(d) that is limited to only a single grant of authority bound by economic considerations, ECF No. 31 at 3, the plain language of Section 4(d) shows that the statute expressly includes two separate grants of authority. The Service's reading is the best and long-standing interpretation of the statute and does not raise any constitutional issues.

A.  **The plain language of Section 4(d) of the ESA clearly contains two separate grants of authority allowing the agency to develop prohibitions for threatened species separate from regulations that may be necessary and advisable to conserve the species.**

As explained in the Service's opening brief, Congress's command to the Service in Section 4(d) of the ESA is clear: the agency shall issue regulations "necessary and advisable to provide for the conservation of [threatened species]" and also may extend the prohibitions enumerated in Section 9 of the Act. *See* ECF No. 29 at 13-15; 16 U.S.C. § 1533(d). This reading of Section 4(d) is the best interpretation of the plain statutory language – the first sentence requires the Secretary to "issue regulations as [she] deems necessary and advisable to provide for the conservation of [any threatened species]" and the second sentence provides that the Secretary "may by regulation prohibit with respect to any threatened species any act prohibited under [S]ection 1538(a)(1)" of the Act. 16 U.S.C. § 1533(d). While Section 4(d) uses the term "regulation" in both sentences, no part of the second sentence specifically references the regulations at issue in the first sentence. Instead, the subject of the second sentence is again "the Secretary." *See id.* Thus, the best reading of the "plain language" of the statute is not that

2

regulations necessary and advisable to conserve a species can merely include take prohibitions, but rather that the Secretary has a second grant of authority to, in her discretion, promulgate regulations that prohibit the taking of any threatened species of fish and wildlife. *See White v. INS*, 75 F.3d 213, 215 (5th Cir. 1996) ("[T]he plain language of the statute is the most reliable indicator of congressional intent.").

In contrast, Plaintiffs' sole argument that Section 4(d) contains only one grant of authority is that the two sentences within Section 4(d) are adjacent to each other and so they must be combined to confer a single grant of authority to the Service. ECF No. 31 at 2-3. While Plaintiffs contend that the second sentence should be read as "a helpful example of the outer bounds of the Secretary's authority granted in the first sentence," *id.* at 3, this argument runs afoul of a canon of statutory interpretation: that if Congress wanted the second sentence of Section 4(d) to be put forth as an example of a regulation described in the first sentence it "presumably would have done so expressly." *See Russello v. United States*, 464 U.S. 16, 23 (1983); *see also United States v. Naftalin*, 441 U.S. 768, 773 (1979) ("The short answer is that Congress did not write the statute that way."). Had Congress intended the second sentence to serve only as an example of the types of regulations the Secretary may issue under the authority conferred by the first sentence, Congress would have specifically stated that limit. Moreover, Plaintiffs' reading renders the second sentence of Section 4(d) superfluous – if, as Plaintiffs argue, Congress intended take protections to be merely a regulatory option to the Service when deciding what regulations are necessary and advisable for the conservation of threatened species, there would be no need for the addition of the second sentence. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon

the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.").

Equally unavailing is Plaintiffs' argument that the Service's interpretation would conflict with the structure of the ESA and Congress's intent to treat threatened and endangered species differently. *Cf.* ECF No. 31 at 4. To the contrary, the best reading of the statute as conferring two separate grants of authority, one mandatory and one permissive, more accurately captures Congress's intent. For example, unlike threatened species, the ESA *automatically* affords endangered species protections under Section 9 immediately upon their listing. *See* § 1538 (a)(1) (providing certain prohibitions "with respect to any endangered species"). Thus, Congress deliberately included Section 4(d) to grant the Service discretion to implement Section 9 protections for threatened species through regulation, rather than automatically through statute. Moreover, that the take provisions for endangered species are in a separate section of the statute (Section 9) does not defeat the fact that Congress unquestionably granted the Service discretion to extend protections to threatened species through regulation in Section 4(d). *See* 16 U.S.C. § 1533(d). Nor does it support Plaintiffs' argument that those protections may only be extended upon a finding that such regulations are "necessary and advisable to provide for the conservation" of the species. *Cf.* ECF No. 31 at 2-4. Accordingly, the Service's interpretation of its authority under Section 4(d) is consistent with the structure of the ESA.

