IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION

| | | |
|---|---|---|
| **KANSAS NATURAL RESOURCE COALITION, et al.,** § § § | | |
| *Plaintiffs,* § | | |
| § | | |
| v. § | MO:23-CV-00159-DC | |
| § | | |
| **UNITED STATES FISH AND WILDLIFE SERVICE, et al.,** § § | | |
| *Defendants.* § | | |

# **ORDER**

The lesser prairie-chicken is a short, ground-dwelling grouse that prefers the openness of large native grasslands.[1] *Prefers* may be an understatement. By some accounts, the bird appears ill-equipped for life near trees, wind turbines, oil and gas related structures, electrical lines, and other tall man-made objects.[2] Between this height aversion and conversion of grassland into cropland, the species has fractured and scattered.[3] It now occupies only ten to twenty percent of its historical range.[4]

And there's very little direct Federal administration of the bird's habitat. While the Federal Government owns nearly twenty-eight percent of U.S. soil, most of it out West,[5]

---

[1] FWS17971.
[2] FWS17973.
[3] FWS17972.
[4] *Id.*
[5] Hanson, Laura A.; Vincent, Carol Hardy, FEDERAL LAND OWNERSHIP: OVERVIEW AND DATA, https://crsreports.congress.gov/product/pdf/R/R42346 (last visited March 12, 2025).

only three percent of it accounts for the bird's remaining grassland habitat.[6] So with no real oversight on that habitat, Fish and Wildlife[7] turned to the "pit bull" of environmental law[8]—the Endangered Species Act. On November 25, 2022, Fish and Wildlife listed the bird's Northern Distinct Population as threatened and simultaneously issued a 4(d) Rule regulating its *take*.[9]

Landowners and a coalition of counties now challenge Fish and Wildlife's 4(d) Rule and ask for a ruling on the core mechanism of the rule. They find themselves in a unique posture. While an endangered species may not be *taken*, full stop,[10] a threatened species does not enjoy protection unless and until a 4(d) Rule issues.[11] And it always issues. For most of ESA history, a threatened species enjoyed protection through a *blanket* 4(d) Rule which automatically applied prohibitions enumerated in Section 9 of the ESA[12] to any threatened

---

[6] ECF No. 29 at 13 ("Because nearly 97 percent of available grassland habitat is on privately-owned land, the majority of grasslands lack regulatory protective measures to help prevent their continued decline.").
[7] Which administers the Endangered Species Act on behalf of the Secretary of Interior.
[8] Timothy Egan, *Strongest U.S. Environment Law May Become Endangered Species*, N.Y. TIMES, May 26, 1992, at A-11.
[9] In another case before this Court, industry and state plaintiffs challenge the Southern Distinct Population's endangered status, arguing, among other things, that the decision-maker did not use the best scientific data available, that the listing decision was artificially broken out into a bifurcated process to hide agency decision-making in an earlier, data gathering process, and that the listing decision was made in bad faith. But that's a story for a different day.
[10] The ESA forbids the taking of an endangered species. 16 U.S.C. § 1532(19); 1532(a). Take means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." § 1532(19).
[11] 16 U.S.C. § 1533(d) ("Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species. The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under section 1538(a)(1) of this title . . .").
[12] 18 U.S.C. § 1538(a)(1).

2

species.[13] These blanket rules prohibited the take of all threatened species but allowed for a later species-by-species determination where Fish and Wildlife could revisit and relax prohibitions for a particular species through *special rules*.[14] As a result, those 4(d) Rule challenges under the blanket rule regime tend to highlight issues other than, or preliminary to, the underlying statutory mechanism.[15] Here, however, the 4(d) Rule promulgated during a brief window where the blanket rule was repealed by Fish and Wildlife.[16] Those additional blanket rule regime considerations have therefore been kicked aside.

---

[13] U.S. Fish and Wildlife Service, FREQUENTLY ASKED QUESTIONS FOR ENDANGERED SPECIES ACT REGULATION FINAL REVISIONS FOR SECTIONS 4 AND 7, 4 (2024), https://www.fws.gov/sites/default/files/documents/2024-03/frequently-asked-questions-revised-endangered-species-act-regulations-2024-03-28.pdf.