While the Service's reading of Section 4(d) as the best interpretation of the statute is sufficiently supported through the plain language of the ESA's text and basic statutory interpretation principles, it is also supported by an array of cases that similarly held that Section 4(d) contains two separate grants of authority, including controlling caselaw in the Fifth Circuit. Plaintiffs attempt to sidestep Fifth Circuit precedent by arguing that *La. ex rel. Guste v. Verity* is

4

inapplicable because the court discusses both endangered and threatened species. ECF 31 at 4. Plaintiffs' argument is misleading, as the relevant analysis in *Verity* was narrowly focused on the authority conferred to the Secretary under Section 4(d) with respect to threatened species. With respect to the authority conferred upon the Secretary to act for the benefit of threatened species under the Act, the Court found that Section 4(d) conferred upon the Secretary the power to issue regulations to prohibit the taking of any threatened species "[i]n addition to [the] mandatory duty" to issue regulations necessary and advisable for the conservation of a threatened species. *Verity*, 853 F.2d at 332-33.

      Perhaps recognizing that controlling caselaw in this circuit supports the Service's interpretation of Section 4(d) as the best interpretation of the statute, Plaintiffs argue that this court should not consider other cited authority which also supports the Service's interpretation. ECF No. 31 at 5-6. The crux of Plaintiffs' argument is that because *Sweet Home Chapter of Communities for a Greater Oregon v. Babbitt*, 1 F.3d 1 (D.C. Cir. 1993) and *In re Polar Bear Endangered Species Act Listing & 4(d) Rule Litigation*, 818 F. Supp. 2d 214 (D.D.C. 2011) deferred to the agency under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984), those cases no longer merit any persuasive effect. *Id*. To be sure, on June 28, 2024, the Supreme Court issued its decision in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), overruling the deference framework of *Chevron,* 467 U.S. 837. *See Loper Bright*, 144 S. Ct. at 2254 (describing the *Chevron* analysis). While the Court overruled *Chevron*, it did "not call into question prior cases that relied on the *Chevron* framework," notwithstanding the Court's "change in interpretive methodology." *Id.* at 2273. Those cases' holdings that the agency actions in question were "lawful . . . are still subject to statutory *stare decisis*" and remain good law. *Id*. Moreover, "despite [the Court's] change in interpretive methodology . . . [m]ere reliance

on *Chevron* cannot constitute a 'special justification' for overruling such a holding." *Id.* (cleaned up). What is more, the court in *Sweet Home*, 1 F.3d 1 did not "reflexively defer[] to the agency" as Plaintiffs claim, ECF No. 31 at 5. Rather, the court analyzed the plain text of the statute, agreeing with the Service's reading that the two sentences represent separate grants of authority because "[o]nly the first sentence of [Section 4(d)] contains the 'necessary and advisable' language," which requires the Service to issue "whatever other regulations are 'necessary and advisable,' including regulations that impose protective measures *beyond* those contained in [Section 9]." *Sweet Home*, 1 F.3d 1 at 8. Thus, the court's holding in *Sweet Home* is still applicable here. In contrast, Plaintiffs offer no cases in support of their limited reading of Section 4(d). And while the agency's position on Section 4(d) is no longer entitled to deference, it is both considered and long-standing, and the Court in *Loper Bright* explained that "[c]areful attention to the judgment of the Executive Branch may help inform" a court in deciding whether an agency has acted within its statutory authority. *Loper Bright*, 144 S. Ct. at 2273; *see also id.* at 2260 (discussing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)).