[14] *See* 50 C.F.R. § 17.31 (2018); U.S. Fish and Wildlife Service, SECTION 4(D) RULES: FREQUENTLY ASKED QUESTIONS, https://www.fws.gov/node/267756 (Last visited March 12, 2025) ("Why is the Service reinstating the 'blanket rules'?  It is more straightforward and transparent to have species-specific 4(d) rules in one place in the Code of Federal Regulations and 'blanket rule' protections described in another, as the Service had done for 40 years before September 26, 2019. This approach will result in less confusion, less duplication of regulatory text in the Code of Federal Regulations, a lower risk of error in transposing regulatory text, and reduced administrative costs associated with developing and publishing a rule in the Federal Register and Code of Federal Regulations. This is because whenever it's determined that the standard suite of protections is appropriate, the Service will not need to develop any additional regulatory text to codify a species-specific 4(d) rule.  Reinstating the 'blanket rule' option also ensures there is never a lapse in threatened species protections. If the Service does not promulgate a species-specific 4(d) rule at the time of listing, the 'blanket rule' protections will be in place to provide for the conservation of that threatened species. The Service is simply providing a streamlined option for protecting threatened species in situations in which they do not promulgate species-specific 4(d) rules.").

[15] *See, generally*, *Sweet Home Chapter of Communities for a Great Oregon v. Babbitt*, 1 F.3d 1, 5 (D.C. Cir. 1993), *opinion modified on reh'g*, 17 F.3d 1463 (D.C. Cir. 1994), *rev'd*, 515 U.S. 687 (1995).

[16] 84. Fed. Reg. 44,753 (Aug. 27, 2019).

So too has the deference given to agency interpretation of the ESA. Before *Loper Bright*,[17] courts deferred to the reasonable interpretation offered by Fish and Wildlife regarding Section 4(d)'s prohibition selection mechanism.[18] This means the parties' core arguments have not yet been interpreted by the courts.

Section 4(d), 16 U.S.C. § 1533(d), provides:

> **[Sentence One]** Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species.
>
> **[Sentence Two]** The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under [Section 9.]

Fish and Wildlife reads these two sentences as separate authorizations of power—in other words, Section 4(d) provides two paths. Fish and Wildlife may either (a) issue any prohibitions it likes so long as it conducts a necessary and advisable determination first, or

---

[17] *Loper Bright Enterprises v. Raimondo,* 603 U.S. 369 (2024).
[18] *Sweet Home*, 1 F.3d 1, 7–8 (D.C. Cir. 1993) (After earlier calling on its duties under *Chevron*, the D.C. Circuit acknowledged that Fish and Wildlife had provided a reasonable interpretation—"As appellees argue, however, there is a reasonable reading of § 1533(d) that would not require the FWS to issue formal 'necessary and advisable' findings when extending the prohibitions to threatened species. According to this interpretation, the two sentences of § 1533(d) represent separate grants of authority. The second sentence gives the FWS discretion to apply any or all of the § 1538(a)(1) prohibitions to threatened species without obligating it to support such actions with findings of necessity. Only the first sentence of § 1533(d) contains the 'necessary and advisable' language and mandates formal individualized findings. This sentence requires the FWS to issue whatever other regulations are 'necessary and advisable,' including regulations that impose protective measures beyond those contained in § 1538(a)(1)."); *see also In re Polar Bear Endangered Species Act Listing*, 818 F. Supp. 2d 214, 228, 229-30 & n. 14 (D.D.C. 2011) (recognizing *Chevron*'s requirement to defer and *Sweet Home*'s precedence—'In accordance with controlling D.C. Circuit precedent [in *Sweet Home*], the Court must reject plaintiffs' plain-language reading of Section 4(d), and it finds that the statute is ambiguous on this point'—before concluding that the "Service premised its Special Rule on a finding that the rule is necessary and advisable to provide for the conservation of the polar bear" despite the Service's counsel's "ad hoc" assertions otherwise, mooting the argument as a backstop.).