  Finally, Plaintiffs attack the Service's reading of ESA Section 4(d) as based solely on the ESA's overall purpose and history and otherwise not supported by the statutory text. ECF No. 31 at 3. First, Plaintiffs ignore the Service's reasoned analysis of the statutory language. Second, this argument misconstrues the Service's interpretation as being limited to the ESA's purpose and legislative history. To the contrary, the Service's interpretation is based on the *plain text* of Section 4(d), which clearly contains two sentences that confer two separate grants of authority upon the agency, the first requiring the Secretary to "issue such regulations as [she] deems necessary and advisable to provide for the conservation of [any threatened species]" and the second providing that the Secretary "may by regulation prohibit with respect to any threatened

6

species any act prohibited under [Section 9] of [the Act]." 16 U.S.C. § 1533(d). Only in response to Plaintiffs' argument that reading the statute as providing two separate grants of authority would conflict with the nondelegation doctrine did the Service provide an overview of the purpose and context of the ESA. ECF No. 29 at 17-18. And while Plaintiffs assert that this analysis "over-stress[ed] the statute's broad purpose," ECF No. 31 at 4, the Supreme Court has consistently put forth this exercise as a basic canon of statutory interpretation. *See e.g.*, *Gundy v. United States*, 588 U.S. 128, 141 (2019) ("[B]eyond context and structure, the Court often looks to 'history [and] purpose' to divine the meaning of language.") (quoting *Maracich v. Spears*, 570 U.S. 48, 76 (2013)); *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 104 (1946) (holding that a statute's interpretation "derive[s] much meaningful content from the purpose of the Act, its factual background and the statutory context").

In sum, the Service's reading that Section 4(d) contains two separate grants of authority is supported by the text and structure of the ESA as well as by decisions in both the Fifth Circuit and the D.C. Circuit. Thus, the Service permissibly exercised its discretion when it issued take prohibitions in the 4(d) rule and was not required to make a determination that issuing these protections was "necessary and advisable."

### B. The Service's reading of Section 4(d) does not raise constitutional concerns.

#### 1. The Service's reading of Section 4(d) does not conflict with the nondelegation doctrine.

As explained above, the Service's reading of Section 4(d) is the best interpretation of the statute. Moreover, it does not conflict with the nondelegation doctrine as Plaintiffs allege. ECF No. 31 at 6. In putting forth this argument, Plaintiffs rely only on *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935), alleging that the Service's reading of Section 4(d) is similar to a statutory provision that gave the President the authority to regulate oil production in order to assure "fair

7

competition." ECF No. 31 at 6-7. But this comparison misses the mark. In *Panama Refining Co.*, the Court does not take issue with the challenged statute because the specific provision granting the President authority to regulate lacked specific criteria, but because *no* provision of the statute contained *any* definitions or prescribed policy that may have confined the President's discretion. *See* 293 U.S. at 417-18.

In contrast here, the second sentence of Section 4(d) of the ESA expressly states that the Service may issue prohibitions from Section 9 to threatened species. While Plaintiffs argue that this provision lacks guidance as to *when* Section 9's prohibitions are applied, this is a higher burden than the nondelegation doctrine requires. Congress need only articulate "an intelligible principle" to which the person or body authorized to exercise the delegated authority is directed to conform. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474–75 (2001). Congress's delegation to the Service of the discretionary authority to issue regulations extending take prohibitions to threatened species passes this relatively lenient standard. *See Mistretta v. United States,* 488 U.S. 361, 372 (1989) (recognizing that "in our increasingly complex society, . . . Congress simply cannot do its job absent an ability to delegate power under broad general directives").

First, the protections that the Service "may" promulgate are limited to those listed in Section 9 of the ESA. *See* 16 U.S.C. § 1538. In addition, with respect to *when* the Service may issue such protections, Section 4(d) only applies to species that the Service determines are threatened species, and making that determination requires a rigorous process that is confined to specific, detailed scientific criteria. *See id.* § 1533(a)(1) (detailing the criteria the Service must follow in making listing determinations). These requirements are in fact more strict than various statutory constraints of delegated authority that have been upheld by the Supreme Court as

constitutionally sound. *See, e.g.*, *Gundy,* 588 U.S. at 146 ("[W]e have over and over upheld even very broad delegations."); *Whitman*, 531 U.S. at 474-75 (outlining an array of statutes authorizing regulation based on broad and ambiguous language that the Supreme Court has upheld).