(b) select at its discretion a prohibition enumerated in Section 9, one pre-approved by Congress.[19] This is the same reading Fish and Wildlife offered courts before the Supreme Court rescinded *Chevron*, despite those out-of-district courts indicating with a heavy hand that they might otherwise reach a different conclusion.[20] This Court therefore, unconfined by *Chevron* deference, finds itself without direct precedent and without persuasive authority as to Section 4(d)'s Sentence One and Sentence Two.[21]

So unobstructed, the Court can now conduct straight ahead statutory interpretation. And Plaintiffs offer the correct reading. Sentence One and Two depend on one another. The first sentence requires a necessary and advisable determination for each prohibition. The second provides a list of regulations made available by Congress, suggestions of the outer bounds of the authority granted in the first sentence. Under this reading, both sentences require a necessary and advisable determination before issuing a 4(d) Rule.

That leaves one final question—does "necessary and advisable" require consideration of economic costs? Plaintiffs believe it does. Fish and Wildlife see no distinction between a listing decision, which cannot consider costs, and its 4(d) Rule, largely because they issued here at the same time.

Plaintiffs offer other theories as backstops. They range from major questions and non-delegation doctrines to whether the Regulatory Flexibility Act should have triggered

---

[19] ECF No. 29 at 20–21.
[20] *See supra* note 18.
[21] To be sure, the Fifth Circuit has brushed against the two-sentence issue before. But that case, *State of La., ex rel. Guste v. Verity*, 853 F.2d 322, 333 (5th Cir. 1988), concerned itself with whether these two sentences required a showing that "the prohibition will itself operate to restore the species to a level considered unendangered." *Id.* While *Verity* sets up a mandatory/discretionary distinction between the two sentences, it says nothing about how they should function—be it in concert or separately. *See id.*

cost benefit analysis. For the most part, the Court does not reach these additional theories. The record is too spare[22] and the briefing does not reveal the kind of impact one expects to find in a successful major questions challenge. The non-delegation doctrine is an argument dead on arrival until further notice from the higher courts that its test has returned to its original formulation.

All said, after considering the parties' briefing, oral argument, and the relevant law, the Court **GRANTS** summary judgment in Plaintiffs' favor[23] and **DENIES** Fish and Wildlife's cross-motion.[24] Fish and Wildlife failed to conduct the proper necessary and advisable considerations in issuing its 4(d) Rule by not considering economic costs.

## LEGAL STANDARD

The Administrative Procedure Act checks "administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices."[25] A court reviewing agency action under the APA "decide[s] all relevant questions of law, interpret[s] constitutional and statutory provisions, and determine[s] the meaning or applicability of the terms of an agency action."[26] And it must "hold unlawful and set aside

---

[22] Perhaps this is a function of the narrow nature of agency-supplied administrative record in a circumstance where no cost-benefit analysis has been required of the relevant agency. A plaintiff could presumably sneak in impact arguments and evidence through its briefing on standing, but it seems unlikely that the "right" plaintiff could ever be found to account for the major economic significance required to trigger the doctrine. It is possible that no major questions doctrine could ever be seriously raised in such a hamstringing unless the doctrine is truly of the "know it when you see it" variety. *United States Telecom Ass'n v. Fed. Commc'ns Comm'n*, 855 F.3d 381, 423 (D.C. Cir. 2017) (Kavanagh, J., dissenting).
[23] ECF No. 28.
[24] ECF No. 29.
[25] *Loper Bright,* 603 U.S. at 391 (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950)).
[26] 5 U.S.C. § 706.

6

agency action . . . not in accordance with law."[27] Courts no longer defer this "exclusively[] judicial function"[28] of review to reasonable interpretations offered by agencies.[29] Rather, courts "begin[] with the text,"[30] apply the familiar "fundamental canons of statutory construction" giving its words "their ordinary meaning at the time Congress enacted the statute,"[31] and examine "the language and design of the statute as a whole."[32]

Agencies and the judiciary therefore remain cabined by (or, return to) their recognized, individual competencies. Agencies give meaning to a particular statutory term only when so "expressly delegated" to do so by statute,[33] or "fill up the details" of a statutory scheme when given guardrails,[34] or "regulate subject to the limits imposed by a term or phrase that 'leaves agencies with flexibility,' such as 'appropriate' or 'reasonable.'"[35] The