Further, Plaintiffs ignore the long-held principle that a statute's meaning should be considered in light of the "purpose of the [statute], its factual background[,] and the statutory context." *Am. Power & Light Co.* 329 U.S. at 104; ECF No. 29 at 17-18. Indeed, the Supreme Court has held that a statute's "statement of purpose" is an "'an appropriate guide' to the 'meaning of the [statute's] operative provisions'" even when it is "'located in the Act's preface' rather than 'tied' specifically to [the provision delegating authority]." *Gundy,* 588 U.S. at 142 (citations omitted). Thus, when considering the purpose of the statute, even a general legislative directive is a constitutionally sufficient delegation of power where Congress "clearly delineates the general policy, the public agency [that] is to apply it, and the boundaries of th[e] delegated authority." *Mistretta,* 488 U.S. at 372–73 (citation omitted).

Here, the ESA explicitly states that its purpose is to "provide a program for the conservation of [] endangered species and threatened species" and declares that agencies "shall utilize their authorities in furtherance of the purposes of [the ESA]." 16 U.S.C. § 1531(b), (c)(1). This purpose clearly serves as an appropriate guide to the operative provision of Section 4(d) that delegates authority to the Service to promulgate take protections to threatened species. Thus, the Service's reading of Section 4(d) does not conflict with the nondelegation doctrine.

### 2. The 4(d) Rule does not implicate the major questions doctrine.

Plaintiffs' arguments that the 4(d) Rule conflicts with the major questions doctrine are also unconvincing. First, Plaintiffs' assertion that the 4(d) Rule will have significant effects on

the local counties and private landowners, ECF No. 31 at 12-13, does not change the fact that such effects do not amount to the "extraordinary" economic and political impact that implicates the major questions doctrine. *See* ECF No. 29 at 19. Indeed, Plaintiffs admit that the 4(d) Rule is incomparable to the ones at issue in *West Virginia v. EPA*, 597 U.S. 697 (2022), but provide no examples of rules that *are* comparable and that conflict with the major questions doctrine. ECF No. 31 at 13. This is because no such rule exists; the Supreme Court has consistently held that, to implicate the major questions doctrine, a regulatory action's effects must be more than just significant to a specific region of the country, such as the 4(d) rule at issue here. Instead, an action must affect "a significant portion of the American economy" or "bring about an enormous and transformative expansion in [the Service's] regulatory authority." *See Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014) (citation omitted). The 4(d) Rule for the Northern DPS of the lesser prairie-chicken clearly falls outside the bounds of these requirements as it neither affects a significant portion of the entire economy nor is it an enormous expansion of the Service's regulatory authority. Rather, it is a narrowly tailored series of regulatory prohibitions designed to ensure the conservation of one species in a limited range.

  Even accepting Plaintiffs' apparent assertion that the 4(d) Rule's effects do amount to having an extraordinary economic and political impact, which it does not, Section 4(d) of the ESA provides clear congressional authorization to promulgate such a rule. *See* ECF No. 29 at 20. Far from being "untethered from its authorizing grant of authority" as Plaintiffs allege, ECF No. 31 at 13, Congress provided explicit direction that the Service may extend Section 9 protections to threatened species through rulemaking. Moreover, the Service's ability to promulgate Section 9 protections to threatened species is central to the ESA's purpose. *See* ECF No. 29 at 20. While Plaintiffs may not agree with Congress's intent to conserve protected species "whatever the cost"

in enacting the ESA, *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 184 (1978), they cannot refute the ESA's own statutory text, legislative history, and years of caselaw that support this reading of the ESA's plain intent. ECF No. 31 at 13. Accordingly, Congress granted the Service clear authority to extend Section 9 prohibitions to threatened species.