---

[27] § 706(2)(A).
[28] *Loper Bright*, 603 U.S. at 392 (quoting *United States v. Am. Trucking Ass'ns*, 310 U.S. 534, 544 (1940)).
[29] *Id.* at 396 ("The deference that *Chevron* requires of courts reviewing agency action cannot be squared with the APA.").
[30] *Texas v. Becerra*, 739 F. Supp. 3d 522, 533 (E.D. Tex. 2024), *modified on reconsideration*, No. 6:24-CV-211-JDK, 2024 WL 4490621 (E.D. Tex. Aug. 30, 2024) (citing *Ross v. Blake*, 578 U.S. 632, 638 (2016), *United States v. Lauderdale Cnty., Mississippi*, 914 F.3d 960, 961 (5th Cir. 2019), and *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("[A] legislature says in a statute what it means and means in a statute what it says there.")).
[31] *Id.* (citing *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019), and ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 69–77 (2012) ("The ordinary-meaning rule is the most fundamental semantic rule of interpretation."), and *Loper Bright*, 603 U.S. at 400 ("[E]very statute's meaning is fixed at the time of enactment." (quoting *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018)))).
[32] *Id.* (citing *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988); and *Bustamante-Barrera v. Gonzales*, 447 F.3d 388, 397 (5th Cir. 2006) (Courts "must read the statute as a whole, so as to give effect to each of its provisions without rendering any language superfluous.").
[33] *Loper Bright*, 603 U.S. at 394 (quoting *Batterton v. Francis*, 432 U.S. 416, 425 (1977) (emphasis deleted).
[34] *Id.* at 395 (quoting *Wayman v. Southard*, 23 U.S. 1, 6 L. Ed. 253 (1825)).
[35] *Id.* (quoting *Michigan v. EPA*, 576 U.S. 743, 752 (2015)).

judiciary, on the other hand, does what it is asked to do routinely—interpret the law, most crucially when asked to resolve statutory ambiguities.[36]

## DISCUSSION

### I.   Statutory interpretation

Section 4 of the ESA directs the Secretary of the Interior, acting through Fish and Wildlife,[37] to determine whether any species should be listed as endangered or threatened.[38] A listing decision, whether it results in an endangered or threatened determination, must be made based on any of the following five factors:

> (A) the present or threatened destruction, modification, or curtailment of its habitat or range;
> (B) overutilization for commercial, recreational, scientific, or educational purposes;
> (C) disease or predation;
> (D) the inadequacy of existing regulatory mechanisms; or
> (E) other natural or manmade factors affecting its continued existence.

The ESA also specifies that a listing decision must be supported "solely on the basis of the best scientific and commercial data available."[39] It has become habit of some sister district courts and commentors to cite to a House Report to understand that a listing decision is a "biological, not an economic, question," and therefore cannot include consideration of economic costs.[40] The Supreme Court recognized a variety of this concept in the snail darter

---

[36] *Loper Bright*, 603 U.S. at 401. ("The very point of the traditional tools of statutory construction—the tools courts use every day—is to resolve statutory ambiguities. That is no less true when the ambiguity is about the scope of an agency's own power—perhaps the occasion on which abdication in favor of the agency is *least* appropriate.") (emphasis in original).
[37] 16 U.S.C. § 1532(15).
[38] § 1533(a).
[39] § 1533(b)(1)(A).
[40] *Gen. Land Off. of Texas v. United States Fish & Wildlife Serv.*, No. AU-17-CV-00538-SS, 2019 WL 1010688, at *10 (W.D. Tex. Feb. 6, 2019), *aff'd in part, vacated in part, rev'd in part sub nom.*

case.[41] Of course, whether a listing decision indeed is prohibited from taking in economic considerations is not at issue. On the one hand, both parties seem to agree that the Secretary cannot account for such costs in a listing decision. On the other, Plaintiffs challenge only the 4(d) Rule, not its underlying listing. That challenge presents itself in another case before this court as noted in footnote 10.