II.     **The phrase "necessary and advisable" in the ESA does not compel consideration of costs.**

Even if the Court accepted Plaintiffs' interpretation of Section 4(d), which it should not, the Section 4(d)'s use of the phrase "necessary and advisable" does not compel the Service to consider the cost of its 4(d) Rule. *Cf.* ECF No. 31 at 7. The fatal flaw in Plaintiffs' argument continues to be their failure to address the entire phrase at issue here, that "the Secretary shall issue such regulations as he deems necessary and advisable *to provide for the conservation of such species.*" 16 U.S.C. § 1533(d) (emphasis added). As Plaintiffs acknowledge, "Congress uses 'distinct terms' . . . 'deliberately.'" ECF No. 31 at 8 (quoting *Corley v. United States*, 556 U.S. 303, 315 (2009)). Yet their argument relies on a reading of the statute that ignores a crucial modifying phrase. And while the language Plaintiffs point to in *Michigan v. EPA*, 576 U.S. 743 (2015) may be similar to Section 4(d)'s language, Plaintiffs again cannot credibly argue that the reasoning in that case is "directly applicable here," ECF No. 31 at 7, when the "appropriate and necessary" phrase in that case is not modified by a subsequent clause like the phrase at issue in Section 4(d). Such arguments are circular at best and utterly fail to apply basic principles of statutory interpretation and thus the Court should not credit them. *See Hibbs v. Winn*, 542 U.S. 88, 101 (2004) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . ." (citation omitted)).

Plaintiffs' reliance on *Mexican Gulf Fishing Co. v. U.S. Department of Commerce*, 60 F.4th 956 (5th Cir. 2023) fares no better. The issue in that case was not, as Plaintiffs allege,

11

whether a statutory provision requires consideration of costs. Rather, the issue in that case involved whether the benefits of a specific requirement in a fishery management plan reasonably outweighed the costs pursuant to a provision in the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), a statute which requires fishery management plans to contain measures that are "necessary and appropriate for the conservation and management of the fishery." *Mexican Gulf Fishing Co.,* 60 F.4th at 965. The Government in that case had *already* included a cost analysis of the fishery management plan requirement in its final rule. *See id.* This is because the MSA's purpose includes fostering economic sustainability of marine fisheries. *See* 16 U.S.C. § 1801(a)(3) (finding that "[c]ommercial and recreational fishing constitutes a major source of employment and contributes significantly to the economy of the Nation"). The MSA also contains language throughout the statute that makes it clear that fishery management plans should be based in part on economic considerations. *See, e.g.*, *id.* § 1801(b)(5) (regional fishery management councils preparing fishery management plans must "take into account the social and economic needs of the States"); *id.* § 1851(a)(7) ("Conservation and management measures [in fishery management plans] shall, where practicable, minimize costs . . . ."). In contrast, the ESA's findings specifically emphasize harm to species from "economic growth and development untempered by adequate concern and conservation" and focus on the "esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people" of fish, wildlife, and plants, rather than their commercial value. *See* 16 U.S.C. § 1531(a)(1), (3).

     Moreover, while Plaintiffs claim that the specific MSA provision at issue in *Mexican Gulf Fishing Co.* bears a "striking" similarity to Section 4(d) of the ESA, ECF No. 31 at 8, Plaintiffs' argument again ignores the entire provision, which requires fishery management plan conservation measures to be "necessary and appropriate *for the conservation and management of*

12

*the fishery*." 16 U.S.C. § 1853(a)(1)(A) (emphasis added). The MSA defines "conservation and management" of a fishery to mean rules and regulations that are designed in part to assure that "a supply of food and other products may be taken . . . on a continuing basis." *Id.* § 1802(5)(B)(i). Thus, unlike the ESA, the MSA's "necessary and appropriate" provision specifically implicates cost considerations, and therefore *Mexican Gulf Fishing Co.* is inapplicable here.