So once a species is determined threatened, the Secretary must issue a 4(d) Rule.[42] This means, other than to locate a 4(d) Rule in the greater statutory context,[43] the listing mechanism's only relevance here comes from Fish and Wildlife's dragging it in. Fish and Wildlife issued its final 4(d) Rule concurrent to its listing decision. It now seems to believe (1) its choice to do so permissibly collapses the two agency actions into one, and (2) the 4(d) Rule therefore suffers the same constraints against considering economic costs that the

---

*Gen. Land Off. v. United States Dep't of the Interior*, 947 F.3d 309 (5th Cir. 2020); *Nat'l Ass'n of Home Builders v. Norton*, No. CV 00-0903-PHX-SRB, 2003 WL 27384062, at *4 (D. Ariz. May 23, 2003); *New Mexico Cattle Growers' Ass'n v. United States Fish & Wildlife Serv.*, No. 21-CV-3263-ACR, 2024 WL 894911, at *2 (D.D.C. Feb. 28, 2024), *Safari Club Int'l v. Jewell*, 960 F. Supp. 2d 17, 30 (D.D.C. 2013); Robert Meltz, *Where The Wild Things Are: The Endangered Species Act And Private Property*, 24 ENVTL. L. 369, 373 (1994); Diana Kirchheim, *The Endangered Species Act: Does "Endangered" Refer To Species, Private Property Rights, The Act Itself, Or All Of The Above?*, 22 SEATTLE U. L. REV. 803, 816 (1999); Jason M. Patlis, *Paying Tribute to Joseph Heller with the Endangered Species Act: When Critical Habitat Isn't*, 20 STAN. ENVTL. L.J. 133, 158 (2001).

[41] *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978) (in the context of a species listed endangered, "[t]he plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost. This is reflected not only in the stated policies of the Act, but in literally every section of the statute.").

[42] 16 U.S.C. § 1533(d).

[43] *See Home Depot U. S. A., Inc. v. Jackson*, 587 U.S. 435, 441 (2019) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989))); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013) ("Just as Congress' choice of words is presumed to be deliberate, so too are its structural choices.").

listing decision does. This first point may well be efficiency of the proverbial sort.[44] But the second creates a foundational disagreement between the parties. The first hurdle is therefore whether a 4(d) Rule suffers the same constraints. It does not.

For one, each action springs from distinct statutory provisions.[45] While the ESA often cross-references other provisions, the text contains no cross-pollinating provision between the listing decision's standards and 4(d) Rule's standards.[46] Fish and Wildlife points to no provision whatsoever for such an understanding, let alone an understanding of one that could have received *Chevron* deference in an earlier era. And second, Fish and Wildlife's practice to issue a listing decision and 4(d) Rule concurrently does not somehow intertwine the two such that a 4(d) Rule is subsumed by a listing decision.[47] Put another way, a listing decision does not establish the universe within from which a 4(d) Rule must spring merely because Fish and Wildlife chooses to combine each action for, say, efficiency's sake. The text simply tells a different story.

"The appropriate starting point when interpreting any statute is its plain meaning."[48] With this principle in mind, the question becomes: What does a 4(d) Rule require? Section 4(d) states:

> Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species. The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under section [9,] 1538(a)(1) of this title[.][49]

---

[44] As in, killing two birds with one stone.
[45] *Compare* 16 U.S.C. § 1553(a) *with* § 1553(d).
[46] *See* ECF No. 29 at 31–33.
[47] *Id.*
[48] *Sample v. Morrison*, 406 F.3d 310, 312 (5th Cir. 2005).
[49] 16 U.S.C. § 1533(d).

Sentence one sets out a mandatory duty placed upon the Secretary. Once a species is listed as threatened, the Secretary "shall issue" regulations he first "deems necessary and advisable to provide for the conservation of that species." Sentence two gives the Secretary discretion and guidance—he "may by regulation prohibit with respect to any threatened species any act prohibited under section [9.]" The Fifth Circuit in *Verity* previously acknowledged, though with different issues before it, this mandatory/discretionary relationship.[50] *Verity* does not, however, describe how the two sentences should function together, other than that the discretionary duty in sentence two "supplements" the mandatory duty in sentence one.[51]