To that end, the Service did not fail to consider "all relevant factors" as required by the APA because costs were not examined, as Plaintiffs' allege. *Cf.* ECF No. 31 at 14-15. Section 4(d) does not require the consideration of costs as explained above, so Plaintiffs' assertions are meritless. The APA standard requires the Service to "examine the relevant data and articulate a satisfactory explanation for its action." *10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 723 (5th Cir. 2013) (citation omitted). In promulgating the 4(d) Rule here, the Service summarized the relevant data it used as a basis for the rule and thoroughly explained how each provision of the Rule directly promotes the conservation of the Northern DPS of the lesser prairie-chicken. *See* FWS18045. Accordingly, the Service considered all relevant factors and, thus the 4(d) Rule satisfies the APA standard.

**III.** **The Service was precluded from considering costs when it promulgated the 4(d) Rule concurrently with the listing decision for the Northern DPS of the lesser prairie-chicken.**

Finally, while the Service was not required to consider costs when it promulgated the 4(d) Rule, the Service was also precluded from doing so for the specific 4(d) Rule at issue here. In issuing the 4(d) Rule, the Service exercised its authority to promulgate protections designed to conserve the Northern DPS concurrently with the listing decision in order to afford immediate protections to the species. FWS18045. While Plaintiffs are correct that the Service does often consider regulatory costs at the same time as listing a species when it concurrently designates

13

critical habitat, ECF No. 31 at 9, the economic costs of designating critical habitat are expressly required by the statute. 16 U.S.C. § 1533(b)(2). By contrast, as explained in the Service's opening brief and below, costs may not be considered as part of the listing process. *See* ECF No. 29 at 25-27. Here, the Service could not plausibly consider regulatory costs when promulgating the 4(d) Rule that accompanied the listing decision for the Northern DPS because the scientific basis informing the Service's decisions to target certain threats through the 4(d) Rule mirrored the same scientific basis that warranted listing of the species. FWS18045. Indeed, the listing process and the 4(d) Rule were coextensive, and it would not have been feasible to separate any costs of the 4(d) Rule from the listing process where consideration of costs is prohibited. As a result, while there are some instances where the Service can separate listing decisions from any information about impacts or costs when those listing decisions are concurrent with other regulations that may warrant cost considerations, here, the scientific basis and decision-making process for the 4(d) Rule and the listing decision are so intertwined that, in order to ensure there is no conflict with the statutory requirement to make listing decisions solely on the basis of the best scientific and commercial data available, the Service was altogether functionally precluded from considering costs. *See* 16 U.S.C. § 1533(a)(1), (b)(1)(A).

      While Plaintiffs acknowledge that cost considerations "may be irrelevant" to listing decisions, ECF No. 31 at 10, the text of the ESA actually goes much further than that, as it requires that listing decisions be made "solely" on the basis of the best scientific and commercial data available. 16 U.S.C. § 1533(b)(1)(A). Courts have routinely found rules related to listing, delisting, or reclassification of species to be arbitrary and capricious if it appears the Service may have analyzed factors outside of this standard. *See, e.g.*, *Turtle Island Restoration Network v. U.S. Dept' of Com.*, 878 F.3d 725, 732-33 (9th Cir. 2017). Thus, because the listing process and

the process of developing the 4(d) Rule for the Northern DPS of the lesser prairie-chicken were so intertwined that the scientific determinations underpinning the two regulations could not be practically separated, the Service was precluded from including a cost analysis in the 4(d) Rule in order to avoid introducing invalid considerations into the listing decision.

## CONCLUSION

For the foregoing reasons, the Court should uphold the 4(d) Rule for the Northern DPS of the lesser prairie-chicken.

Respectfully submitted,

Dated: September 13, 2024

TODD KIM
Assistant Attorney General
S. JAY GOVINDAN
Section Chief
NICOLE SMITH
Assistant Section Chief

 /s/ *Bonnie Ballard*
BONNIE BALLARD (MD Bar No. 22112800027)
Trial Attorney
United States Department of Justice
Environment & Natural Resources Division
150 M Street N.E.
Washington, D.C. 20002
Tel:  (202) 305-1513
bonnie.m.ballard@usdoj.gov

*Attorneys for Federal Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on September 13, 2024, I filed the foregoing using the Court's CM/ECF system, which will electronically serve all counsel of record registered to use the CM/ECF system.

/s/ *Bonnie Ballard*