It stretches credulity to conclude that Congress intended sentence two's discretionary duty to swallow sentence one's mandatory duty, thus neutering it altogether. In capsule form, Fish and Wildlife contends that sentence two is a preapproved list of prohibitory regulations that the Secretary may select from, and in doing so may avoid the need to first make a necessary and advisable determination.[52] Each sentence provides a separate grant of authority with no reference toward one another, so the argument goes.[53] While perhaps a reasonable interpretation in the *Chevron* era, that reading requires making superfluous the mandatory duty in sentence one. And courts should "hesita[te] to adopt an interpretation of congressional enactment which renders superfluous another portion of that same law."[54]

---

[50] *Verity*, 853 F.2d at 333.
[51] *See id.*
[52] ECF No. 29 at 19–21, 31–33.
[53] *See id.*
[54] *Mackey v. Lanier Collection Agency & Service, Inc.*, 486 U.S. 825, 837 (1988).

Instead, Congress intended that a threatened species may be given the same prohibitions as an endangered species provided an extra step occurs. The Secretary first deems the regulation necessary and advisable under sentence one. He may then select from Section 9's prohibition menu or develop a prohibition off-menu. Sentence two then serves as (1) a reminder that a threatened species can enjoy the same protections as an endangered one after such a determination, and (2) suggests that a threatened species cannot enjoy protections greater than those automatically afforded to an endangered species, though in perhaps near infinite permutations.[55]

Despite Fish and Wildlife's protest that each sentence provides separate grants of power, the 4(d) Rule here did not issue through sentence two.[56] Rather, it declares on its face that the Secretary made a necessary and advisable determination:

> We find that the protections, prohibitions, and exceptions in this final rule as a whole satisfy the requirement in section 4(d) of the Act to issue regulations deemed necessary and advisable to provide for the conservation of the Northern DPS of the lesser prairie-chicken.[57]

Stranger still, it recites Plaintiffs' formulation:

> Section 4(d) requires the Secretary to issue such regulations as she deems necessary and advisable to provide for the conservation of each threatened species and authorizes the Secretary to include among those protective regulations any of the prohibitions that section 9(a)(2) of the Act prescribes for endangered species.[58]

---

[55] *See White v. I.N.S.*, 75 F.3d 213, 215 (5th Cir. 1996) ("[T]he plain language of the statute is the most reliable indicator of congressional intent.").
[56] FWS18045 (Final 4(d) Rule).
[57] *Id.*
[58] *Id.*

This Court, like its sister court in *In re Polar Bear*, must not take post hoc rationalizations from Government counsel too seriously.[59] So with no real sentence two issurue before it, the next hurdle presents itself.

What is a necessary and advisable determination, and does it include economic costs? First, a retracing of steps is necessary to describe what determination is not. As discussed above, nothing in the text tethers a 4(d) Rule to the same prohibition against economic cost consideration that a listing decision is afforded.[60] If Congress wanted to require the same limitation, surely it would have done so plainly.[61] And Fish and Wildlife's practice, along with its counsel's after the fact rationalizations, do nothing to clarify the text other than to highlight its own uncertainty about how the two sentences function. Recall also that Fish and Wildlife's longstanding practice was to issue blanket rules; this concurrent rule is not the norm.

*Conservation's* definition helps a little. The full phrase requires the Secretary to promulgate such rules as it deems "necessary and advisable to provide for the *conservation* of [the] species."[62] Conservation, defined elsewhere, means "all methods and procedures which are necessary to bring . . . threatened species to the point at which the measures provided

---

[59] *In re Polar Bear Endangered Species Act Listing & 4(d) Rule Litig.*, 818 F. Supp. 2d 214, 229 (D.D.C. 2011) ("However, this Court can only uphold an agency decision based on the grounds relied upon by the agency itself and not the *post hoc* rationalizations of agency counsel.") (citing *Burlington Truck Lines, Inc v. United States,* 371 U.S. 156, 168–69, (1962) ("[A] reviewing court . . . must judge the propriety of [agency] action solely by the grounds invoked by the agency.").
[60] It would appear that despite its proclamation, the snail darter case does not cast its shadow over every action taken under the ESA.
[61] *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001) (Congress does not, after all, "hide elephants in mouseholes.").
[62] §1533(d) (emphasis added).

pursuant to this chapter are no longer necessary."[63] But that context does less work than Fish and Wildlife might hope.[64] True, *necessary* aims at the goal of providing for the conservation of the threatened species. But *advisable* does something different. What? The parties don't say. Nor do they parse the phrase with any granularity. Perhaps "[o]ne does not need to open up a dictionary in order to realize the capaciousness of ['necessary and advisable']."[65]

A handful of other cases show that similar phrases require at least some attention to cost.[66] These cases provide the surest way forward. The Fifth Circuit has looked at *necessary and appropriate*, understanding these words "at a minimum require[] that [the rule's] benefits reasonably outweigh its costs."[67] And the Supreme Court has held that *appropriate and necessary* "requires at least some attention to cost. One would not say that it is even rational, never mind 'appropriate,' to impose billions of dollars in economic costs in return for a few dollars in health or environmental benefits."[68] While neither case contemplates a threatened species

---

[63] § 1532(3).
[64] ECF No. 29 at 29 ("As an initial matter, by focusing on only the phrase 'necessary and advisable' in the first sentence of Section 4(d), Plaintiffs' argument fails to analyze the full text of the statutory provision, which reads: 'Whenever any species is listed as a threatened species . . . the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species.' 16 U.S.C. § 1533(d) (emphasis added). While Plaintiffs focus only on the term 'necessary and advisable,' the inclusion of the phrase's subsequent modifier is crucial to analyzing its meaning because 'conservation' is defined elsewhere in the statute as 'all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary.' 16 U.S.C. § 1532(3). Taken together, the phrase means the Secretary must promulgate regulations that are necessary and advisable to bring the species to the point at which the ESA's restrictions are no longer necessary.").
[65] *Michigan v. E.P.A.*, 576 U.S. 743, 752 (2015).
[66] *See Michigan*, 576 U.S. at 751–52; *Mexican Gulf Fishing Co. v. U.S. Dep't of Commerce*, 60 F.4th 956, 965 (5th Cir. 2023).
[67] *Mexican Gulf Fishing*, 60 F.4th at 965.
[68] *Michigan*, 576 U.S. at 752.

14

or the ESA,[69] "Congress is presumed to have acted against a background of shared understanding of the terms it uses in statutes."[70] And *advisable* appears close enough as to be interchangeable with *appropriate* in this context. Merriam-Webster defines *advisable* as "fit to be advised or done; prudent."[71] It defines *appropriate* as "especially suitable or compatible; fitting.[72] Though the two are not perfect synonyms, the Court sees no reason not to view *advisable* as one of those "classic broad and all-encompassing term[s] that naturally and traditionally includes considerations of all the relevant factors . . . [weighing] benefits on the one hand and costs on the other."[73]

As observed earlier, the 4(d) Rule decision-making universe is not established by the constraints placed on the listing decision. While, as here, data supplying the listing decision supports the Secretary's choice of necessary prohibitions, that data does not check the advisability box. Such a determination requires consideration of costs. Because Fish and Wildlife failed to account for costs, to include cost of compliance,[74] it failed to consider the "all relevant factors" and ignored "important aspect[s] of the problem" before it.[75] For these reasons, the Court **VACATES** the 4(d) Rule.

---

[69] *See* ECF No. 29 at 30–31
[70] *Chamber of Commerce of United States of America v. U.S. Dep't of Labor*, 885 F.3d 360, 373 (5th Cir. 2018).
[71] ADVISABLE, Merriam-Webster, https://www.merriam-webster.com/dictionary/advisable (Last visited, March 19, 2025).
[72] APPROPRIATE, Merriam-Webster, https://www.merriam-webster.com/dictionary/appropriate (Last visited, March 19, 2025).
[73] *White Stallion Energy Ctr., LLC v. E.P.A.*, 748 F.3d 1222, 1266 (D.C. Cir. 2014) (concurrence of Kavanaugh, J.), *rev'd sub nom. Michigan v. E.P.A.*, 576 U.S. 743, 135 S. Ct. 2699, 192 L. Ed. 2d 674 (2015).
[74] *Mexican Gulf Fishing*, 60 F.4th at 966 (citing *Michigan*, 576 at 751.
[75] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 55 (1983).

**II.   Major questions, Nondelegation, and the RFA**

As stated in the introduction, Plaintiffs have not raised a significant enough impact concern to warrant close review under the major questions doctrine. That doctrine admonishes agency claims of broad authority to exercise powers of "vast economic and political significance" without "'clear authorization' for the power it claims."[76] The Court made inquiries about the alleged impact of Fish and Wildlife's 4(d) Rule at the summary judgment hearing and heard no answer that even whispers of a major question. By comparison, the Supreme Court in *West Virginia v. EPA* recently collected cases that triggered a major question concern:

> In *Brown & Williamson*, for instance, the Food and Drug Administration claimed that its authority over "drugs" and "devices" included the power to regulate, and even ban, tobacco products. We rejected that "expansive construction of the statute," concluding that "Congress could not have intended to delegate" such a sweeping and consequential authority "in so cryptic a fashion." In *Alabama Assn. of Realtors* v. *Department of Health and Human Servs.*, we concluded that the Centers for Disease Control and Prevention could not, under its authority to adopt measures "necessary to prevent the . . . spread of" disease, institute a nationwide eviction moratorium in response to the COVID–19 pandemic. We found the statute's language a "wafer-thin reed" on which to rest such a measure, given "the sheer scope of the CDC's claimed authority," its "unprecedented" nature, and the fact that Congress had failed to extend the moratorium after previously having done so.[77]

Plaintiffs ultimately brought too little in the way of the national impact contemplated by these cases. In any event, Plaintiffs' argument here is predicated on a finding that Fish and Wildlife need not consider costs. The Court has found that it does. The same is true of Plaintiffs' non-delegation doctrine argument. Little else need be said.

---

[76] *West Virginia v. U.S. Env't Prot. Agency*, 597 U.S. 697, 716, 723 (2022) (quoting *Util. Air Regul. Grp. v. U.S. Env't Prot. Agency*, 573 U.S. 302, 324 (2014)).
[77] *West Virginia*, 597 U.S. at 721–22 (2022) (internal citations omitted).

16

The Regulatory Flexibility Act is a different story. Plaintiffs argue that the RFA's requirement to prepare an initial regulatory flexibility analysis describing impacts on small entities and assessing less burdensome alternatives should have triggered.[78] Likewise, once Fish and Wildlife issued its final rule, it should have conducted final regulatory flexibility analysis.[79] Such analysis should have included, among other things, "a description of the steps the agency has taken to minimize the significant economic impact on small entities."[80] In the alternative, the agency head could have certified "that the rule will not, if promulgated, have a significant impact on a substantial number of small entities."[81]

Fish and Wildlife does not argue Plaintiffs aren't the sort of entities contemplated by the RFA. Nor does it argue that the RFA does not apply to the ESA whatsoever. Instead, it argues that a 4(d) Rule cannot consider costs because listing decisions cannot consider costs; therefore, the RFA is inapplicable.[82] As Plaintiffs correctly highlight, because Fish and Wildlife is required to consider costs, it must also comply with the RFA. Because the Court vacates the 4(d) Rule for the reasons stated in the first section, remand or deferring enforcement of the rule is unnecessary.[83]

---

[78] ECF No. 28 at 15, 18, 29; 5 U.S.C. § 601(3)(a).
[79] *Id.*
[80] § 604(a)(6).
[81] § 605(b).
[82] ECF No. 29 at 34.
[83] *See* § 611(4).

## CONCLUSION

For the above reasons, the Court **GRANTS** summary judgment in Plaintiffs' favor[84] and **DENIES** Fish and Wildlife's summary judgment motion.[85] The Court **ORDERS** that Fish and Wildlife's 4(d) Rule is **VACATED**.[86]

It is so **ORDERED**.

SIGNED this 29th day of March, 2025.

DAVID COUNTS
UNITED STATES DISTRICT JUDGE

---

[84] ECF No. 28.
[85] ECF No. 29.
[86] See 5 U.S.C. § 706(2) (a court "shall" "hold unlawful and set aside" unlawful agency action); *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022) ("The default rule is that vacatur is the appropriate remedy." (collecting cases)).